**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
**BUFFALO DIVISION**

---

**JOSEPH MILLER, individually and on behalf of his minor children attending an Amish school in Clymer and as a board member of that school; EZRA WENGERD, as representative of all Amish schools in the State of New York; JONAS SMUCKER, individually and on behalf of his minor children; DYGERT ROAD SCHOOL, PLEASANT VIEW SCHOOL a/k/a TWIN MOUNTAIN SCHOOL, SHADY LANE SCHOOL,**

*Plaintiffs,*

-against-

**DR. JAMES V. MCDONALD, in his official capacity as Commissioner of Health of the State of New York, and DR. BETTY A. ROSA, in her official capacity as Commissioner of Education of the State of New York,**

*Defendants.*

Civil Action No. _____

---

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The straightforward issue presented to this Court is whether the State of New York can force members of the Amish community to vaccinate their children as a condition of educating their children, while simultaneously allowing secular families to be exempt from the state's childhood vaccination requirements on medical grounds. Because this policy violates the United States Constitution, Plaintiffs request declaratory and injunctive relief.

1

Plaintiffs, by and through their attorneys for their complaint, against defendants, allege as follows:

## INTRODUCTION

1.      Members of the Amish faith "are religiously committed to living separately from the modern world. Maintaining that commitment is not easy. They grow their own food, tend their farms using pre-industrial equipment, and make their own clothes. In short, they lead lives of faith and self-reliance that have not altered in fundamentals for centuries." *Mast v Fillmore County*, 141 S. Ct. 2430, 2430 (2021) (internal quotations omitted). For the Amish, this "traditional way of life … is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." *Wisconsin v Yoder*, 406 US 205, 216 (1972). Recognizing this separate way of life, the Supreme Court has concluded they were entitled to exceptions to mandatory educational laws and even paying social security taxes. *Id.* at 216, 222.

2.      Plaintiffs are all sincere adherents to the Amish belief system, which includes educating their children in the Amish way, with Amish teachers, in Amish schools, on Amish owned property. Given their commitment to a century's old way of life, it is hardly surprising that many Amish maintain profound religious objections to vaccines. As such, Plaintiffs, who run these Amish schools, do not require proof of vaccination from students to attend school. According to Defendants, this violates N.Y. Public Health Law § 2164 (the "**Compulsory Vaccination Law**"), which requires a school to refuse admission to a child who has not obtained the list of vaccines dictated by the State.

3.      State authorities have refused to grant Plaintiffs a religious exemption to the Compulsory Vaccination Laws. Without that exemption, the State is barring the Amish children from attending school, and the New York Department of Health ("**DOH**") recently levied crippling

financial penalties against the Amish and their schools, with threats of considerably greater future fines.

4.     The refusal to provide the Amish religious exemptions when the state readily provides discretionary secular medical exemptions is unconstitutional under the First Amendment's Free Exercise Clause. The Supreme Court in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) made clear that where the government provides discretionary secular exemptions to a policy, the First Amendment demands that it also provide a religious exemption. In addition, the Compulsory Vaccination Law also violates Plaintiffs' well-established rights to control the upbringing and education of their children, their free speech rights, and their rights to freedom of association.

## JURISDICTION AND VENUE

5.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a). This action arises under the First Amendment to the United States Constitution.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this district.

7.     This Court has authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, implemented through Rule 57, Federal Rules of Civil Procedure.

## PARTIES

8.     Plaintiffs Dygert Road School, Pleasant View School a/k/a Twin Mountain School, and Shady Lane School (the "**three Amish schools**") are all Amish community schools that do not receive any public funding, are located within their respective Amish communities, and have received violations for refusing to require their students be injected with products that violate the religious beliefs of those running the school, the children attending the school, and the parents of

those children. The schools will imminently shutter their doors as the families who fund these schools cannot afford these fines, much less any impending substantial future fines, civil and other penalties, and resulting enforcement actions against their properties.

9.      Plaintiff Ezra Wengerd was elected by the Amish community as a representative of all Amish schools in the State to deal with issues with the State, and his role and function is to preserve and protect the religious beliefs of the Amish community, which have been fundamentally impinged by Defendants. Plaintiffs Jonas Smucker and Joe Miller are fathers of children who attend different Amish schools, and they are also both board members of their children's respective schools. Plaintiff Joe Miller and his children reside in Clymer, in Chautauqua County, and his children attend an Amish-run school in Chautauqua County.  Both Plaintiffs Smucker and Miller have sincerely held religious beliefs which do not permit them to inject into their children the products required by the Compulsory Vaccination Law. The religious beliefs of all these plaintiffs have been fundamentally impinged by Defendants, who are demanding that they, and others in their respective communities, surrender their sincerely held religious beliefs against injecting these products, or alternatively, surrender their religious beliefs in conducting group instruction of their children.

10.      Defendant Doctor James V. McDonald ("**Dr. McDonald**") is a party to this Action in his official capacity as the Commissioner of Health of the State of New York. Under New York law, Dr. McDonald is tasked with implementing and enforcing, and does implement and enforce, the immunization requirements of the Compulsory Vaccination Law for school-aged children, pursuant to the authority granted to him in N.Y. Public Health Law ("**PHL**") § 206(1)(f) and (4).

11.      Defendant Doctor Betty A. Rosa ("**Dr. Rosa**") is a party to this Action in her official capacity as the Commissioner of Education of the State of New York. Under New York

law, Dr. Rosa is empowered to adjudicate parental requests or appeals following exclusion from schools under N.Y. Educ. Law § 310, and is tasked with implementing and enforcing, and does implement and enforce, the mandatory educational instruction and supervision of school requirements pursuant to the authority granted to her in N.Y. Educational Law § 305(1) and (2).

## STATEMENT OF COMMON FACTS

**A.   Childhood Vaccination and Education in the Amish Community**

12.    The Amish are religiously committed to living separately from the modern world and have done so since prior to the founding of this country. Maintaining that commitment has entailed significant sacrifices, at least when viewed in contemporary terms. They grow their own food, tend their farms using pre-industrial equipment, make their own clothes, and educate their children pursuant to their clearly defined religious beliefs. They pursue a faith-based and self-reliant lifestyle that has "not altered in fundamentals for centuries." *Yoder*, 406 U. S. at 216-217.

13.    The Amish community's faith informs every aspect of their lives, including medical treatment and the education of their children. As part of their religious beliefs, Plaintiffs desire to have their children educated in their Amish community schools. Plaintiffs, alongside the majority of Amish parents in New York, also possess fervent religious objections to injecting their children with vaccines. The Compulsory Vaccination Law is in sharp conflict with their religious beliefs and their way of life.

14.    The Amish also vehemently object on religious grounds to the practice of abortion, which is inextricably intertwined with the development of many vaccines and the pharmaceutical industry in general. Plaintiffs and their community are aware of fetal cell involvement in medical research. It is commonly understood that several childhood vaccines were derived directly from aborted fetal cells or otherwise depend on these fetal cells for testing, design, and/or manufacture,

including the harvesting of organs and other body parts from numerous healthy fetuses while they were alive to then use to culture viruses.

15.     In New York, members of the Amish faith educate their children in accordance with their religious beliefs in religious schools, which provide both religious and secular education, and provide a setting for them to engage in daily prayer and worship with their peers. In the Amish community, education in a group setting, in matters both secular and religious, is a vital part of children's spiritual development.

16.     Because of the Compulsory Vaccination Law, it is illegal for Plaintiffs' unvaccinated children to become educated within their community under the tenants of their faith. New York has forced Plaintiffs to choose between competing aspects of their faith.

**B.     Background of Compulsory Vaccination in New York and the United States**

17.     New York law mandates that every parent or guardian have certain vaccines administered to their children. *See* PHL § 2164(2)(a). The statute prohibits school attendance absent receipt of these vaccines or a medical exemption granted at the discretion of a physician and subject to further review and approval from state authorities. *Id.* at § 2164(5), (7), and (8). The statute defines "school" broadly to mean "any public, private or parochial … school." *Id.* at § 2164(1)(a).

18.     Even though they do not accept public funds, are run entirely by the Amish community, and are located on community property, the one-room parochial schools Plaintiffs' children attend within the confines of their own community and without any state funding are still subject to New York's statutory scheme. *Id.* This scheme precludes children from gathering to learn, pray, and receive an education in these one-room settings, but does not prohibit them from

gathering in any other settings, including to play, attend church or barn raisings, or do communal chores.

19.     New York recognized a religious exemption until June 2019 when it repealed this exemption. Presently, forty-four states have legislation allowing school-age children to be exempt from mandatory vaccination laws for religious reasons, including the neighboring states of Pennsylvania, Ohio, New Jersey, Vermont, and Massachusetts.

20.     When justifying the 2019 legislative removal of New York's pre-existing religious exemption, the State senator sponsor of this legislation advised the public that the religious exemption had to be removed because a formal mechanism to evaluate and grant or deny religious exemption request was not something New York officials should be doing. The senator explained: "The goal should be to take religion out of the equation. . . . We can't put our public health officials or our school officials into that position of deciding if a religious belief is sincere or not. That is why we need to remove it altogether."

21.     In contrast, New York does have in place a process to evaluate and determine whether medical exemptions can be accepted or denied.

**C.     New York's Discretionary Medical Exemption Process**

22.     New York has instituted a discretionary exemption to the Compulsory Vaccination Law that benefits certain individuals (secular), and deliberately excludes others (non-secular). Students are not permitted to seek exemption from the required vaccines for religious reasons.

23.     In "Frequently Asked Questions" promulgated immediately after the legislative removal of the religious exemption, the Department of Health ("**DOH**") made clear that with regard to attending school, "Religious exemptions are no longer valid in New York State." However, students are permitted to seek a medical exemption from the required vaccines.

24.     The medical exemption scheme in New York is discretionary.

25.     New York gave school administrators and government officials broad latitude to accept or deny secular exemptions on an individualized basis. This process begins with a "signed, completed medical exemption form approved by the NYSDOH … from a physician licensed to practice medicine in New York State certifying that immunization may be detrimental to the child's health, containing sufficient information to identify a medical contraindication to a specific immunization" "consistent with ACIP guidance or other nationally recognized evidence-based standard of care" and "must be reissued annually." 10 NYCRR §§ 66-1.1(l) and 66-1.3(c) *implementing* N.Y. Pub. Health Law § 2164(8) ("If any physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable.") Meaning, through the plain language of the relevant statute, New York has implemented a discretionary review process whereby medical exemptions are approved or denied on an individualized basis, and in which New York has effectively outsourced this evaluation to medical doctors whom it licensed.

26.     While the plain language of the statute alone is sufficient to evidence that New York has instituted a medical exemption scheme that includes individualized assessment, the process includes even more discretion than what may be initially apparent. This is because each school official then possess enormous independent and personalized discretion to override a physician's discretionary recommendation, including the ability to require additional information and ultimately make the final discretionary decision to grant or deny a medical exemption. *Id*. In fact, this extraordinary latitude given to school administrators was recently challenged as *ultra vires* and unconstitutional, and New York vigorously defended its delegation of discretionary power to school officials and prevailed. *Goe v. Zucker*, 43 F.4th 19, 33 (2d Cir. 2022) ("New York

State law, as it has for decades, delegates to school officials the authority to grant a medical exemption from the State's school immunization requirements") (*citing* N.Y. Pub. Health Law § 2164(7)(a) and 10 NYCRR § 66-1.3(c)).

27.    This broad, multilayer discretionary process is why medical exemption rates vary wildly between New York schools. For example, for the 2021-22 school year, medical exemptions were granted to 50% of children attending A Plus Kidz Academy, 30% of children attending Duane Lake Academy, and 17% of children at the Marilyn David Girls Academy.[1] In contrast, schools in the same communities as these three schools recorded a zero percent medical exemption rate for the 2021-2022 school year, demonstrating that school administrators ultimately hold the power to press the red or green light on each medical exemption request.[2] Hence, it is the functional practice in New York to permit local government officials to "decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 141 S. Ct. at 1879.

28.    In sum, New York dictates what circumstances to consider when evaluating whether a child possesses a qualifying condition for a medical exemption, including on the DOH's medical exemption request form where physicians are instructed to refer to guidance issued by vaccine manufacturers and the CDC for valid exemption conditions.[3] Through the Medical Exemption Form, the DOH dictates what circumstances qualify for a medical exemption and, by omission, which circumstances do not. Thus to qualify for a medical exemption, the exemption must be: on a form issued by DOH or the Department of Education; signed by a physician licensed to practice medicine in New York state after such physician has conducted an individualized

---

[1] *See* https://health.data.ny.gov/Health/School-Immunization-Survey-Beginning-2012-13-Schoo/5pme-xbs5/data.

[2] *Id*.

[3] *See* https://www.health.ny.gov/forms/doh-5077.pdf ("Guidance for medical exemptions for vaccination can be obtained from the contraindications, indications, and precautions described in the vaccine manufacturers' package insert and by the most recent recommendations of the Advisory Committee on Immunization Practices (ACIP).. . . ").

assessment pursuant to the detailed guidelines and specifications from the DOH concerning what qualifies for a medical exemption and who then certifies that an immunization meets those DOH criteria; specify the length of time for which the immunization is medically contraindicated; and be accepted by the private or public institution to which it is being submitted. The institution may, pursuant to DOH guidelines, request additional supporting documentation and information for the medical exemption. If a medical exemption is granted, the student must re-apply for a medical exemption on an annual basis, whereby an individualized discretionary assessment is again conducted.

29.     New York has determined that medical exemptions are appropriate in the state and has implemented a discretionary review process by which schoolchildren who seek medical exemption to the Compulsory Vaccination Law have their situations reviewed and either approved or denied on an individual and granular level. A similar exemption process is unavailable to citizens with religious objections to compulsory vaccination.

**D.     New York Seeks to Compel Plaintiffs and Amish Schools to Violate Their Beliefs**

30.     Plaintiffs' Amish children attended school for years after the State repealed the religious exemption in June 2019, during which time the DOH took no action. In fact, the DOH only issued its first notice of violation against the Amish in March 2022, over two and a half years after repeal of the state's religious exemption, and only more recently assessed penalties. Plaintiffs' children attended school for this entire time period.

31.     In November and December 2021, the DOH "audited" the school records of the three Amish school plaintiffs.

32.     On March 11, 2022, the DOH mailed a Statement of Charges and Notice of Hearing to the three Amish school plaintiffs charging them with non-compliance with the Compulsory

Vaccination Law. *See* **Exhibit A**. Attached hereto as Exhibit A is a true and correct copy of the

Statement of Charges and Notice of Hearing issued to each of the three Schools.

33.     The Statement of Charges for each school included a single charge that provided

the Amish school was in violation of New York law for permitting:

> students [to] attend school in excess of fourteen (14) days from the
> initial date of such students' attendance during the 2021-2022
> school year without having on file: (1) a certificate of
> immunization…; and/or (2) documentation that the student is
> immune from the disease to the extent permitted by 10 NYCRR 66-
> 1.1(g); and/or (3) a signed medical exemption form approved by the
> Department and completed by a licensed physician or certified nurse
> practitioner in accordance with the requirements set forth in 10
> NYCRR 66-1.3, which much include information sufficient to
> identify a medical contradiction to a specific immunization and the
> length of time such immunization is medically contraindicated.

(Exhibit A).

34.     The Notice of Hearing instructed that a hearing would be held at 1 p.m. on May 2,

2022 at a specific location pursuant to the PHL on charges set forth in the Statement of Charges

and that civil penalties of up to $2,000 per violation could be imposed as well as such other action

that may be authorized by the PHL. *Id.* The Statement of Charges and the Notice of Violation were

signed by Susan G. Cartier, Esq., Acting Deputy General Counsel for the DOH's Division of Legal

Affairs. *Id.*

35.     Under PHL § 206(l), the DOH has been delegated authority to ensure that schools

throughout the state comply with the Compulsory Vaccination Law. Under this authority, the DOH

has issued regulations providing that violations of the Compulsory Vaccination Law are subject to

a civil penalty of up to $2,000 per violation. The DOH considers each student who is permitted to

attend school, each day, in violation of the requirement of PHL § 2164(7)(a) an independent basis

for a separate violation.

36.     On May 2, 2022, an administrative hearing was held with regard to the Statement of Charges and Notice of Violations at the Montgomery County Annex Building, Room 214, 20 Park Street, Fonda, New York. *See* **Exhibit B** which is a true and correct copy of the recording of the administrative hearing for the violations given to the three Amish schools.

37.     The Amish attended in-person while the Administrative Law Judge ("**ALJ**") Natalie J. Bordeaux, who oversaw the hearing, and the Department of Health attorneys appeared via WebEx Videoconference.

38.     In the hearing, Ezra Wengerd represented the schools and articulated his community's religious beliefs that preclude them from vaccinating their children, which all plaintiffs in this complaint agree with. He began by stating:

> First of all, I want to thank God for the freedom that we still have and ask his blessings concerning this hearing. It looks like we have representation here from at least three or four different Amish communities and two different Mennonite communities. We helped each other in getting this statement together that I am about to read.

(Exhibit B at 1:50:24.)

39.     Mr. Wengerd then proceeded to read the following statement:

1

In Reply why we are not in compliant with the NYS requirement of child hood vaccination

First of all, let us say, That we. As a peace buing Religious group, Are sincerely sorry that we are causing the state a prob.. We are indeed grateful to the state of N.Y. for the many priveleges, Freedoms, & protections they have blessed us with, for many years

As a religous group, with our Roots here in America since the late 1600s. We your humble subjects the old order Amish + Mennonite Community Churches will hereby give you part of our confession of faith

Our forefathers came to America for Freedom of religion in concerns of living A God Fearing life + bringing up our children in A way, to hope through salvation, An everlasting life in Eternity. To do this we need to put our full Trust in the Almighty God. As Proverbs 3:5 then in verse 6 we have the sure promise that he will direct our paths. Also in MARK 8:35 For who soever seeketh to save his life shall lose it. but who soever loses his life for my sake and the gospels, the same shall save it. Yes our Almighty God wants us to folly put our faith + Trust in Him. which is in conflict to put our trust in vaccines We are also commanded to not be conformed to this world. Romans 12-1-2. If we honestly obey this, then it will affect everything we do, yes even in the way we try to remain healty. Forcing us to Violate our Religios belief will create a conflict which has no solution. A Large percentage of the Amish + Mennonite Familys will choose other consequences before going against our Religios convictions

13

2

Also since some of the vaccines are based on fetal or aborted cell lines, we believe it would be an abomination to our Creator to inject such into our bodies

We the Amish & Mennonites our wondering & question why or how was the State able to take our Religious exemptions away, based on the Constitution in the First amendment. Also we are citizens of the U.S. as written in Amendment XIV ~ "nor shall any state deprive any person of life LIBERTY or property"

We the Amish & Mennonites have deep convictions. Our whole way of life is based on how we understand, and interpret the bible. It is our utmost desire to live a quiet peacefull undesturbed life and obey those in Authority over us. But once those laws are in conflict with what the bible teaches then we are commanded to obey God rather then MAN. Acts 5:29

In Previous years we were always able ∅ with the help of God to work out our differences with the state's or governments, concerning our schools churches etc.

Our Schools are church run, small 1 Room parochial schools We do not accept any state Aid for funding for our schools We plead with you & beg for pardon & grace with the Help of God, That you can again grant us our Freedom of Religion, for the exemption of immozization for our Children on Religious and Ethical grounds

We love our State of N.Y. & have no desire to move out ~ ~~the~~ , we beleive in working together and having our children together in a happy social life in our schools

HeRe   ARe   siGNATuRe's of the
3 School PAReNTS

Andy M Mast
Roman R Byler
Eli C. Miller
David S Mast
Christian M Yoder
Enos R Byler
Levi O Byler
Samuel J Byler
Jacob M Byler
Steve C. Byler
Rudy J Kurtz
Eli M Kuhns
Mahlon L. Byler
Harvey J Yoder

Jonas M Smucker
Aaron Miller
Ann J
Levi Blu
Amos Fisher
Elmer B Stoltzfus
Daniel J Esh
Eli S. Fisher
Steve M. Esh
A J
Melvin H. Stoltzfus
Linda S. Stoltzfus

*See* **Exhibit C** which is a true and correct copy of the statement submitted by the three Amish

schools on behalf of themselves and their communities at the hearing on May 2, 2022.

15

40.     Plaintiffs affirm this statement as reflecting their own religious beliefs that preclude them from vaccinating their children.

41.     Mr. Wengerd also affirmed that the Amish families in New York will choose prison time or a martyr's death before going against their convictions.

42.     During the hearing, Mr. Wengerd requested that the State recognize religious exemptions for its immunization requirements:

> Our schools are church run, small 1 room private schools. We do not accept any state aid for funding for our schools. We plead with you + beg for pardon + grace with the help of God, that you can again grant us our freedom of religious, for the exemption of immunization for our children on religious and ethical grounds.

*See* Exhibit C at 2.

43.     Vanessa Murphy, attorney for the DOH, explained in the Hearing "that there is no provision in the law that permits unvaccinated or non-immune students to attend school based on a non-medical exemption." *See* Exhibit B at 22:27. Plaintiffs' children, like most Amish children, do not have any medical condition that would qualify them for a medical exemption as they, for the most part, do not suffer from many of the medical conditions that plague children in non-Amish communities.

44.     Mr. Wengerd also emphasized that he believed that the penalized schools were arguably operating as "home schools" but the State did not agree with this position. *See* Exhibit C at 2 ("We think our schools are home schools. They are funded by ourselves, are on private land, and we have our own teachers.").

45.     Mr. Wengerd further highlighted that homeschooling each child individually was not a realistic option for the community (and indeed is not consistent with the faith principles of the community):

16

We love our state of N.Y. + have no desire to move out – home schooling is not an option, we believe in working together and having our children together in a happy social life in our schools.

*Id*.

46.     The DOH sought a $52,000 penalty against the Dygert Road School, representing the $2,000 maximum civil penalty for 26 students who were found to be non-compliant with the Compulsory Vaccination Law for one day. The DOH sought a $46,000 penalty against the Twin Mountains School, representing the $2,000 maximum civil penalty for 23 students who were found to be non-compliant with the Compulsory Vaccination Law for one day. The DOH sought a $20,000 penalty against the Shady Lane School on the grounds it was more probable than not that at least one student in attendance violated immunization requirements and would have attended the school for more than ten days, with each day of attendance constituting a separate violation.

47.     On May 25, 2022, ALJ Bordeaux issued her Report and Recommendation finding that all three schools had violated the Compulsory Vaccination Law and recommended that charges be sustained against each school; but because she found that the schools had not been given adequate notice of the state's immunization requirements, ALJ Bordeaux recommended that no penalties be imposed against any of the schools. *See* **Exhibit D** which is a true and correct copy of the Report and Recommendation of ALJ Bordeaux.

48.     ALJ Bordeaux also explained in her Report and Recommendation that the DOH charged that the three Schools "admitted students, and continued to allow such students to attend their schools … without documentation that the students were immunized against the disease delineated in the PHL § 2164 or medically exempt from the immunization requirements" and demanded the three Schools "immediately exclude [these] students" and provide the DOH "a written corrective action plan." *Id.* At 2-4.

49.     On June 21, 2022, the DOH, by its Senior Attorney, issued a report with its exceptions to the ALJ's Report and Recommendation. *See* **Exhibit E** which is a true and correct copy of the Department's Exceptions to the ALJ's Report and Recommendation.

50.     The DOH exceptions to the ALJ report explained that, "In 2019, the State legislature amended PHL § 2164 to remove the religious exemption, which means that medical exemptions are now the only exception to the school immunization documentation requirements set forth in the statute." *Id.* at 2. It further took exception with the "ALJ's recommendation that the that Respondents pay no penalty, despite the Respondents' admission that they violated the statute and their promise to continue violating the law of 'man' is in essence a recommendation for administrative nullification of a duly enacted law, in violation of the separation of powers doctrine inherent in the State Constitution." *Id.* at 2.

51.     The DOH further took exception with imposing no penalty because, "Respondents testified that they were aware of the requirements placed on them and made it clear that the matter could not be resolved with the Department because they have no intention of complying with the requirements." *Id.* at 3. The DOH further explained that if it fails to punish the Amish it "will send a clear message to the Respondents and every school in the State that violations of this type will not result in Department sanctions. A more direct disincentive towards statutory and regulatory compliance cannot be fathomed." *Id.* at 3.

52.     The DOH report also indicated it viewed its fine of over $100,000 as being lenient, apparently something the DOH is indicating it will not be the next time, because "the proposed fines [of over $100,000] represent one day of non-compliance, for each school, respectively." *Id.* at 14.

53.     Later in the report, the DOH again touted its reasonableness in imposing fines that Plaintiffs have no ability to pay, stating it "only recommended multiplying the maximum penalty ($2,000) by the number of students without adequate documentation on file for just one day of each schools' [sic] non-compliance with the law." *Id.* at 18. The DOH even claimed its "methodology was very generous to the Respondents" and that "the above proposed fines are conservative calculations for three respondent schools who were willfully noncompliant and promise to continue such noncompliance." *Id.* at 19.

54.     In an Order dated December 15, 2022, the DOH adopted ALJ Bordeaux's recommendation to sustain charges but rejected her recommendation that no penalties be imposed. *See* **Exhibit F** is a true and correct copy of the Order, dated December 15, 2022, of the DOH finding against the Amish and a cover letter sending the Order, dated December 20, 2022.

55.     The Order explained that, "Respondents testified that they were aware of the legal requirements but intend not to comply because of an irreconcilable conflict between their religious beliefs and PHL §2164" and that the "Department does not doubt the genuineness of the Respondents' religious assertions." *Id.* at 4. However, it explained that "the Legislature amended PHL § 2164 to remove the religious exemption, leaving medical exemptions as the only exception to the school immunization requirements in the statute." *Id.* at 4.

56.     The Order imposed a $52,000 penalty against Dygert Road School, a $46,000 penalty against Twin Mountains School, and a $20,000 penalty against Shady Lane School. *Id.* at 5-6.

57.     The cover letter sending a copy of the Order to Mr. Wengerd, as representative of the three schools, stated that the payment of the over $100,000 "civil penalty shall be made within thirty (30) days of the date of this letter" and that "Any civil penalty not paid by the date prescribed

herein shall be subject to all provisions of law relating to debt collection by the State of New York. This includes, but is not limited to, the imposition of interest, late payment charges and collection fees; and non-renewal of permits or licenses (Tax Law §171 (27); State Finance Law §18; CPLR §5001; Executive Law §32)." *Id.* at 1-2. Nevertheless, at present, there are no filed actions, administratively or in state court, against the Plaintiffs related to this matter, only the immediate threat of such action.

58. Because the schools are not publicly funded and have no reserve cash, they are unable to pay the penalties. Due to the crippling financial penalties that have been levied against them, and the threat of even larger penalties in the near future should the Amish continue to adhere to their sincerely held religious beliefs, these Amish schools will no longer be able to operate and the children that attend these schools will no longer receive the parochial education in a group setting that comports with their community's religious beliefs. In the same vein, if the schools shut down due to the actions of Defendants and the threats of future enforcement, the individual parent Plaintiffs would be subject to penalties and enforcement by Defendants due to the compulsory school attendance law. For the avoidance of all doubt, Plaintiffs do not, will not, and cannot comply with the Compulsory Vaccination Law and thus face the prospect of current and additional enforcement, while, for their parts, Defendants have demonstrated a zealous readiness and willingness to enforce that law against them, both in the past, and in the future.

**COUNT**
**42 U.S.C. § 1983**
**VIOLATION OF PLAINTIFFS' FIRST AMENDMENT FREE EXERCISE RIGHTS**

59. Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

60. The First Amendment of the U.S. Constitution provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The

Supreme Court recently reaffirmed that the Free Exercise Clause "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022) (*quoting Employment Div.* v. *Smith*, 494 U. S. 872, 877 (1990)). Defendants' actions threaten Plaintiffs' ability to "live out their faiths in daily life" by forcing them to compromise their strongly held religious objections to vaccination while permitting secular exemptions to these same requirements. The Compulsory Vaccination Law thus fails the general applicability and neutrality tests, and violates Plaintiffs' rights to free exercise, speech, and assembly, and to regulate their children's upbringing.

### *The Statute Is Not Generally Applicable*

61.     Strict scrutiny is triggered if the law in question is not generally applicable. A law is also not generally applicable where it invites the government to consider the particular reasons for a person's conduct by providing "a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1872.

62.     The Compulsory Vaccination Law fails the general applicability test because it allows discretionary medical exemptions, but prohibits a similar exemption process for those who, like Plaintiffs, possess sincerely held religious reasons for declining compulsory vaccination.

63.     In the wake of *Fulton*, federal courts around the country have reached the conclusion that the granting of medical exemptions to vaccination policies renders a law not generally applicable thus requiring strict scrutiny review of any refusal to grant a religious exemption.

64.     Here, the medical exemption scheme is discretionary. Through the plain language of the relevant statute, New York gave school administrators and government officials broad

latitude to accept or deny secular exemptions on an individualized basis. This process begins with a "signed, completed medical exemption form approved by the NYSDOH … from a physician licensed to practice medicine in New York State certifying that immunization may be detrimental to the child's health, containing sufficient information to identify a medical contraindication to a specific immunization" "consistent with ACIP guidance or other nationally recognized evidence-based standard of care" and "must be reissued annually." 10 NYCRR §§ 66-1.1(l) and 66-1.3(c) *implementing* N.Y. Pub. Health Law § 2164(8) ("If any physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable.") Each school official then possess enormous independent and personalized discretion to override a physician's discretionary recommendation, including the ability to require additional information and ultimately make the final discretionary decision to grant or deny a medical exemption. *Id*. In fact, this extraordinary latitude given to school administrators was recently challenged as *ultra vires* and unconstitutional, and New York vigorously defended its delegation of discretionary power to school officials and prevailed. *Goe v. Zucker*, 43 F.4th 19, 33 (2d Cir. 2022).

65.    This broad multilayer discretionary process is why medical exemption rates vary wildly between New York schools. For example, for the 2021-22 school year, medical exemptions were granted to 50% of children attending A Plus Kidz Academy, 30% of children attending Duane Lake Academy, and 17% of children at the Marilyn David Girls Academy. In contrast, schools in the same communities as these three schools recorded a zero percent medical exemption rate for the 2021-2022 school year, demonstrating that school administrators ultimately hold the power to press the red or green light on each medical exemption request. Hence, it is the functional practice in New York to permit local government officials to "decide which reasons for not complying with

the policy are worthy of solicitude." *Fulton*, 141 S. Ct. at 1879. This despite the fact that the secular and religious activity at issue here (*i.e.*, non-vaccination) are not only comparable, they are exactly the same.

66.     Indeed, Amish children and adults, irrespective of vaccination status, can still congregate at barn raisings, church, community festivals, and the innumerable events at which Amish communities and family congregate. Outside the context of the Amish community, there exist few if any restrictions on unvaccinated individuals congregating in almost any context, including malls, arenas, houses of worship, strip clubs, and casinos. Even students attending universities *must* be afforded a religious exemption under New York law. The Compulsory Vaccination Law also does not apply to adults, who comprise over 79% of New York's population. *See* https://www.census.gov/quickfacts/fact/table//PST04522.

67.     Even if the comparability analysis could somehow logically be confined to a school setting, New York permits unvaccinated individuals in the education system, including those with medical exemptions, teachers, administrators, maintenance staff, bus drivers, students over age 18, or any other unvaccinated adult or child who might visit a school. Further, the total number of unvaccinated children that attend schools in New York without a medical exemption is more than triple the entire Amish population in New York.[4] There are approximately 66,000 students without all mandated vaccines and without a medical exemption enrolled in New York schools (excluding

---

[4] The NYS Department of Health publishes immunization statistics for each school and the NYS Department of Education publishes enrollment statistics for each school. *See* https://health.data.ny.gov/Health/School-Immunization-Survey-Beginning-2012-13-Schoo/5pme-xbs5/data and https://data.nysed.gov/enrollment.php?year=2022&state=yes. Given differences in these datasets, around 60 percent of the students reflected in the DOE's enrollment data could be matched to the DOH's immunization data and, among these students, a total of 39,846 students did not have all mandated vaccines nor a medical exemption. *Id.* Extrapolating that number to all students, it appears approximately 66,000 students in New York are enrolled in school without required immunizations and without any medical exemption. That is more than triple the total Amish population in New York which is estimated at 21,000 souls, including children and adults.

Amish schools), while, in contrast, the entire Amish population in New York is only around 21,000.[5]

68.     The State's choice to permit discretionary medical exemptions while refusing to extend a religious exemption option to Plaintiffs means that N.Y. Pub. Health Law § 2164 is not generally applicable.

**The Statute and Its Enforcement Are Not Neutral**

69.     "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. 1868 at 1877.

70.     Since 1963, New York had a religious exemption to its Compulsory Vaccination Laws until it was repealed in 2019 when the State targeted religious adherents by eliminating that long-standing exemption while leaving the medical exemption process in place. State leaders spearheading the legislative removal of the religious exemption spoke openly about the need to eliminate any process for reviewing a religious exemption, explaining: "The goal should be to take religion out of the equation . . . . We can't put our public health officials or our school officials into that position of deciding if a religious belief is sincere or not. That is why we need to remove it altogether."

71.     And, not to be outdone, the enforcers of the statute were clear: On June 21, 2022, the DOH, by its Senior Attorney, issued a report with its exceptions to the ALJ's Report and Recommendation, explaining that, "In 2019, the State legislature amended PHL § 2164 to remove the religious exemption, which means that medical exemptions are now the only exception to the school immunization documentation requirements set forth in the statute." Exhibit E at 2. It also

---

[5] *Id.*

pushed for a significant penalty because "Respondents' admission that they violated the statute and their promise to continue violating the law of 'man' is in essence a recommendation for administrative nullification of a duly enacted law." *Id.* When the DOH finally issued its Order finding the Amish in violation and imposing over $100,000 in fines, it explained the "Department does not doubt the genuineness of the Respondents' religious assertions" but "the Legislature amended PHL § 2164 to remove the religious exemption, leaving medical exemptions as the only exception to the school immunization requirements in the statute" (Exhibit F at 2) and "Respondents testified that they were aware of the legal requirements but intend not to comply because of an irreconcilable conflict between their religious beliefs and PHL §2164." Exhibit E at 2. Moreover, here there are comparable secular activities (from a risk perspective) that are permitted, while religious exemptions are forbidden, which also undermines neutrality under *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

72.    The challenged statute and its enforcement are not neutral.

***The Statute Infringes on Other Constitutionally Protected Rights***

73.    In *Yoder*, 406 US at 234-35, the Supreme Court acknowledged that Free Exercise rights can overlap with and can be inherently intertwined with the right to make decisions regarding the upbringing of one's child as recognized in *Pierce v. Socy. of Sisters*, 268 U.S. 510 (1925). There, the Court reached this conclusion due to the Amish's "religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of … Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others." *Id.* at 235. In such circumstances, "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a reasonable relation to some purpose

within the competency of the State is required to sustain the validity of the State's requirement under the First Amendment" (*i.e.*, requires the application of strict scrutiny). *Yoder*, 406 U.S. at 233. *See also Smith*, 494 U.S. at 881-81 (acknowledging hybrid rights that triggered strict scrutiny).

74.     Here, the Compulsory Vaccination Law implicates Plaintiffs' right to free exercise as well as their rights to free speech, to associate, and to regulate the up bringing and education of their children. These provide independent reasons for strict scrutiny.

75.     The Amish "assert as an article of faith, that their religious beliefs and what we would today call 'life style' have not altered in fundamentals for centuries" and "[t]heir way of life in a church-oriented community, separated from the outside world and 'worldly' influences, … is a way inherently simple and uncomplicated, albeit difficult to preserve against the pressure to conform." *Yoder*, 406 U.S. at 217. Their system of communal education is a vital part of how they have successfully resisted these pressures to conform for centuries, and thereby preserved their religious beliefs. Their beliefs also consider abortion murder and aborted fetuses are inextricably intertwined with vaccine development, including that the harvesting of organs and other body parts from numerous healthy fetuses while alive occurred and that aborted fetal material are in the final formulation of many vaccines.

76.     Furthermore, as the Supreme Court acknowledged last year in *Kennedy*, "[w]here the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities," and further explaining:

> That the First Amendment doubly protects religious speech is no accident. It is a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent. "[I]n Anglo-American history, . . . government suppression of speech has

so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U. S. 753, 760, 115 S. Ct. 2440, 132 L. Ed. 2d 650 (1995).

142 S. Ct. at 2421.

77.     "As the Supreme Court has long recognized, even conduct can claim the protections of Free Speech where '[a]n intent to convey a particularized message [is] present, and . . . the likelihood [is] great that the message would be understood by those who viewed' or learned of the conduct." *New Hope Family Servs. v. Poole*, 966 F3d 145, 176 (2d Cir 2020) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). The Amish's chosen way of life, one that resists "pressure to conform," *Yoder*, 406 U.S. at 217, is a way the Amish express their religious beliefs, and communicate those beliefs to the outside world. Like choosing to use a horse and buggy, to wear certain dress, or to abstain from vaccinations, Plaintiffs are conveying the message that vaccination does not comport with their religious beliefs and way of life.

78.     Furthermore, "when government 'direct[ly] regulat[es] . . . speech' by mandating that persons explicitly agree with government policy on a particular matter, it 'plainly violate[s] the First Amendment.'" *New Hope*, 966 F.3d at 170 (quoting *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013)). In addition to parents, Plaintiffs also include the Amish school leaders who the Compulsory Vaccination Law deputizes to enforce the law by excluding children who have not received mandated vaccines. By mandating that these school leaders agree with the state's policy to either require vaccination or refuse admittance to a school, the Compulsory Vaccination Law compels speech that those Plaintiffs are opposed to on religious grounds. In so doing, the Compulsory Vaccination Law violate those Plaintiffs' free speech rights. *New Hope*, 966 F.3d at 170-71.

79.    The Supreme Court has also recognized a right of association to engage in protected activities, such as the exercise of religion. *New Hope*, 966 F.3d at 178. If Plaintiffs choose to vaccinate their children against their and their community's religious beliefs, they risk their association with their community; and by demanding that the school administrator Plaintiffs refuse admission to the unvaccinated, the Compulsory Vaccination Law makes association with those schools, and with those plaintiffs, "'less attractive' for those who would otherwise combine their voices with [theirs] in order to convey their shared beliefs and values more effectively." *Id.* at 179.

80.    The infringement of Plaintiffs' free exercise rights, coupled with infringement of their rights to educate, associate, and speak, involve hybrid rights that also trigger strict scrutiny under *Smith*, 494 U.S. at 881-882.

### *The Compulsory Vaccination Law Cannot Survive Strict Scrutiny*

81.    A law can "survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton,* 141 S. Ct. at 1881 (quoting *Church of Lukumi*, 508 U.S. at 546). The Supreme Court has made clear that, just because a law is intended to target infectious disease, strict scrutiny "is not watered down." *Tandon*, 141 S. Ct. 1294 at 1298. Even during an international pandemic, the Constitution is not suspended. *See Catholic Diocese v. Cuomo*, 141 S. Ct. at 66; *Tandon*, 141 S. Ct. 1294 at 1297.

### *New York Cannot Demonstrate its Interest is Sufficiently "Compelling"*

82.    Whatever interests New York may advance in support of its law, its interests are not so compelling as to prohibit secular exceptions. A law cannot be regarded as protecting an

interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.

83.     In the context of similar mandatory immunization requirements, courts across the country have rejected claims of a compelling interest to deny religious exemptions where the government grants secular medical exceptions to the otherwise mandatory immunization requirements.

84.     These decisions are consistent with the Supreme Court's reasoning that, where the government permits secular conduct that it asserts purportedly endangers public health, it cannot then credibly assert a compelling interest in regulating similar religious activity.

85.     Furthermore, Defendants cannot rely on a broad policy goal, but must demonstrate a compelling interest in denying a religious exemption to each specific Amish Plaintiff. In reviewing refusal of a religious exemption, courts cannot "rely on 'broadly formulated interests'"; instead "courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Fulton,* 141 S. Ct. at 1881. "The question, then, is not whether the [DOH] has a compelling interest in enforcing its" vaccination "policies generally, but whether it has such an interest in denying an exception to" each Amish plaintiff. *Id. see also Mast*, 141 S. Ct. at 2433; *Gonzales*, 546 U.S. at 431 ("In *Yoder* … [w]e recognized that the State had a 'paramount' interest in education, but held that 'despite its admitted validity in the generality of cases, we must searchingly examine the interests that the State seeks to promote . . . and the impediment to those objectives that would flow from recognizing *the claimed Amish exemption*.'") (emphasis in original).

86.     Thus, Defendants bear "the burden of presenting a 'compelling reason why' [they] cannot offer the Amish this same" exemption for religious purposes that they offer to thousands of people for secular purposes. *Mast*, 141 S. Ct. at 2433. Defendants cannot meet this burden.

87.     Nor will persecuting the Amish be likely to lead to additional vaccinations. Their "traditional way of life … is not merely a matter of personal preference, but one of deep religious conviction." *Yoder*, 406 U.S. at 216. That way of life includes rejecting abortion. As explained by Plaintiff Ezra Wengerd, the Amish "will choose prison time or a martyr's death before going against their convictions." This is not exaggerated rhetoric. The Amish have shown a willingness over the years to accept even jail time rather than compromise their religious beliefs, such as when Kentucky and Ohio tried to mandate the use of bright reflective triangles on Amish buggies, or when Pennsylvania tried to force the Amish to send their children to secular schools or bring outhouses into compliance with state sewage laws.[6] Here, the DOH imposed ruinous financial penalties against the Amish for exercising their religious beliefs, and has threatened even greater penalties, but the Amish have held fast to their beliefs.

88.     That is the very nature of sincerely held religious beliefs. No amount of state pressure is going to cause the Amish to violate their beliefs and thereby endanger their immortal souls. Hence, the only thing forcing compliance with the instant law will accomplish is to terminate Plaintiffs' ability to collectively educate their children in a way that comports with their religious beliefs.

---

[6] *Amish Buggy Light Law Violators Go To Jail In April*, Amish America (Jan 13, 2023) ("The Amish here told the judge they **prefer** jail to paying fines for violating Ohio's new buggy lighting law.") *available at* https://amishamerica.com/amish-buggy-light-law-violators-to-prison-april/; Bruce Bonta, *Amish Men Begin Serving Jail Sentences*, UNC Greensboro (Sept. 22, 2011) *available at* https://peacefulsocieties.uncg.edu/2011/09/22/amish-men-begin-serving-jail-sentences/; Bill Uhrich, *Amish men jailed in 1960 for not sending children to school*, Reading Eagle (Sept. 13, 2015) *available at* https://www.readingeagle.com/2015/09/13/bill-uhrich-amish-men-jailed-in-1960-for-not-sending-children-to-school/; Associated Press, *Amish farmer gets jail in outhouse dispute* , NBC News (March 17, 2009) *available at* https://www.nbcnews.com/id/wbna29742577.

89.     It is telling that New York's purported concern for public safety is only urgent when it seeks to eradicate religious observance related to mandatory vaccination for school. In that arena, the State has pursued its claimed public health goals with a punitive and religious fervor. In contrast, in all other contexts, the State is disinterested in the purported threats posed by being unvaccinated, including in virtually every other area of life, nor the over 66,000 children enrolled in school without required vaccination and without a medical exemption. There is no indication that the State levied any penalties against these schools, as the State did with Plaintiffs. The State's selective approach to enforcement, targeting religious believers with crippling penalties, but not these other schools, further underscores that the government's asserted healthcare goals are not actually compelling, and instead are targeting Plaintiffs for their religious beliefs.

### The Compulsory Vaccination Law is Not Narrowly Tailored

90.     Even if the government's interest is sufficiently compelling, New York's Compulsory Vaccination Law still cannot withstand strict scrutiny because it lacks narrow tailoring. "[N]arrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest." *Tandon*, 141 S. Ct. at 1296-97. The Compulsory Vaccination Law lacks narrow tailoring to meet its purpose of protecting public health because it is both under-inclusive and over-inclusive relative to the government interests it purportedly attempts to achieve.

91.     The Compulsory Vaccination Law is under-inclusive because it only applies to certain unvaccinated children, and only in a school setting. Events like barn raisings, church services, community festivals, and all other Amish gatherings do not require vaccination. Given their religious beliefs, most, if not all, of the Amish community members who are above school

age are unvaccinated. As such, the Compulsory Vaccination Law does not stop the purported risk of transmission in the Amish community, and therefore it is underinclusive.

92.     The law is also underinclusive because it permits medical exemptions for schoolchildren. If a child with medical exemption can safely attend school, so can a child with a religious exemption. The law's under-inclusivity is further magnified by the fact that adults in the school system are exempt from New York's immunization requirements nor are there any vaccine requirements in nearly any other aspect of life in New York for children or adults.

93.     The Compulsory Vaccination Law is also overbroad for several reasons. First, it is overbroad because it fails to include a reasonable religious exemption for the Amish's sincerely religious beliefs. Second, as explained in *Yoder*, "[t]he independence and successful social functioning of the Amish community for a period approaching almost three centuries and more than 200 years in this country are strong evidence that there is at best a speculative gain" to be made by the state seeking to override their religious beliefs. *Yoder*, 406 U.S. at 233. The state's zeal to vaccinate the tiny number of healthy Amish children is plainly an overbroad application of the state's power.

94.     Third, and more generally, lawmakers rationalized the elimination of the religious exemption to the Compulsory Vaccination Law on grounds it was purportedly being misused. In a knee-jerk reaction to an uptick in measles cases, none of which occurred in the Amish community, the Legislature eliminated *all* religious objections to compulsory vaccination, even for those who, like Plaintiffs, undisputedly possess sincere religious beliefs precluding them from vaccinating their children. This is a dramatically overbroad response to what is a relatively small problem. The Legislature could have confronted this concern by, for example, instituting a standardized method for reviewing applications for religious exemptions to ensure they are granted

only to those who, like Plaintiffs, plainly have sincere religious beliefs. *See Lukumi*, 508 U.S. at 539 (A law is suspect "if First Amendment freedoms are curtailed to prevent isolated collateral harms not themselves prohibited by direct regulation.").

95.     Finally, the Compulsory Vaccination Law is also overbroad because many of the vaccines required by the Compulsory Vaccination Law, including the pertussis, tetanus, diphtheria and the currently used polio vaccines, do not prevent transmission or infection of the diseases they target.[7] These vaccines merely provide a level of personal protection by preventing recipients from experiencing the symptoms of these infections, which Plaintiffs would gladly decline in favor of upholding their religious beliefs. Moreover, the CDC does not have a single documented case of Hepatitis B being transmitted in a school setting.[8] The only other immunizations required for school are the MMR injection and Chicken Pox vaccine, and there is no health imperative to give these vaccines since the peer reviewed studies roundly show significantly lower rates of cancer and cardiovascular deaths if one contracts these childhood diseases.[9] However, despite these

---

[7] *See, e.g.,* https://pubmed.ncbi.nlm.nih.gov/31333640/ ("Natural infection evokes both mucosal and systemic immune responses, while aPVs [acellular pertussis vaccine, the exclusive pertussis vaccine used in the United States] induce only a systemic immune response. … Mucosal immunity is essential to prevent colonization and transmission of B. pertussis organisms. Consequently, preventive measures such as aPVs that do not induce a valid mucosal response can prevent disease but cannot avoid infection and transmission. … aPV pertussis vaccines do not prevent colonization. Consequently, they do not reduce the circulation of B. pertussis and do not exert any herd immunity effect."); https://www.cdc.gov/vaccines/pubs/pinkbook/tetanus.html ("Tetanus is not contagious from person to person."); https://pubmed.ncbi.nlm.nih.gov/5026197/ (Diphtheria vaccine only creates antibodies to a toxin released by the diphtheria bacteria and does not generate any antibodies to the diphtheria bacteria itself, hence "Diphtheria toxoid helps prevent symptomatic disease but does not prevent the carrier state nor stop the spread of infection."); https://polioeradication.org/polio-today/polio-prevention/the-vaccines/ipv/ ("IPV induces very low levels of immunity in the intestine. As a result, when a person immunized with IPV is infected with wild poliovirus, the virus can still multiply inside the intestines and be shed in the feces … IPV does not stop transmission of the virus."); https://www.cdc.gov/vaccines/vpd/mening/public/index.html ("data suggest MenACWY vaccines have provided protection to those vaccinated, but probably not to the larger, unvaccinated community (population or herd immunity)").

[8] https://icandecide.org/wp-content/uploads/2020/12/Final-Response-No-Records.pdf.

[9] Japan tracked over 100,000 of its citizens for more than 22 years and it found that having measles and mumps was "associated with lower risks of mortality from CVD [cardiovascular disease]." https://pubmed.ncbi.nlm.nih.gov/26122188/. After 22 years, only 7% of the men that had measles and mumps had died of cardiovascular disease while 14% of the men that never had measles or mumps died of cardiovascular disease. *Id.* (Figure 1). Cardiovascular disease is the number one killer of Americans, taking the lives of 697,000 Americans in 2020. https://www.cdc.

realities, New York destroyed the option for religious objections to *all* required vaccines. Further

demonstrating the overbreadth of the Compulsory Vaccination Law, the state has made no attempt

to differentiate between vaccine requirements, to show why specific vaccines were necessary and

thus required elimination of the religious exemption option.

96.     New York deployed a blunt hammer and, in one stroke, obliterated every possibility

for Plaintiffs to simultaneously abide by the law, and educate their children consistent with their

religious convictions. Because the Compulsory Vaccination Law cannot withstand strict scrutiny

review, Plaintiffs should prevail on the merits of their First Amendment claims.

---

gov/heartdisease/facts.htm. In contrast, according to the CDC, around 400 Americans died in the years before there
was a measles vaccine, and the death rate had already declined over 98% before the introduction of the first measles
vaccine in 1963, and 43 died of mumps and 24 died of rubella before a vaccine was introduced for each in 1967 and
1969, respectively. https://www.cdc.gov/nchs/data/vsus/vsrates1940_60.pdf (Figure 19); https://www.cdc.
gov/nchs/products/vsus/vsus_1939_1964.htm; CDC, *Epidemiology and Prevention of Vaccine-Preventable Diseases*,
Appendix E-3 (13th Edition). Japan's extremely reliable prospective study spanning 22 years with over 100,000
individuals reflects that MMR vaccine has caused multiple times more deaths in the United States from cardiovascular
disease each year that it could have possibly saved from measles and mumps. No study reflects otherwise. Moreover,
but in studies not nearly as robust, eliminating measles appears to have caused a measurable increase in certain cancer
rates. For example, the International Agency for Research on Cancer found that those who never had measles had a
66% increased rate of Non-Hodgkin Lymphoma and a 233% increased rate of Hodgkin Lymphoma.
https://pubmed.ncbi.nlm.nih.gov/16406019/ (See Table 2 and in the Non-Hodgkin's Lymphoma (NHL) column divide
the odds ratio 1 (never had measles) with .6 (had measles) which results in a 66% increased risk, and in the Hodgkin's
Lymphoma (HL) column divide the odds ratio 1 (never had measles) with .3 (had measles) which results in a 233%
increased risk.) These two cancers killed an estimated **21,170** Americans in 2022.
https://seer.cancer.gov/statfacts/html/hodg.html and https://seer.cancer.gov/statfacts/html/nhl.html. There are event
studies that found remission of Hodgkin's disease after having measles. https://pubmed.ncbi.nlm.nih.gov/4574047/.
Likewise, researchers at the Department of Health Care and Epidemiology at the University of British Columbia and
the Department of Biology at the University of Victoria found that those who never had measles had a 50% increased
rate of ovarian cancer, which killed an estimated **12,810** Americans in 2022. https://pubmed.ncbi.
nlm.nih.gov/16490323/ and https://seer.cancer.gov/statfacts/html/ovary.html. Other studies have reached similar
conclusions that measles as well as mumps, rubella, chickenpox, etc. reduce the rate of various forms of other cancers,
including a study from researchers at the University of Berne, Switzerland that specifically reviewed these fever
(febrile) causing illnesses and found that the "study consistently revealed a lower cancer risk for patients with a history
of FICD [febrile infectious childhood diseases]." https://pubmed.ncbi.nlm.nih.gov/9824838/. Studies have also found
that children who have had measles have far less allergies and atopic diseases, such as asthma, and adults who had
measles have a reduced risk of Parkinson's Disease. https://pubmed.ncbi.nlm.nih.gov/19255001/; https://pubmed.ncbi
.nlm.nih.gov/16854347/ and https://pubmed.ncbi.nlm.nih.gov/4061437/. The bottom line is that, prior to the
introduction of the vaccine, these were all considered mild childhood infections, like the chickenpox; the ecological
relationship humans developed with them through millennia did not eliminate them; and having them conferred
benefits for survival that exceeded the virus' negative effects. This may explain why, unlike most pathogens, they
have been eliminated over time through natural selection, as they appear to provide a survival advantage.

***The Amish Will Suffer Irreparable Harm***

97.     Plaintiffs have endured irreparable injury. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir. 1991) ("when deprivation of rights derives from allegations of a First Amendment violation, irreparable harm presumptively exists."). That extends to the loss of "free exercise rights 'for even minimal periods of time.'" *Tandon*, 141 S.Ct. 1294 at 1297. Here, the violation of Plaintiffs' First Amendment rights alone constitutes irreparable injury as a matter of law. *Id.; Cuomo*, 141 S. 63 at 67-68.

98.     Plaintiffs' children are also categorically evicted from the State's educational system, even though New York's Constitution combined with the Fourteenth Amendment guarantees a free public-school education. *See* N.Y. Const., Art. 9 § 1 (requiring a system of free public education for all children in the State); *see also Goss v. Lopez,* 419 U.S. 565 (1975) (when state law creates a right to public education, it is protected by the Due Process Clause of the Fourteenth Amendment). While New York guarantees a free education and permits children who remain unvaccinated for medical reasons to obtain a free education, the State forbids Plaintiffs' children from attending school on Amish property. Moreover, efforts to collect on the ruinous fines that Defendants have already taken steps to impose are equably irreparable harm. *Eternal Word TV Network, Inc.Sec'y, United States HHS*, 756 F.3d 1339, 1349-1350 (11th Cir. 2014); *Soos v. Cuomo*, 470 F.3d 268 (NDNY 2020). These constitute irreparable injury, and Plaintiffs' injuries— past, ongoing, and imminent—cannot be remedied by a later-issued court order.

## INJUNCTIVE RELIEF ALLEGATIONS

99.     Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

100.    Plaintiffs allege that as applied, the Compulsory Vaccination Law violates their First Amendment rights and their right to be free from unlawful statutes.

101.    Plaintiffs are being and will continue to be irreparably harmed unless this Court enjoins Defendants from enforcing the Compulsory Vaccination Law.

102.    Plaintiffs have no plain, speedy, and adequate remedy at law to prevent Defendants from enforcing the Compulsory Vaccination Law.

103.    If not enjoined by this Court, Defendants will continue to implement and enforce the Compulsory Vaccination Law in violation of Plaintiffs' constitutional rights.

104.    Accordingly, injunctive relief is appropriate.

## DECLARATORY RELIEF ALLEGATIONS

105.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if set forth fully herein.

106.    Plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201. An actual and substantial controversy exists between Plaintiffs and Defendants as to their legal rights and duties with respect to New York's Compulsory Vaccination Law, which allows for secular but not religious exemptions and therefore violates the United States Constitution.

107.    The case is presently justiciable because the Compulsory Vaccination Law and absence of any religious exemption to the same applies to Plaintiffs and their children, who are currently harmed by enforcement of the Compulsory Vaccination Law.

108.    Declaratory relief is therefore appropriate to resolve this controversy.

## **PRAYER FOR RELIEF**

Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, it is appropriate and proper that a declaratory judgment be issued by this Court, declaring that the Compulsory Vaccination Law is unconstitutional. Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that the Court issue appropriate injunctive relief prohibiting Defendants from enforcing the Compulsory Vaccination Law against Plaintiffs and schools, including against any principal, teacher or person in charge, for the students they enroll whose parents have a sincerely held religious belief against administering one or more vaccines required by the Compulsory Vaccination Law.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and provide Plaintiffs with the following relief:

A.   Appropriate injunctive relief prohibiting Defendants, their agents, servants, employees and any other persons acting on their behalf, from implementing and enforcing N.Y. Public Health Law § 2164 against Plaintiffs;

B.   Declare that N.Y. Public Health Law § 2164 is unconstitutional as applied to Plaintiffs and their schools, including against any principal, teacher or person in charge, for the students they enroll whose parents have a sincerely held religious belief against administering one or more vaccines required by N.Y. Public Health Law § 2164;

C.   Declare that N.Y. Public Health Law § 2164 violates Plaintiffs' First Amendment right to free exercise of religion;

D.   Grant Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable authority; and

E.    For any such other and further relief as the Court deems equitable and just under

the circumstances.

Dated: June 2, 2023.

Respectfully submitted,
SIRI & GLIMSTAD LLP

*Elizabeth A. Brehm*
Aaron Siri, Esq.*
New York Bar Number: 4321790
Elizabeth A. Brehm, Esq.
New York Bar Number: 4660353
Walker D. Moller, Esq.*
745 Fifth Ave, Suite 500
New York, NY 10151
Tel: (212) 532-1091
Fax: (646) 417-5967
aaron@sirillp.com
ebrehm@sirillp.com
wmoller@sirillp.com

Christopher Wiest*
25 Town Center Blvd., Suite 104
Crestview, KY 41017
Tel: (513) 257-1895
Fax: (859) 495-0803
chris@cwiestlaw.com

*Attorneys for Plaintiffs*

*Pro vac vice* application to be submitted.

**VERIFICATION OF JOSEPH MILLER, individually and on behalf of his minor children attending an Amish school in Clymer and as a board member of that school**

I, Joseph Miller, a citizen of the United States and of New York, have read the foregoing Verified Complaint and know the contents thereof as to myself and the three Amish schools, that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this  31st day of **May** 2023 in Clymer, New York.

Joseph R Miller
Joseph Miller

**VERIFICATION OF EZRA WENGERD, as representative of all Amish schools in the State of New York, DYGERT ROAD SCHOOL, PLEASANT VIEW SCHOOL a/k/a TWIN MOUNTAIN SCHOOL, and SHADY LANE SCHOOL (the "three Amish schools")**

I, Ezra Wengerd, a citizen of the United States and of New York, have read the foregoing Verified Complaint and know the contents thereof as to myself and the three Amish schools, that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this  31st  day of  May 2023 in Canajoharie, New York.

Ezra Wengerd
Ezra Wengerd

39

## VERIFICATION OF JONAS SMUCKER, individually and on behalf of his minor children

I, Jonas Smucker, a citizen of the United States and of New York, have read the foregoing Verified Complaint and know the contents thereof as to myself and the three Amish schools, that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this 31st day of May 2023 in Canajoharie, New York.

Jonas H. Smucker
Jonas Smucker

40