# Exhibit E

STATE OF NEW YORK   :   DEPARTMENT OF HEALTH
-------------------------------------------------------------------------------

IN THE MATTER

OF

MARY T. BASSETT, M.D., M.P.H. as Commissioner of Health
Of the State of New York, to determine the action to be taken
With Respect to:

      Dygert Road School,
      Pleasant View School (a/k/a Twin Mountain School),
      and Shady Lane School

Respondents
-------------------------------------------------------------------------------

**Department's Exceptions to the ALJ's Report and Recommendation**

To:    Hon. Dawn Mackillop-Soller
       Bureau of Adjudication
       New York State Department of Health
       150 Broadway, Suite 510
       Albany, New York 12204

       Hon. Natalie Bordeaux
       Bureau of Adjudication
       New York State Department of Health
       150 Broadway, Suite 510
       Albany, New York 12204

       Ezra Wengerd
       139 H. Jones Road
       Canajoharie, New York 13317

Respectfully submitted on June 21, 2022, by:

       Vanessa Murphy, Senior Attorney
       New York State Department of Health
       Bureau of Administrative Hearings
       Corning Tower Room 2412
       Empire State Plaza
       Albany, New York 12237

**Preliminary Statement**

For the reasons described in herein, the Department respectfully submits that the Report and Recommendation (hereinafter referred to as "Report") of Administrative Law Judge ("ALJ") Natalie Bordeaux, Esq. should be rejected insofar as the ALJ recommended no penalties. The ALJ's recommendation to find that the Department met their burden by sustaining the charges, but not to assess a civil penalty against schools that admittedly violated Public Health Law ("PHL") § 2164 and associated regulations at 10 NYCRR Subpart 66-1 is contrary to public policy, the Department's mission, and the clear intent of the State legislature.

In 2019, the State legislature amended PHL § 2164 to remove the religious exemption, which means that medical exemptions are now the only exception to the school immunization documentation requirements set forth in the statute.[1] The ALJ's recommendation that the Respondents pay no penalty, despite the Respondents' admission that they violated the statute and their promise to continue violating the law of "man" is in essence a recommendation for administrative nullification of a duly enacted law, in violation of the separation of powers doctrine inherent in the State Constitution.

The ALJ attempts to justify the recommendation of total amnesty for the Respondents by blaming the Department for the Respondents' violations, which is obviously false given the Respondents' testimony that they were aware of the immunization requirements and intended to continue violating these requirements. The ALJ's criticism of the Department relates primarily to issues of notice, which is incompatible with the ALJ's correct acknowledgement at the outset of the Report that lack of notice is not a defense to the Charges. Further, the ALJ's findings that the Department did not "reasonably accommodate" the Respondents by providing them notice of the

---

[1] Laws of 2019, Chapter 35.

amendment to the law or provide them an opportunity to resolve the issues prior to hearing, are also incorrect. Perhaps most significant, the "notice" issues upon which the ALJ largely bases her recommendation for amnesty, were never raised by the Respondents. To the contrary, Respondents testified that they were aware of the requirements placed on them and made it clear that the matter could not be resolved with the Department because they have no intention of complying with the requirements.

Besides the misplaced "notice" concerns, the ALJ identifies several additional "factors" that she believes justify amnesty for the Respondents, including her findings that the Department did not submit proposed settlement agreements into the Record; that the Respondents do not use the public health system; that the Department did not identify the names of unimmunized students; and that the Department did not consider that some alleged non-immunized students received a first dose for each immunization series. As explained in detail in Section III below, each of these findings is factually incorrect and/or irrelevant as a matter of law.

The ALJ's analysis and resulting recommendation, if adopted by the Commissioner, will send a clear message to the Respondents and every school in the State that violations of this type will not result in Department sanctions. A more direct disincentive towards statutory and regulatory compliance cannot be fathomed.

I.    **Sanctions are Necessary and Appropriate in this Case**

   **1. Sanctions are a necessary to deter continuing and future violations.**

The imposition of civil monetary penalties (a/k/a fines), pursuant to PHL §§ 12 and 206(4) is the only remedy that the Department has available to deter noncompliance with violations of PHL § 2164. Imposing fines against the Respondents in this case is particularly necessary

considering their testimony at hearing that they were aware they had been non-compliant with the requirements of PHL § 2164 and intend to continue violating the law.  In fact, the Respondents' prepared written statement read into the Record by their representative was entitled "why we are not in compliance with the NYS requirement of childhood vaccination."[2]  The Statement explains that the Respondents believe there is an irreconcilable conflict between their religious beliefs and PHL § 2164, making compliance with the law a largely non-viable option.[3]  The ALJ's recommendation against assessing fines, if adopted by the Commissioner, will ensure that the Respondents' promise to continue violating this law will be fulfilled.  It would also incentivize other religious schools, and maybe even secular schools, to ignore the requirements of PHL § 2164, and represent to the public at large that the Department takes a lax approach to regulatory compliance.

2. **Failure to sanction here would constitute a revival of the religious exemption to PHL § 2164 in violation of the Separation of Powers doctrine.**

Under the doctrine of the separation of powers inherent in the New York State Constitution, the three branches of state government are coequal, and each should be free from interference from one another.[4]  As the Court of Appeals explained, "the object of the written

---

[2] Hearing Recording at 1:50:50. It should be emphasized that the Department has made the point clear that it does not dispute the genuineness of Respondents' religious assertions.  The Department simply argues that such assertions can no longer serve as the basis for an exemption to the school immunization requirements in PHL § 2164 (Hearing Recording at 22:20).

[3] Hearing Recording at 1:52:45. While not directly relevant to this matter, the Department noted on the record that parents and legal guardians attending the Respondent schools are not being compelled to get their children vaccinated if they do not wish to do so.  In those instances, the alternative is homeschooling (Hearing Recording at 1:58:25 (referring to DEPT OF HEALTH, OFFICE OF CHILDREN AND FAMILY SERVICES, AND STATE ED. DEPT, *Vaccination Requirements Applicable to All Students*)).

[4] N.Y.S Const., art. III, § 1, art. IV, § 1, and art. VI.  *People ex rel. Burby v Howland*, 155 N.Y. 270 (1898).

Constitution is to regulate, define, and limit the powers of the government by assigning to the executive, legislative, and judicial branches distinct and independent powers."[5]

To that end, in 2019, the Legislature exercised its "distinct and independent powers" to remove the religious exemption from PHL § 2164 – something only the legislative branch of government could do.  As explained on the Record, in the Sponsor's memorandum for this amendment, it was noted that "sustaining high vaccination rates among school children is vital to the prevention of disease outbreaks including the reestablishment of diseases that have been largely eradicated in the United States."[6]

The ALJ's Report recommends against using the only tool that the Department has available to enforce a validly enacted statute (i.e., civil penalties).  If the Commissioner adopts this recommendation, she will essentially be engaging in what amounts to a constitutionally impermissible circumvention of the Legislature.

### 3. Sanctions support the Department's mission.

The imposition of sanctions is consistent with the Department's stated mission to "protect, improve, and promote the health, productivity, and well being of all New Yorkers."[7]  As the Department made clear on the Record, "the potential of having to combat an outbreak of a vaccine preventable disease or diseases will overtax an already strained public health system."[8] The Department also stressed that "an outbreak that starts out in a school often does not stay

---

[5] *Id.*
[6] Hearing Recording at 22:52 (*quoting* Laws of 2019, Chapter 35, Sponsor's Memorandum).
[7] *Mission, Vision, Values – New York State Department of Health,* N.Y.S. DEPT OF HEALTH, available at https://www.health.ny.gov/commissioner/mvv.htm (last visited June 6, 2022).
[8] Hearing Recording at 2:02:45.

confined to a school, because as we have learned all too well over the past two plus years, communicable diseases know no boundaries."[9]

The ALJ's assertion that the Respondents "do not utilize the public health system" in attempt to entirely dismiss the Department's concern, reflects a lack of understanding of the Department's mission and the hard work that it does every day to prevent and control disease outbreaks.[10] It is also an assertion that is unsupported by the Record. In fact, had this issue even been raised at the administrative hearing, the Department would have requested an opportunity to call public health expert witnesses to refute the claim. Furthermore, there is some indication in Record that this assertion is false. Specifically, one of the Respondent schools provided documentation of twelve students who had partial immunizations or, in one case, was fully immunized.[11] This alone cuts against the ALJ's finding that Respondents "do not utilize" the public health system. Also, the Department notes that this position can be viewed as another "end-run" around the Legislature. It is not for the Department to decide who a statute applies to based upon assumed public health system use. The Legislature has clearly defined what entities are included in the definition of "schools," and there are no carve-outs based on use of such a system.[12]

4. **Failure to sanction here will set a dangerous and potentially illegal precedent.**

The failure to assess penalties against Respondents, who plainly refuse to comply with PHL § 2164, sets a dangerous precedent. It is difficult to imagine a rationale for assessing

---

[9] Hearing Recording at 2:02:55.
[10] ALJ Report at 17.
[11] Department's Exhibit No. 8.
[12] PHL § 2164(1)(a).

penalties against any other school who similarly violates this law that would not be viewed as arbitrary and/or capricious, or a violation of State or federal civil rights laws, subjecting the Department to penalties and sanctions.

Thus, if the Commissioner adopts the ALJ's Report and fails to assess penalties against the Respondents, she will necessarily have to take the same approach to all other schools in order to comply with federal and State law.   The Third Department's analysis in *FF v NY*, 194 AD3d 80 (3d Dept. 2021) is instructive here.   *FF* involved a challenge to the removal of the religious exemption from PHL § 2164.  The Court, in denying the Petition, noted that the prior religious exemption in the law created a benefit to the covered class (those with a religious belief contrary to vaccination), and that the elimination of the exemption subjects those in the previously covered class to vaccine rules that are generally applicable to the public.  Thus, it follows that if the benefit that the ALJ recommends bestowing on the Respondents here (not issuing fines despite finding violations and testimony from the Respondents that they intend to continue committing the same violations) is not provided to future similarly situated schools, the Commissioner will be viewed as favoring one religion over another or favoring a religious school over a secular school. Of course, as set forth above, if the Commissioner adopts the ALJ's recommendation and applies it across the board to all religious schools, she would essentially be nullifying a duly enacted statute in violation of the Separations of Powers doctrine.  Accordingly, the Commissioner has no option but to assess penalties against the Respondents.

**II.    The ALJ's criticisms of the Department regarding notice are unsupportable and irrelevant.**

Despite the fact that the Department is the Petitioner in this proceeding and that the Respondents did not assert any defenses or affirmative claims against the Department, the ALJ

devotes a significant amount of her Report and Recommendation to criticizing the Department. These criticisms, which primarily relate to "notice" type claims, are baseless, and not relevant to whether the Charges should be sustained or whether fines should be imposed against the Respondents. Notably, the ALJ acknowledges that notice is not required to prove the Charges before subsequently explaining that her recommendation (i.e., no fines) is based largely on a perceived lack of notice to the Respondents. These two findings are incompatible.

### 1. Notice of the Amendment to PHL § 2164

For example, the ALJ criticizes the Department and excuses the Respondents for the Department not "reasonably accommodating" (what the ALJ perceives as special needs of the Respondents) by taking steps to ensure that the Respondents were aware of the amendment to PHL § 2164.[13] First, the Department submits that such special notice is not required under the law and the perceived adequacy of notice provided should not be relevant to whether fines are assessed. Second, the ALJ's finding is incorrect and not supported by the Record. There is no evidence that the Respondents were not adequately informed of the 2019 amendment to PHL § 2164, and the Respondents did not assert the issue as a defense. Indeed, Respondents admitted on the Record they were aware of the amendment, and that the Department might have provided notice, as illustrated by the following colloquy between the Respondents and the ALJ (*see* electronic recording of the hearing at 2:06:50):

> ALJ: Mr. Wengerd, was your community made aware of the law change?
>
> Mr. Wengerd: We were somewhat aware of it through just reading the paper and through different people talking about it. As far as the health department actually coming out and telling us, I guess I can't say for sure. But, in general, that's not our

---

[13] ALJ Report at 14.

argument.

ALJ:              No, I understand.

Mr. Wengerd:      Our argument is that our religious freedom was taken away.


## 2. Notice Regarding Impending Audits

The Report suggests there are deficiencies in the Department's pre-audit communications to the Respondents that somehow impacted their opportunity to respond. The Department respectfully submits that the law here is controlling, and the pre-audit communications are an optional tool, among many, to assist with the overall audit process. No matter the content of the Department's pre-audit communications with Respondents, the law has been clear and consistent for decades with regard to the documentation that schools must obtain from parents or persons in parental relation to a child attending school.[14]

Additionally, Respondents were not prejudiced by any purported deficiencies in the Department's pre-audit written communications. As the record clearly demonstrates, Respondents had ample opportunity to contact the Department to supply all documentation that was requested at multiple points during the audit and enforcement period -- nearly five months for Dygert Road and Shady Lane Schools, and almost two months for Pleasant View/Twin Mountain School. It should be noted that as part of the audit process, the Department's letters relaying the audit findings also requested that Respondents submit documentation regarding the number of students out of compliance with the law, as well as documentation that such students were temporarily excluded. This alone demonstrates that Respondents had ample opportunity to address audit findings prior to enforcement.[15] Further, both of the Department's letters about the

---

[14] 10 NYCRR §§ 66-1.3 and 66-1.4.
[15] See Department's Exhibit No. 4, 5, 6, 9, 10, and 11.

audit had a phone number to contact the Department with any questions.  At no point in time over the audit/enforcement period did any of the Respondent schools or their representative(s) attempt to provide or ask questions about providing missing documentation to the Department.[16]

### 3.  Notice of Audit Findings

The ALJ also argues that Respondents did not have a meaningful opportunity to comply with the law because the Department's written communications to Respondents (relaying audit findings and steps for coming into compliance with the law) directed the Respondent schools to send documentation by email.[17] The ALJ questions how this is possible, given that Respondents assert they do not have access to email.   This observation stems from a line of questioning made by the ALJ of the Department's witness during the administrative hearing.   However, the ALJ failed to take notice of the language in the Department's written communications that read, "[i]f you have any questions, please contact . . . [sic] James Brewster at 518-474-7654."[18]   Moreover, as the hearing record shows, a representative from one of the Respondent schools did in fact place calls to the Department.[19]  Additionally, Respondent's representative had phone conversations with the Department, further demonstrating that Respondents had a viable way to contact the Department to arrange for alternatives to submitting the requested documentation. Most importantly, however, the notice of the audit findings was not relevant to the Respondents' non-compliance, as Respondents testified that they were aware of the requirements and were,

---

[16] *Id.*
[17] ALJ's report at 14.
[18] Department's Exhibit Nos. 9, 10, and 11.
[19] Department's Exhibit No. 12.

nevertheless, not adhering to them.[20]  Further, Respondents were obviously not prejudiced by a

lack of notice, as evidenced from their testimony that they intend to remain noncompliant.[21]


**III.    Additional factors enumerated by the ALJ as a basis for granting the Respondents amnesty are also irrelevant, unsupportable, and/or based upon a misapplication of the law.**

The ALJ's Report identifies several "factors" upon which the ALJ justifies her

recommendation that, despite the Respondents' noncompliance with the law, no civil monetary

penalties should be assessed against them.  Viewed individually and in the aggregate, these

"factors", many of which are incorrect as a matter of fact and law, do not justify the complete

exoneration of the Respondents recommended by the ALJ.   The "factors" the ALJ considered

and the Department's response to each one, are set forth below:


**1.    The ALJ's finding that the charges were only established because the Respondents were forthcoming in their willful violations of law cannot be appropriately considered as a factor to calculate fines.**

The ALJ lauds the Respondents for admitting directly to violating State immunization

laws and declaring they will continue to do so, as being "forthcoming and candid", yet ignores the

fact that the violations were only discovered through audits.  There is nothing exculpatory or

laudable about repeatedly and willfully violating a law that was amended for the sole purpose of

eliminating the very defense to which the Respondents have asserted.  Most importantly, the

ALJ's positive treatment of the Respondents' candid and forthcoming testimony appears to

completely dismiss the fact that the testimony also included a promise to continue committing the

same violations for which they were charged.

---

[20] Hearing Recording at 1:50:50.
[21] Hearing Recording at 1:52:45.

2. **The ALJ's finding that there is "cause to question the reasonableness of the Department's communications with the Respondents" regarding the change to the law is irrelevant and unsupported by the Record**.

       See Section II (1). Special notice is not required under the law and the perceived adequacy of notice should not be relevant to whether fines are assessed.   Second, the ALJ's finding is incorrect and not supported by the Record.

3. **The ALJ's finding that the Department did not consider students who had begun obtaining vaccinations as being "in progress" when considering fines is based upon a misapplication of the relevant law.**

       The ALJ's Report comes to the inaccurate conclusion that the Department's proposed fines did not carve out students that were "in-progress."  Specifically, the ALJ's Report states that "[t]he Department's determination that only fully immunized students would be deemed compliant with immunization requirements is a clear departure from applicable law."[22]  This is incorrect.  The ALJ's conclusion fails to account for <u>all</u> the "applicable law" on point related to "in progress" students. Specifically, with respect to immunizations, "in progress" is defined in 10 NYCRR§ 66-1.1(j) to include a student who has received "at least the first dose **in each immunization series** required by section 2164 of the Public Health Law . . . and **has age appropriate appointments** to complete the immunization series."[23]

       The only Respondent school to which "in progress" could possibly apply would be Pleasant View/Twin Mountain, as it is the only school that provided documentation that some of their students had submitted partial immunization documentation.   As is clear from Department's Exhibit No. 8, out of the 11 students that had partial immunizations, 9 students did not have "at

---

[22] ALJ's Report at 17.
[23] 10 NYCRR § 66-1.1(j) (emphasis added).

least the first dose in **each immunization series**."[24]  For remaining 2 students (who had at least

the first dose in each immunization series), the school did not provide any documentation that

such students had age-appropriate appointments to finish the immunization series.  Accordingly,

it would have been inconsistent with the law for the Department to count any of these partially

immunized students as "in progress" when calculating penalties for Pleasant View/Twin

Mountain School.

**4.  The ALJ's finding that the Department's written communications with Respondent
schools ("pre-audit letters") contained deficiencies that somehow impacted Respondents'
opportunity to comply with/respond to the audit are both irrelevant and inaccurate.**

See Section II.  The Department's pre-audit communications are an optional tool to

facilitate the overall audit process.  No matter the content of such communications, the law has

been clear and consistent for decades as to the documentation schools must obtain from parents or

persons in relation to a child attending school.  Further, Respondents were not prejudiced by any

deficiencies in the Department's pre-audit communications, as they had ample opportunity to

contact the Department to supply all documentation that was requested at multiple points during

the audit and enforcement period.

**5.  The ALJ's finding that "Respondents were deprived of a reasonable opportunity to
understand what the November 23, 2021 audits would be assessing" again is both
irrelevant and inaccurate.**

See No. (4) above and Section II.

---

[24] *Id.* (emphasis added).

**6. The ALJ's finding that the Department departed from the law in determining that only "fully immunized students would be deemed compliant" is both inaccurate and based on a misunderstanding of the law.**

See No. 3 above.  When calculating fines, the Department did in fact take into account whether students were "in progress."  The ALJ's conclusions on this point are based on a misapplication of applicable law.

Further, contrary to the assertions made in the ALJ's Report, the Department did, in fact, account for the 14-day grace period afforded in the law.[25]  As set forth in 10 NYCRR § 66-1.4, a school cannot permit continued school attendance for more than 14 days for students that do not have immunization-related documentation on file (i.e., "the grace period").[26]  To that end, the Report is correct that it would be improper to calculate any fines during the grace period window.  However, that is not the approach that the Department took in this matter.  As the Department noted in their closing argument, it is the Department's position that the proposed fines represent one day of non-compliance, for each school, respectively.[27]  And, because it is more probable than not that these students had been attending such schools for several weeks by the time the on-site portion of the audit was conducted on November 23, 2021, it could have resulted in a much higher fine than the Department is asking for, even after accounting for the grace period.[28]

**7. The ALJ's finding that because the Respondents did not have access to email, they were not "presented a reasonable opportunity to show compliance with requirements" is inaccurate.**

See Section II.  The ALJ failed to take notice of the language in the Department's written communications that read, "[i]f you have any questions, please contact . . . [sic] James Brewster at

---

[25] ALJ's Report at 11.
[26] 10 NYCRR § 66-1.4.
[27] Hearing Recording at 1:59:30.
[28] *Id.*

518-474-7654."[29]  As the hearing record shows, a representative from one of the Respondent schools did in fact place calls to the Department.  Additionally, Respondent's representative had phone conversations with the Department, demonstrating that they had a viable way to contact the Department to arrange for alternatives to submitting the requested documentation.

**8.  The ALJ's finding that the "evidence fails to support the Department's representation that stipulation and order accompanied the hearing notices and statement of charges" is an inappropriate and irrelevant factor upon which to consider penalties.  It is also unsupported by the Record.**

The ALJ's Report states that the direct examination is "inappropriate" because it "suggested that Respondents made no attempt to resolve the issues raised," which "presupposes that the Respondents were afforded a full and fair opportunity to address these matters before the hearing."[30]  The Report further notes, "although the mailing affidavits for the hearing notices and statements of charges attest to having enclosed a proposed stipulation and order, no stipulation and order was included in the notices that the Department presented at hearing."[31]  From this, the ALJ concludes that it is "unclear whether the Respondents were given a proper opportunity to respond."[32]

These assertions, which ultimately question the truthfulness of Department's representations at the hearing, are unfounded and unnecessary.  As an initial matter, it is well known that stipulations and orders are not customarily entered into the Record because they contain confidential proposed monetary penalties to settle a matter early on.  Further, in some cases, these documents propose deferment and ultimately absolution of fines when the terms of

---

[29] Department's Exhibit Nos. 9, 10, and 11.
[30] *Mission, Vision, Values – New York State Department of Health*, N.Y.S. DEPT OF HEALTH, https://health.ny.gov/commissioner/mvv.htm (last visited June 6, 2022).
[31] ALJ's Report at 14 and 15.
[32] *Id.* at 15.

the stipulations and orders are adhered to over a specified period of time. Accordingly, keeping

settlement documents and discussions confidential and out of the Record aids in eliminating bias

to either party at an administrative hearing.

Further, the question of whether the stipulations and orders were served on Respondents

was addressed at the hearing. On the hearing recording, beginning at 04:08, the ALJ,

Department, and representative for the Respondent schools, Mr. Wengerd, discussed as follows:

| | |
|---|---|
| ALJ: | The affidavits of service on all of these . . . also indicate . . . now there's an attestation that there was a mailing not just of the hearing notice and the statement of charges, but a proposed a stipulation and order. Now, I know that wasn't included in what I was given. My question is was that offered to the schools . . . the respondent schools? |
| Department: | The stipulation and order was sent to the respondent schools, correct. |
| ALJ: | So, for each one, right? 1 through 3? |
| Department: | 1 through 3. And Your honor, one of the things that I wanted to bring up is I did speak with Mr. Wengerd last week about stipulating to service that they received all of the documentation. And, you know, Mr. Wengerd, I don't know if you have anything to say about that. |
| Mr. Wengerd: | I don't, no. We understood whatever we got in the mail. |
| ALJ: | Okay, so you did receive them? |
| Mr. Wengerd: | We did, yes. |

Relatedly, the Report also omits mention that the primary vehicle to serve the notices of

hearing, statements of changes, and stipulations and orders was by personal service. Specifically,

to ensure service and provide the Respondents with an opportunity to settle well in advance of the

scheduled hearing date, the Department personally served **all** the above referenced documents on

Dygert Road School, Shady Lane, and Pleasant View School/Twin Mountain School on March

11, 2022.[33]  Notarized affidavits of personal service were admitted into evidence for all three

schools.[34] Only after personal service was made, did the Department complete service by mail – a

step that was arguably unnecessary, but one that demonstrates the Department's diligent

commitment to giving the Respondents ample notice and an opportunity to settle.[35]


**9.  The ALJ's finding that the Department did not "provide an intelligible basis for its penalty demand," relying "largely on assumptions and estimates" is not supported by the Record.**

        The Report's findings are flawed in several respects with regard to how the Department

calculated the proposed fines.  Further, the ALJ failed to treat the findings of the Department's

witness (Mr. Brewster) as rebuttable presumptions, as required by the law.  Specifically, PHL

§ 10 requires that the written reports of state health officers "pertaining to, concerning, or arising

under and in connection with alleged violations, investigations, proceedings, actions, authority

and orders . . . shall be presumptive evidence of the facts so stated therein."  Respondents did not

rebut the Department's audit findings, and as made clear, they admitted their willful

noncompliance.[36] Accordingly, the Department now reiterates what was clearly stated on the

---

[33] Department's Exhibit No. 1, pp. 8 and 9; Department's Exhibit No. 2, pp. 7 and 8; and Department's Exhibit No. 3, pp. 8 and 9.
[34] *Id.*
[35] *Id.* The Report only accounts for three affidavits of service, which are the ones that were completed after service by mail.  However, Department's Exhibits 1, 2 and 3 each contain two notarized affidavits for service, completed by two separate Department employees and attesting that they served, among other documents, proposed stipulations and orders on each of the Respondent schools either personally or by mail. In sum, a total of six notarized affidavits of service that were admitted into the evidence.
[36] Along those same lines, The ALJ's Report also notes that the list of students was not entered into the evidence as part of post-audit letter exhibits. The Department briefly notes that this was done to protect the privacy of the students' and their families, and because the Department entered into evidence the Student Immunization Worksheets for the schools that provided at least some documentation to the Department. The Department notes that its witness (Mr. Brewster) testified on examination by the ALJ that he sent them (Hearing Recording at 1:29:30). Lending

Record with respect to its careful consideration of penalties, given the Department's unrebutted audit findings:

*Dygert Road and Pleasant View/Twin Mountain schools:*

The Department used the "Student Immunization Worksheets," which the Department completed with the documentation the schools did (or did not) provide to the Department.[37] Accordingly, fines were then calculated as follows:

| School | Proposed Fine Amount | Calculation Methodology |
|---|---|---|
| Dygert Road School | $52,000 | 26 students found to be out of compliance by audit for 1 day multiplied by $2,000 = $52,000 |
| Pleasant View School (a/k/a Twin Mountain) | $46,000 | 23 students found to be out of compliance by audit for 1 day, multiplied by $2,000 = $46,000 |

Notably, while the Department's penalty recommendation is based on an assessment of the maximum fine of $2,000 per violation pursuant to PHL § 12, such recommendation was also based on a very conservative tally of the number of violations. Specifically, the Department only recommended multiplying the maximum penalty ($2,000) by the number of students without adequate documentation on file for just one day of each schools' non-compliance with the law.

support to this is the statement of Respondent's representative at the hearing.  Specifically, when speaking about whether Pleasant View/Twin Mountain School received audit correspondence from the Department, Respondents' representative states, "the students' names were right, but the addresses were wrong." (Hearing Recording at 13:30).
[37] Department's Exhibit Nos: 7 and 8.

*Shady Lane School*

For Shady Lane School, the Department was not able to use the "School Immunization Worksheet" to conduct the audit because the school did not provide any immunization-related documentation for its students. Therefore, to fairly calculate a penalty, the Department found that it was more probable than not that at least one student was in attendance for at least 10 days as of the date of the audit on November 23, 2021 and had been in attendance, dating back to the first day of school earlier in the Fall.[38] Using this methodology, the Department multiplied $2,000 by 10 days to arrive at a civil monetary penalty of **$20,000** (i.e., one student out of compliance for 10 days multiplied by $2,000).[39] Notably, this methodology was very generous to the Respondents, as it reduced their student population to 1 individual and more than accounted for the 14-day grace period that such student would have been entitled to.[40]

*Alternative Penalty Schedules*

The Department believes that the above proposed fines are conservative calculations for three respondent schools who were willfully noncompliant and promise to continue such noncompliance. That said, the Commissioner is not required to accept the Department's recommended fines, if the Commissioner believes a lesser amount would serve as a deterrent, while ensuring that the Department is not impermissibly engaging in the nullification of the Legislature's duly enacted statutory amendment. To that end, alternative penalty schedules that may be considered are as follows:

---

[38] Hearing Recording at 2:00:33.
[39] Hearing Recording at 2:01:10.
[40] *See* Section II (4) above.

12

| % OF TOTAL MAXIMUM FINES: | DYGERT ROAD | PLEASANT VIEW/TWIN MOUNTAIN | SHADY LANE | TOTALS |
|---|---|---|---|---|
| **MAXIMUM PENALTY** | **$52,000** | **$46,000** | **$20,000** | **$118,000** |
| **10%** OF MAXIMUM PENALTY | $5,200 | $4,600 | $2,000 | **$11,800** |
| **20%** OF MAXIMUM PENALTY | $10,400 | $9,200 | $4,000 | **$23,600** |
| **30%** OF MAXIMUM PENALTY | $15,600 | $13,800 | $6,000 | **$35,400** |
| **40%** OF MAXIMUM PENALTY | $20,800 | $18,400 | $8,000 | **$47,200** |
| **50%** OF MAXIMUM PENALTY | $26,000 | $23,000 | $10,000 | **$59,000** |
| **60%** OF MAXIMUM PENALTY | $31,200 | $27,600 | $12,000 | **$70,800** |
| **70%** OF MAXIMUM PENALTY | $36,400 | $32,200 | $14,000 | **$82,600** |
| **80%** OF MAXIMUM PENALTY | $41,600 | $36,800 | $16,000 | **$94,400** |
| **90%** OF MAXIMUM PENALTY | $46,800 | $41,400 | $18,000 | **$106,200** |

*Number of Charges vs. Number of Violations:*

Lastly, while not directly addressed in the ALJ's Report, it is important for the

Department to address a comment made by the ALJ at 2:10:40 in the electronic hearing recording,

which is as follows:

> ALJ: One issue I have, and I can say it right now so there won't be a surprise is that each of these statements of charges has one charge. So, if they were individual violations, it's not my reading of the public health law fines – the way they are assessed in 12(a) that this can be done per student – if we are looking at one charge, which I view as one violation. But that's something I'll have to look into again.

In response, the Department notes that pursuant to the State Administrative Procedural Act § 301, the statement of charges shall consist of "a short and plain statement of the matters asserted." Consistent with the law, and as a significant practical matter, when there are multiple identical or related violations, the Department's practice is to organize such violations under one charge.[41]  To do otherwise would result in statements of charges that are hundreds of pages long in some cases, which would create unnecessary burdens for both the Department and respondents. Accordingly, not only is the approach suggested by the ALJ legally unsupportable, but it lacks practicality and has the effect of creating more institutional barriers, particularly for *pro se* respondents.

## Conclusion

Accepting the Report's recommendation to sustain the charges <u>without</u> assessing penalties signals that compliance with the law is optional, both to the Respondents and to all schools in New York State.  This is effectively Departmental nullification of the Legislature's duly enacted statute.

In contrast to the very real and actual threat acted on by the Legislature when amending PHL § 2164 to remove the religious exemption (i.e., 2018-2019 measles outbreak, disproportionately impacting schools), the ALJ's Report appears to suggest that the Department's public health concerns in preventing vaccine-preventable communicable disease incidence in schools, at least in this matter, are without merit based on the erroneously held assumption that

---

[41] *Id. See also Eden Park Health Services, Inc. v. Whalen*, 73 AD2d 993 (3d Dept 1980); *Greenbaum v. Whalen,* 70 AD2d 1014 (3d Dept 1980).

Respondents do not use the public health system.[42]   This assumption reflects a fundamental misunderstanding of public health and the Department's mission.   Further, it also represents another impermissible circumvention of the Legislature, who defined "school" in statute, with no nuanced exceptions or carve-outs for certain groups/entities based upon vague references to system-level utilizations.[43]  It is not for the Department to make these carve-outs when the Legislature plainly did not provide for that kind of discretion.[44]

This case is a straightforward one: Respondents should be assessed the penalties recommended by the Department because (1) the Department sustained their burden in showing that the Respondents violated the law; and (2) the Department carefully considered the recommended penalties in light of the undisputed facts demonstrating the Respondents' willful noncompliance with the law. Accordingly, the Department respectfully submits that the record in this proceeding must be carefully reviewed and that the ALJ's findings and conclusions to which the Department has herein made exceptions should be reversed.  Specifically, the Department seeks the following in civil monetary penalties:

| School | Penalties |
|---|---|
| Dygert Road | $52,000 |
| Pleasant View/Twin Mountain | $46,000 |
| Shady Lane | $20,000 |
| **Total:** | **$118,000** |

[42] Laws of 2019, Chapter 35, Sponsor's Memorandum.
[43] PHL § 2164(1)(a).
[44] In fact, during a legislative debate of this amendment in 2019, the question was asked as to whether the change to this law would apply to Amish schools.  The Sponsor (Mr. Dinowitz) replied, "[i]f it's a school, yes." (*N.Y.S Assembly Debate on A02371A*, (June 13, 2019) (statements of Mr. Manktelow and Mr. Dinowitz)).  Here, the ALJ's Report correctly accepted the Department's finding that the entities in this matter are "schools" within the meaning of PHL § 2164 (*see* ALJ's Report at 9 and 10). It is, therefore, improper to make any further classifications.

Again, as noted above, while the Department believes these proposed penalties represent a conservative approach based on Respondents' willful noncompliance, the Commissioner has discretion to instead impose alternative penalty schedules that she believes will have a deterrent effect, while ensuring due deference to a validly enacted law. Examples of such alternative penalty schedules are outlined in detail in Section III (9) above.