UNITED STATE DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOSEPH MILLER, individually and on behalf of
his minor children attending an Amish School in
Clymer and as a board member of that school;
EZRA WENGERD, as a representative of all
Amish schools in the State of New York; JONAS
SMUCKER, individually and on behalf of his
minor children; DYGERT ROAD SCHOOL,
PLEASANT VIEW SCHOOL a/k/a TWIN
MOUNTAIN SCHOOL, SHADY LANE SCHOOL

                              Plaintiffs,                      Case No. 23-cv-00484-EAW

    vs.

DR. JAMES V. MCDONALD, in his official
capacity as Commissioner of Health of the State of
New York, and DR. BETTY A. ROSA, in her
official capacity as Commissioner of Education of
the State of New York

                              Defendants.

---

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION AND
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

LETITIA JAMES
Attorney General of the State of New York
DENETRA D. ROBERTS
DANIEL R. MAGUIRE
Assistant Attorney General, of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, New York 14202
Tel: (716) 853-8400

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

    A.    Historical and Legislative Record .................................................... 3

    B.    Vaccine-Preventable Disease Outbreak in Amish Communities............ 9

    C.    Public Health Law § 2164 ............................................................... 3

    D.    Alleged Facts. ................................................................................ 9

STANDARD OF REVIEW .................................................................................. 14

    A.    Preliminary Injunction Standard .................................................... 14

    B.    Motion to Dismiss Standard........................................................... 15

ARGUMENT ...................................................................................................... 15

POINT I      PLAINTIFFS' CLAIMS AGAINST DOE FAIL FOR LACK OF STANDING AND ON SOVEREIGN IMMUNITY GROUNDS ............................................. 15

    A.    Plaintiffs Lack Standing to Sue DOE ............................................. 16

    B.    Sovereign Immunity Bars Plaintiffs' Claims against DOE ................. 18

POINT II     PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM.............. 19

POINT III    PLAINTIFFS' FIRST AMENDMENT CLAIM FAILS REQURING DENIAL OF MOTION FOR PRELIMINARY INJUNCTION AND DISMISSAL OF COMPLAINT ............................................................................................. 21

    A.    Plaintiff's Free-Exercise Claim is Foreclosed by Supreme Court and Second Circuit Precedent..................................................................................... 22

    B.    Plaintiffs' Argument that Strict Scrutiny Applies Has Been—and Should Be— Steadfastly Rejected. ..................................................................... 26

          1.    The Statute is Neutral.............................................................. 28

          2.    The Statute is Generally Applicable ......................................... 31

                 i.    Mechanism for Individualized Exemptions ..................... 32

                 ii.    The Statute is Neither Underinclusive Nor "Overbroad" ............ 35

    C.    Plaintiffs' Hybrid Arguments Fare No Better.................................... 39

    D.    Even if Strict Scrutiny Applied, the Statute Satisfies It....................... 44

    E.    Plaintiffs Do Not Even Try to Satisfy the Rational-Relationship Test............... 48

POINT IV   THE BALANCE OF EQUITIES TIPS OVERWHELMINGLY IN DEFENDANTS' FAVOR ................................................................................ 49

CONCLUSION................................................................................................... 49

## **TABLE OF AUTHORITIES**

**Cases**

*All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82 (2d Cir. 2006)............... 19

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140,(2d Cir. 2011)...................................... 19

*Cacchillo v. Insmed, Inc.,* 638 F.3d 401 (2d Cir. 2011)......................................................... 18, 23

*Caractor v. City of New York Dep't of Homeless Servs.* (S.D.N.Y.  June 14, 2013) .................. 42

*Carver v. City of New York*, 621 F.3d 221 (2d Cir. 2010) ............................................................ 19

*Caviezel v. Great Neck Public Schools,* 739 F.Supp.2d 273 (E.D.N.Y. 2010)............................ 29

*Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520(1993)................................ 29, 31

*Citizens Union of N.Y. v. AG of N.Y.,* 2017 U.S. Dist. LEXIS 97514, *8 (S.D.N.Y. 2017)......... 22

*Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415 (2d Cir. 2002)..................... 41

*CompassCare v. Cuomo,* 465 F. Supp. 3d 122 (N.D.N.Y. June 5, 2020)..................................... 30

*Connecticut Citizen Defense League v. Cuomo,* 465 F.Supp.3d 56 (D. Conn. 2020) ................. 20

*Doe v. San Diego Unified School Dist.*, 19 F.4th 1173 (9th Cir. 2021)........................................ 36

*Doe v. Zucker,* 520 F. Supp. 3d 218 (N.D.N.Y. 2021) .................................................................. 43

*Doe v. Zucker,* 520 F.Supp.3d 217 (N.D.N.Y. 2021) ................................................................... 50

*Emilee Carptenter, LLC v. James,* 575 F.Supp.3d 353 (W.D.N.Y. 2021) .................................. 30

*Fields v. Palmdale Sch. Dist.,* 427 F.3d 1197 (9th Cir. 2005)..................................................... 44

*Fight Finest, Inc. v. Bratton*, 95 F.3d 224 (2d Cir. 1996)............................................................. 45

*Fradys v. Rondeau*, 2022 WL 1289674 (S.D.N.Y. Apr. 29, 2022) ............................................. 46

*Fulton v. City of Phila., Pennsylvania*, 141 S. Ct. 1868 (2021) ........................................ 5, 27, 29

*Goe v. Zucker,* 43 F.4th 19 (2d Cir. 2022)..................................................................................... 8

*Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d Cir. 1985) .................................................... 17

*Harris v. Univ. of Mass.,* 557 F. Supp. 3d 304 (D. Mass. 2021) ................................................. 27

*HealthNow N.Y., Inc. v. New York,* 739 F. Supp. 2d 286 (WDNY 2010)........................... 21

*Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) ......................... 22

*Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454 (2d Cir. 1996) .................................................... 44

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979) .............................. 24

*Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11 (1905) ............................................ 25

*Kissinger v. Board of Trustees of Ohio state Univ., Coll. Of Veterinary Medicine,* 5 F.3d 177, (6th Cir. 1993) ................................................................................................................................... 42

*Lawsky v. Condor Capital Corp.*, 2015 U.S. Dist. LEXIS 96347 (SDNY July 2015) ................. 24

*Leebaert v. Harrington,* 332 F.3d 134 (2d Cir. 2003) .................... 42

*Libertarian Party* v. *Cuomo,* 970 F.3d 106 (2d Cir. 2020) ......................... 20

*Liu v. United States Congress,* 834 Fed, App'x. 600 (2d Cir. 2020) ........................... 20

*Massachusetts State Grange v. Benton,* 272 U.S. 525 (1926) ...................... 22

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* __U.S. __, 138 S. Ct. 1719 (2018). 30

*McCartney v. Austin,* 31 A.D.2d 26 (3d Dept. 1969) ........................... 29

*McCormick v. Stalder*, 105 F.3d 1059 (5th Cir. 1997) ..................... 47

*Mongielo v. Hochul,* 2023 WL 2307887 (W.D.N.Y. Mar. 1, 2023)........................... 46

*N.Y. ex rel. Schneiderman v. Actavis PLC,* 787 F.3d 638 (2d Cir. 2015) ..................... 18

*Our Lady of Guadalupe Sch. V. Morrissey-Berru,* __ U.S. __, 140 S.Ct. 2049 (2020) ............. 34

*Pennhurst State School & Hosp. v. Halderman,* 456 U.S. 89 (1984) .......................... 21

*Phillips v. City of New York,* 775 F.3d 538 (2d Cir. 2015) ........................ 26

*Plyler v. Doe,* 457 U.S. 202 (1982) ........................... 43

*Prater v. City of Burnside, Ky.,* 289 F.3d 417 (6th Cir. 2002)........................ 42

*Prince v. Massachusetts,* 321 U.S. 158 (1944) .......................... 10

*Rabbinical Cong. of the U.S. v. N.Y.C. Dep't of Hlth. & Mental Hygiene*, 763 F.3d 183 (2d Cir. 2014) ..................... 31

*Reynolds v. Giuliani*, 506 F.3d 183 (2d Cir. 2007)........................ 23

*Robinson v. Sessions*, 721 F. App'x 20 (2d Cir. 2018)........................ 19

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020)........................... 31

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006) ................... 45

*State v. Green*, 96 N.Y.2d 403 (2001) .................... 8

*Territory of Alaska v. American Can Co.*, 388 U.S. 224 (1959) ..................... 8

*United States v. Smith*, 945 F.3d 729 (2d Cir. 2019) ..................... 19

*Viemeister v. White*, 179 N.Y. 235 (1904) ..................... 38

*Watkins-El v. Dep't of Educ.,* 2016 U.S. Dist. LEXIS 139860 (E.D.N.Y. Oct. 6, 2016)............. 28

*We the Patriots USA Inc. v. Hochul,* 17 F.4th 266 (2d Cir. 2021)......................... passim

*Workman v. Mingo Co. Bd. of Ed.,* 419 Fed. Appx. 348 (4th Cir. 2011) ................. 28, 48

*Yellowbear v. Lampert,* 741 F.3d 48 (10th Cir. 2014) ..................... 34

*Zucht v. King,* 260 U.S. 174 (1922) ...................... 25

**Statutes**

1966 N.Y. Laws 3331 ................................................................................................ 8

N.Y. Comp. Codes R. & Regs., tit. 10, §§ 66-1.1(f)-(g), 66-1.3(a)................................ 8

N.Y. Public Health Law §2164........................................................................ 4, 5, 8, 13

N.Y. Senate Bill S2994A, 242d Sess. (2019) ............................................................... 8

**Other Authorities**

CDC, *Pertussis Outbreak in Amish Community, Kent Co., Delaware* (Sept 2004 – February 2005) ....................................................................................................................... 12

*Five Cases of Polio in Amish Group Raise New Fears*, New York Times (Nov. 8, 2005).......... 13

M. Newman, *Democrat and Chronicle*, "97 cases of whooping cough reported among Delaware Amish" (Aug. 23, 2018).......................................................................................... 12

N.Y. Assembly Sponsor's Memorandum in Support of Bill A2371A , https://digitalcollections.archives.nysed.gov/ind ex.php/Detail/objects/85273# .....…………….9

N.Y. Assembly, Tr. of Floor Proceedings, 242d Sess., at 70-71 (June 13, 2019), https://nystateassembly.granicus.com/DocumentViewer.php?file=nystateassembly_8c58f742b2b 59522cb1cfb4aa53273a8.pdf&view=1 ……………………………………………………9

N.Y. Senate Introducer's Memorandum in Support of Bill S2994A, 242d Sess. (May 21, 2019), https://www.nysenate.gov/legislation/bills/2019/s2994/amendment/a ...................................……9

N.Y. Senate, Tr. of Floor Proceedings, 242d Sess., at 5387 (June 13, 2019), https://legislation.nysenate.gov/pdf/transcripts/2019-06-13T14:43/ ........................................... 9

N.Y. State Bar Ass'n, Memorandum in Support of S2994A/A2371, at 2-3 (May 20, 2019), https://nysba.org/NYSBA/Advocacy%20and%20Leadership/Governmental%20Relations/Leg islative%20Memoranda/19-20%20Legislative%20Memos/19-20Children8.pdf  .................. 9

P. Gastanaduy, J. Budd, N. Fisher, S. Redd, *A Measles Outbreak in an Underimmunized Amish Community in Ohio*, N. Engl. J. Med. 375:1343-1354 (Oct. 6, 2016)...................................... 12

Paul Etkind, Susan Lett et al., "Pertussis outbreaks in groups claiming religious exemptions to vaccinations,"....................................................................................................................... 13

U.S. Citizenship & Immigr. Servs., Vaccination Requirements (last updated Dec. 21, 2022), https://www.uscis.gov/tools/designated-civil-surgeons/vaccination-requirements

U.S. Centers for Disease Control and Prevention, Center for State, Tribal, Local, and Territorial Support, State School Immunization Requirements and Vaccine Exemption Laws(Feb. 2022), https://www.cdc.gov/phlp/docs/school-vaccinations.pdf

## PRELIMINARY STATEMENT

Dr. James V. McDonald, in his official capacity as Commissioner of the New York State Department of Health ("DOH"), and Dr. Betty Rosa, in her official capacity as Commissioner of the New York State Education Department ("SED") (collectively, "Defendants"), submit this Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in support of Defendants' Motion to Dismiss.

Plaintiffs, identified as Amish schools, representatives, and parents, seek the drastic and exceptional remedy of a preliminary injunction. They argue that N.Y. Public Health Law ("PHL") §2164, which mandates immunizations for school children, violates the Free Exercise Clause and cannot survive because it allows medical, but not religious, exemptions.  New York's law, which requires that school children who can safely be vaccinated must be vaccinated, fully complies with the Constitution.

Over one hundred years ago, the Supreme Court rejected constitutional challenges to vaccine mandates without a religious exemption.  It observed that compulsory vaccination laws are among the neutral, generally applicable laws that do not require religious exemptions under the First Amendment.[1]  No court appears to have ever held that strict scrutiny be applied to immunization mandates. Indeed, the Second Circuit found that New York could constitutionally require that *all children* be vaccinated in order to attend public school, and that by allowing religious exemptions, New York law *went beyond* what the Constitution requires. And, a myriad of federal and state courts have recognized that the Free Exercise Clause does not bar states from adopting mandatory vaccination laws that, like the law at issue here, have only medical exemptions.

---

[1] *See Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905).

Recently, the Second Circuit in *We the Patriots USA Inc. v. Hochul,* 17 F.4th 266 (2d Cir. 2021), *opinion clarified,* 17 F.4th 368 (2d Cir. 2021) cert. denied 142 S. Ct. 2569 (2022) (hereinafter, "*Patriots*") rejected the same argument Plaintiffs make here. The Second Circuit held that plaintiffs were unlikely to succeed on their claim that challenged a mandatory vaccination law, which included a medical but not religious exemption. Reaching this decision after considering the Supreme Court's decision in *Fulton v. City of Phila., Pennsylvania,* 141 S. Ct. 1868, 1877 (2021), the Second Circuit found that DOH's vaccination requirement was neutral, generally applicable, subject only to rational-basis review, and "easily" met the lower standard. *Patriots,* 17 F.4th at 290. The Court determined that the Constitution permits a law requiring those "who could safely receive the vaccine to be vaccinated." *Id.* at 282. That is precisely what PHL § 2164 does.

Plaintiffs do not mention *Patriots*. Despite citing forty cases—including cases about wedding cakes and adoption; Second Circuit cases decided before and after *Patriot;* and cases from district courts "across the country"—Plaintiffs refused to acknowledge Second Circuit precedent. *Patriots* rejected the argument that the presence of a medical exemption created comparable secular conduct for purposes of determining general applicability, and refused to enjoin a New York statute that mandated vaccines, which allowed for a medical, but not religious, exemption. Even if this Court did not view *Patriots* as controlling precedent, its impact is undeniable: Plaintiffs cannot succeed on constitutional claims repeatedly rejected by the Second Circuit and Supreme Court.

Where, as here, the plaintiff seeks mandatory preliminary injunctive relief against state executive officers, they are required to "meet a higher standard" by making a "clear" or "substantial" showing of entitlement to the relief requested. In the wake of *Patriots, supra,* and coupled with the long and well-tested Supreme Court and Second Circuit precedent rejecting strict

scrutiny of immunization mandates, Plaintiffs cannot meet this standard.

Recognizing as much, Plaintiffs contend that strict scrutiny applies because they present a hybrid claim based on religious, parental, freedom of speech, and/or association rights. But this, too, ignores Second Circuit precedent holding that there is no good reason for the standard of review to vary simply with the number of constitutional rights asserted. This also ignores that only two of the plaintiffs are parents suing on behalf of their infant children and, thus, only these two plaintiffs can assert their parental rights at all.

In any event, while parents' liberty interest in the custody, care, and nurture of their children resides first in the parents, it does not reside there exclusively*;* it is not beyond regulation by the state in the public interest; it is not a "fundamental" right; and it is subject to rational review. Plaintiffs also insist that their children are being deprived of their right to an education due to the vaccine mandate. Not only does this overstate their case, as courts already found, there is no fundamental right to an education and, in any event School-Plaintiffs remained open to inoculated and uninoculated children even after the DOH determined that the School-Plaintiffs violated New York record-keeping requirements and assessed a penalty.  Nor is there any merit to Plaintiffs' free-speech and free-association claims. Compliance with mandatory immunization laws regulates conduct, not protected speech or association.

## STATEMENT OF FACTS

### A.  Public Health Law § 2164.

Public Health Law § 2164 requires "every person in parental relation to a child in this state [to] have administered to such child an adequate dose or doses" of certain "immunizing agent[s]," including those that guard against mumps, measles, diphtheria, and  hepatitis B. PHL § 2164(1)(d). When applying for admission to a "public, private, or parochial ... school," parents and guardians

are required to provide schools with certificates of their child's vaccination history. *Id.* §§ 2164(1)(a), (6). If any physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable until such immunization is found no longer to be detrimental to the child's health. *Id.* §(8).

## B. Historical and Legislative Record

In 1860, New York became the second State to enact vaccination requirements for schoolchildren. Ch. 438, § 1, 1860 N.Y. Laws 761, 761.[2] That law "directed and empowered" local school boards to deny admission to any child who was not vaccinated against smallpox. *Id.* Over time, more states adopted mandatory school vaccination laws. By 1981, mandatory vaccination laws were universal throughout the United States.[3]

Today, New York's school vaccination law, like that of every other state, mandates vaccination against several contagious diseases, including measles, polio, varicella (chicken pox), and pertussis (whooping cough).[4] New York's law provides that any child who is not immune to any of the enumerated diseases based on past exposure must be vaccinated against that disease to enter or attend any public or non-public childcare center, nursery school, or elementary, intermediate, or secondary school. PHL § 2164(1), (7); N.Y. Comp. Codes R. & Regs. ("NYCRR"), tit. 10, §§ 66-1.1(f)-(g), 66-1.3(a). The law contains a single, narrow exception: a medical exemption that is limited in duration and scope. *See* 66-1.3(c); § 2164 (8). It applies only

---

[2] *See* James G. Hodge, Jr. & Lawrence O. Gostin, *School Vaccination Requirements: Historical, Social, and Legal Perspectives*, 90 Ky. L.J. 831, 851 (2002).

[3] James Colgrove, *State of Immunity: The Politics of Vaccination in Twentieth-Century America 177* (2006).

[4] U.S. Centers for Disease Control and Prevention, *Center for State, Tribal, Local, and Territorial Support, State School Immunization Requirements and Vaccine Exemption Laws* 8 (Feb. 2022)(internet). U.S. Centers for Disease Control and Prevention, *Center for State, Tribal, Local, and Territorial Support, State School Immunization Requirements and Vaccine Exemption Laws 8* (Feb. 2022) (internet). (For sources available on the internet, full URLs appear in the Table of Authorities. All URLs were last visited on July 30, 2023.)

to the specific immunization that is medically contraindicated, 66-1.3(c), and only when consistent with a "nationally recognized evidence-based standard of care," such as the guidance issued by the Centers for Disease Control and Prevention's Advisory Committee on Immunization Practices ("ACIP"), *id.* §66-1.1(1). The exemption applies only until the "immunization is found no longer to be detrimental to the child's health," PHL § 2164(8), and that duration must be specified in the child's medical records. 10 NYCRR § 66-1.3(c).

Starting in 1966, New York included a non-medical, religious exemption, Ch. 994, § 2, 1966 N.Y. Laws 3331, 3333, which exempted children whose parents or guardians objected to vaccination on religious grounds, Ch. 538, § 3, 1989 N.Y. Laws 2785, 2787 (codified at PHL former § 2164(9)). In 2019, a bill was introduced in both houses of the legislature to amend the school vaccination law by repealing the religious exemption. *See* N.Y. Senate Bill S2994A, 242d Sess. (2019);[5] N.Y. Assembly Bill A2371A, 242d Sess. (2019). In June 2019, the legislature enacted that bill into law. Ch. 35, §§ 1-4, 2019 McKinney's Sess. Laws of N.Y. 153, 153-54.

The repeal bill was prompted by the Nation's worst measles outbreak in a quarter-century.[6] As the Legislature was aware, New York was the epicenter of the outbreak, with the virus primarily spreading in areas "with precipitously low immunization rates." N.Y. Senate Introducer's Memorandum in Support of Bill S2994A, 242d Sess. (May 21, 2019) ("Senate Mem.").[7]  The

---

[5] It is beyond cavil that a court may take judicial notice of the repeal's legislative history, including the accompanying legislative memoranda and floor debate in the New York State Assembly and Senate. *See, e.g., Territory of Alaska v. American Can Co.,* 388 U.S. 224, 226-27 (1959) *State v. Green,* 96 N.Y.2d 403, 408 n.2 (2001).

[6] *See also Goe v. Zucker,* 43 F.4th 19, 24 (2d Cir. 2022)("That year, following a nationwide measles outbreak, [the State] repealed the non-medical exemption and adopted new regulations that clarified the requirements for a medical exemption. Specifically, the State narrowed the availability of medical exemptions to cases consistent with guidelines issued by the Advisory Committee on Immunization Practices (the "ACIP" and the "ACIP Guidelines") of the Centers for Disease Control and Prevention (the "CDC")[1] or with other nationally recognized evidence-based standards of care.").

[7] https://www.nysenate.gov/legislation/bills/2019/S2994

outbreak was so severe that the Nation was at risk of losing its status as a country that had eradicated measles. *See id.;* N.Y. Senate, Tr. of Floor Proceedings, 242d Sess., at 5387 (June 13, 2019) ("Senate Tr.") (*internet*).

In passing the bill, the Legislature considered extensive data and scientific evidence. That data showed that, over the last several years, the rate of religious exemptions had increased statewide by 65 percent. *See* Senate Tr. at 5388-89. At least five times as many children had religious exemptions as had medical ones. *See* N.Y. Assembly, Tr. of Floor Proceedings, 242d Sess., at 70-71 (June 13, 2019) ("Assembly Tr.") (*internet*). Religious exemptions also tended to cluster geographically. Some schools had granted religious exemptions to over 20 percent of their students. *See id.* at 58-59; Senate Tr. at 5384-85, 5389, 5399. Indeed, in the jurisdictions hardest hit by the measles outbreak, the vast majority of those infected were unvaccinated children. *See* Assembly Tr. at 58-59, 106; N.Y. State Bar Ass'n, Memorandum in Support of S2994A/A2371, at 2-3 (May 20, 2019) ("NYSBA Mem.") (*internet*) (cited in 2019 *New York State Legislative Annual* 40, n.38). One local health department reported that one child with a religious exemption who had contracted measles caused 44 new cases, 26 of which were schoolchildren with religious exemptions. Senate Tr. at 5385. Thus, as the legislative record made clear, the repeal bill would increase vaccination rates and thereby "protect the health of all New Yorkers, particularly our children." Senate Mem., *supra; see also* N.Y. Assembly Sponsor's Memorandum in Support of Bill A2371A ("Assembly Mem."), *in* Bill Jacket to N.Y. Sess. Laws 2019, Ch. 35, at 4a (2019) (emphasizing importance of "high vaccination rate" among schoolchildren to prevent outbreaks) (*internet*).

Medical and public health organizations, including the American Medical Association and the American Academy of Pediatrics, uniformly supported the bill as an important public health

measure. *See* Senate Tr. at 5445-46; Assembly Tr. at 64-65, 101. So too did numerous educational organizations, including the New York State PTA and the New York State School Boards Association. *See* Senate Tr. at 5435.

The Legislature modeled the bill after legislation that other states had adopted in response vaccine-preventable disease outbreaks. California, for instance, removed the non-medical exemptions from its school vaccination law after a 2014 measles outbreak. *See* Senate Mem., *supra.* Thereafter, its vaccination rates "improved demonstrably, particularly in schools with the lowest rates of compliance." *Id.; see also* Senate Tr. at 5385 ("California showed us the way"); Assembly Tr. at 47 ("The vaccination rate in California, once they eliminated nonmedical exemptions, went from 90 percent, approximately, to 95 percent"). Maine likewise repealed its school vaccination law's non-medical exemption in response to an outbreak of pertussis, another vaccine-preventable disease. *See* Senate Tr. at 5404.

When considering the bill, the State made clear its respect for religious practices while also finding that public health concerns necessitated the measure. One legislative memorandum accompanying the bill noted that "freedom of religious expression is a founding tenet of this nation" while also observing that, under "longstanding" legal precedent, the legislature could pass laws to protect the public health, including through compulsory vaccination. *See* Senate Mem., *supra* (citing, e.g., *Prince v. Massachusetts,* 321 U.S. 158 (1944)). The Governor of New York stated upon signing the bill: "While I understand and respect freedom of religion, our first job is to protect the public health and by signing this measure into law, we will help prevent further transmissions."[8]

---

[8] https://www.usnews.com/news/politics/articles/2019-06-14/new-york-gov-andrew-cuomo-signs-bill-removing-religious-vaccination-exemptions

Similar sentiments animated the floor debate over the repeal bill. One senator quoted a letter from the New York State Council of School Superintendents submitted in support of the bill that she said "get[s] the tone right":

> We do not take this stance with ease or with any lack of respect for individuals with a sincerely held religious belief against vaccination. Nor have we arrived at this conclusion lightly or without debate. However, school districts are now struggling to deal with an illness that was effectively eliminated from the country two decades ago. This is unacceptable.

Senate Tr. at 5436; *see also, e.g., id.* at 5448-49. Other legislators who supported the bill likewise admitted that it was "a difficult vote." Assembly Tr. at 61; *see also id.* at 112 ("This has not been an easy task."); *id.* at 118 ("I've been torn, and I think many of us are torn."). Still other legislators applauded the respect the Legislature had shown to religious practices when considering the bill. *See* Senate Tr. at 5432, 5451-53. One senator who *opposed* the bill nonetheless acknowledged, "I do appreciate the debate and the respectfulness with which this issue was approached." *Id.* at 5451. He continued: "I'm proud of this body. We balanced everybody's interest." *Id.* at 5452.

The legislative history thus establishes that the Legislature, guided by scientific data, crafted a sensible measure to confront the pressing public health threat of insufficient vaccination rates and thereby "protect the health of all New Yorkers, particularly our children."

Notably, numerous lawsuits have been brought challenging that legislative repeal and requesting injunctive relief, none of which have been successful. *See F.F. v. State*, 66 Misc. 3d 467 (Sup. Ct. Albany Cty.); *F.F. v. State*, 194 A.D.3d 80 (App. Div. 3rd Dep't 2021); *V.D. v. State*, 403 F. Supp. 3d 76 (E.D.N.Y. 2019); *Stoltzfus v. Cuomo*, Index No. 20190311, NYSCEF Doc. No. 56 (Sup. Ct. Seneca Cty. Nov. 4, 2019); *Sullivan-Knapp v. Cuomo*, Index No. E2019-1338CV,

NYSCEF Doc. No. 41 (Sup. Ct. Steuben Cty. Oct. 9, 2019); *Mermigis v. Cuomo*, Index No. 608729/2019, NYSCEF Doc. No. 15 (Sup. Ct. Nassau Cty. June 29, 2019).

**C. Alleged Facts.**

In contrast to the standard applicable to pleadings on a motion to dismiss where a plaintiff is required to plead sufficient facts to state a plausible claim and where conclusory statements and legal argument need not be accepted by a court, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009), the Court need not accept Plaintiffs' factual assertions on a motion for preliminary injunction as true. *Brooks v. Roberts,* 251 F.Supp.3d 401, 422 (N.D.N.Y. May 5, 2017). Thus, accepting Plaintiffs' factual assertions only for the purposes of a motion to dismiss, as is required, Plaintiffs tell the following story.

Plaintiffs are "sincere adherents to the Amish belief system." Dkt. 1, ¶ 2. Members of the Amish faith educate their children in accordance with their religious belief in religious schools. *Id.* ¶ 15. Plaintiffs assert that "many" Amish have "profound religious objections" to vaccines. *Id.* ¶¶ 2, 13. The Amish also object to the practice of abortion on religious grounds, and Plaintiffs "and their community are aware of fetal cell involvement in medical research." *Id.* ¶ 14. Plaintiffs own submission show that 26% of students attending at least one of the Amish schools received at least some vaccinations. *Id.*, Exh. D at 10.

New York's statute prohibits school attendance absent receipt of vaccines or a medical exemption. *Id.* ¶ 17. These schools include public, private, or parochial setting, *id.*, as defined by the Legislature. *Id.,* Exh. E, p. 6 ("The Legislature has clearly defined what entities are included in the definition of 'schools'").

After the Legislature repealed the religious exemption in 2019, Amish children continued to attend school. *Id.* ¶ 30. During this time, none of the Plaintiffs requested an exemption from the

state mandate and the Plaintiffs "who run these schools" did not require proof of vaccination. *Id.*, ¶ 2. Plaintiffs admit that they knew of the vaccine mandate.[9]  Although Plaintiffs allege that the statute "precludes children from gathering to learn, pray and receive an education," *id.* ¶ 18, documents annexed to and incorporated into Plaintiffs' Complaint make clear that Amish children attended school, with and without vaccinations. *Id.*, Exh. D, p. 6, ¶ 10 (one student found to be fully compliant with immunization requirements, and several other students in the process of receiving required immunizations); *id.*, Exh. E, p. 6 & n. 11 (respondent schools provided documentation of twelve students who had partial immunizations and, in one case, fully compliant).

On November 8-9, 2021, the DOH advised various Amish school principals of record that an audit would be conducted. *Id.*, Exh. D at p. 3, ¶ 2, p. 4, ¶ 5, p. 5, ¶8. In November and December 2021, the DOH audited or attempted to audit the three Amish-school (the "School-Plaintiffs").[10] *Id.* (Complaint) ¶ 31; *id.*, Exh. D at 3, ¶ 3; at 5, ¶ 6; at 6, ¶ 10. On March 11, 2022, the DOH mailed Statements of Charges and Notices of Hearing (the "Notices") to the School-Plaintiffs. *Id.* ¶ 32 & Exh. A attached thereto.

Appendixes to the Statement of Charges included (now redacted) names of 49 students who attended the school either with partial or no vaccinations. Given that one student had full vaccinations and 12 had partial vaccinations, 26% of the 50 students who attended the Amish schools had some level of vaccinations.

A hearing was held before Administrative Law Judge Natalie Bordeaux on May 2, 2022. Dkt. 1, Exh. D at 1. Plaintiff Ezra Wengerd appeared on behalf of the School-Plaintiffs and read a

---

[9] *See* Roberts Dec., *infra*, Exh. B, p.109-110.
[10]  More specifically, Dygert Road, Twin Mountain a.k.a. Pleasant View ("Pleasant View"), and Shady Lane Schools.

statement into the record admitting that "schools were not in compliant with the NYS requirement of childhood vaccination." *Id.*, Exh. C.[11] Only at that time did Mr. Wengerd ask for an exemption for religious reasons.

Counsel for the DOH made clear that the charges against the schools related to their failure to keep a record of vaccinations, as required by PHL 2164. *See generally* Roberts Dec. Exh. B. Further, because Shady Lane School produced no list of children whatsoever, the DOH recommended that it be assessed a financial penalty of $20,000. *Id.* at p. 104. As against Dygert Road School, the DOH recommended a financial penalty of $52, 000 and as against Pleasant View School, the DOH recommended a financial penalty of $$46, 000. *Id.* at 103, Plaintiff Wengerd gave no testimony then, and Plaintiffs do not offer any financial proof now, in support of their blanket assertion that the Amish are unable to pay the penalty. Nor is such an inability, if true, relevant to Plaintiffs' claims in this case.

The ALJ sustained all charges, but assessed no penalty, against the schools because the School-Plaintiffs received insufficient notice. *Id.* at 18; *see also* Complaint, Dkt. 1, Exh. D. A Senior Attorney for the DOH submitted objections to the ALJ's Report and Recommendation insofar as it assessed no penalty. Dkt. 1, Exh. E. Among other things, the DOH did not dispute the genuineness of the religious assertions, *id.* at 4 n. 2, and argued that if no penalty was assessed, the School-Plaintiffs would continue to violate the law and would

---

[11]   A digitalized recording of the hearing was made, which runs, at least according to the ALJ's report, more than two hours. *Id.*, Exh. D. at 2. While Plaintiffs manually filed a thumb drive of the oral testimony at the hearing, they did not serve it with their summon, complaint, and motion papers, nor have it transcribed. Plaintiffs also cherry-picked certain exhibits from the hearing and annexed them to their complaint. The full hearing record and a certified transcript of the hearing are annexed to the Declaration of Denetra D. Roberts, Esq.("Roberts Dec.") as Exhibits A & B, respectively.

incentivize other religious schools and maybe even secular schools to ignore PHL § 2164. *Id.*, Exh. E at 4.

On December 22, 2022, the DOH sustained much of the ALJ's Report, which found that Plaintiffs failed to comply with New York State law, and imposed the above requested monetary penalties. *See Id.*, Exh. F (the "DOH Order").

Additionally, Plaintiffs do not allege that they voluntarily closed the schools after the DOH Order. Nor do they allege that unvaccinated students did not attend school during the January-June 2023 term. Ostensibly, Plaintiff-Schools continued to allow school children to attend, despite the vaccine mandate and the DOH Order. Rather than comply with the DOH Order, four years after the New York State Legislature abolished the religious exemption, one year after the administrative hearing, and six months after determining Plaintiff-Schools' liability and assessing a penalty, Plaintiffs filed their motion for a preliminary injunction, claiming that they cannot pay the penalty and asking for drastic and extraordinary relief.

## D. Vaccine-Preventable Disease Outbreak in Amish Communities

In support of their Preliminary Injunction, Plaintiffs have not offered evidence to show why the Amish community should be treated distinctly under PHL §2164 or that Amish communities are insulated from disease outbreak. Nor can they, as outbreaks such as the 2018-2019 measles outbreaks have historically started or occurred in interwoven, small communities that are undervaccinated, some of which have been Amish. Nor are the Amish, and Amish children in particular, immune from vaccine-preventable serious illness or death. *See, e.g.,* S. Long, R. Lowe*, "Severe Pertussis Infection with Hyperleukocytosis in a 10-month Old Amish Female".* A measles outbreak in an Amish community in Ohio "served as a reminder that measles remained epidemic." *See* P. Gastanaduy, J. Budd, N. Fisher, S. Redd, *A Measles Outbreak in an*

*Underimmunized Amish Community in Ohio*, N. Engl. J. Med. 375:1343-1354 (Oct. 6, 2016). Measles infection of two Amish community members, who returned from typhoon-relief charitable work in the Philippines, resulted in 383 confirmed cases of measles in an Amish community, 340 of which were unvaccinated. *Id*. The measles outbreak "was the largest such outbreak documented in the United States in more than two decades, with a crude attack rate that was several orders of magnitude larger than the annual incidence of measles in the country (which is <1 case per million persons), and lasted for approximately 4 months, which was longer than any other measles outbreak since the disease was eliminated in the United States." *Id*.; *see also* CDC: *Measles Outbreak in Amish Community Demonstrates Potential for Ongoing Threat* (Oct. 7, 2016).

Disease outbreak in largely-unvaccinated communities is not confined to measles. Almost 100 people in an Amish community in Kent County, Delaware, developed pertussis, in August 2018, a highly contagious disease, transmitted by coughing or sneezing, that can cause severe breathing illness among babies and young children. Dr. Karyl Rattay, director of the Delaware Division of Public Health, noted that "Pertussis is a vaccine-preventable disease and vaccination was the best and most proactive preventive measure you can take to prevent it." *See* M. Newman, *Democrat and Chronicle*, "97 cases of whooping cough reported among Delaware Amish" (Aug. 23, 2018); *see also* CDC, *Pertussis Outbreak in Amish Community, Kent Co., Delaware* (Sept 2004 – February 2005); *see also Five Cases of Polio in Amish Group Raise New Fears*, New York Times (Nov. 8, 2005).[12]

---

[12] "Poliovirus Infections in Four Unvaccinated Children—Minnesota, Aug.-Oct. 2005," 54 MMWR Dispatch (Oct. 14, 2005):1-3.; Paul Etkind, Susan Lett et al., "Pertussis outbreaks in groups claiming religious exemptions to vaccinations," American Journal of Diseases of Children 146(Feb. 1992):173-76, report on four pertussis outbreaks in Massachusetts; Daniel Feikin, Dennis Lezotte et al., "Individual and community risks of measles and pertussis associated with personal exemptions to immunization," JAMA 284 (Dec. 27, 2000):3145-50, found that children ages

## STANDARD OF REVIEW

### A. Preliminary Injunction Standard

"Issuance of a preliminary injunction is an 'extraordinary and drastic remedy' that is 'never awarded as of right.'" *Patriots,* 17 F.4th at 279 (2d Cir. 2021) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90  (2008); *see also Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies"). Preliminary injunctive relief "should not be routinely granted." *Hanson Tr. PLC v. SCM Corp.*, 774 F.2d at 60 (quoting *Medical Soc. of State of N.Y. v.  Toia*,  560  F.2d  535,  537  (2d  Cir. 1977)). When deciding whether to issue a preliminary injunction,  courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008)).

"To obtain a preliminary injunction that 'will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting  the  injunction." *Id*. (citing *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (internal quotation marks omitted). The movant must also show that the balance of equities supports the issuance of an injunction. *Id.* at 280 (citing *Yang v.*

---

3-18 with personal belief exemptions were 5.9 times more likely to contract pertussis than vaccinated children; AP, "Whooping cough outbreak kills infant in community," Prescott Courier (Nov. 23, 1988):9A ("In 1988 a four-month-old Amish boy died of pertussis in Conewango, New York, and 32 others in his Amish community contracted the disease."); ils.unc.edu/~viles/172i/users/big/docs/AP881103-0207 (The same Amish community had 216 cases of pertussis in 1982 and six in 1985); Briss P, Fehrs L, Hutcheson RH, et al. Rubella among the Amish: resurgent disease in a highly susceptible community, Pediatr Infect Dis J 1992;11:955—9; Fry A, Lurie P, Gidley M, et al. *Haemophilus influenzae* type B disease among Amish children in Pennsylvania: reasons for persistent disease, Pediatrics 2001;108:E60; Adams CE, Leverland MB. The effects of religious beliefs on the health care practices of the Amish. Nurse Pract 1986;11:58—67; Guris D, Strebel PM, Bardenheier B, et al. *Changing epidemiology of pertussis in the United States: increasing reported incidence among adolescents and adults*, 1990--1996. Clin Infect Dis 1999;28:1230; Biellik RJ, Patriarca PA, Paul W, Sanden G, Brink EW, Silverman P. *Pertussis in an Amish community in Delaware* [Abstract no. 268].

*Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020)). Because Plaintiffs seek to restore the status-quo ante

(or the right to a religious exemption that pre-dated the 2019 legislative amendment) and compels

state action (forgiveness of the penalty), Plaintiffs must make a clear showing of entitlement to

relief. *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 406 (2d Cir. 2011) (citation omitted); *see also N.Y.*

*ex rel. Schneiderman v. Actavis PLC,* 787 F.3d 638, 650 (2d Cir. 2015) (requiring a "clear" or

"substantial" likelihood of success as well as a "strong showing" of irreparable harm).

**B.  Motion to Dismiss Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678

(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2005)).  Legal conclusions, deductions, or

opinions are not given a presumption of truthfulness.  *Iqbal*, 556 U.S. at 678.  Thus, "a formulaic

recitation of the elements of a cause of action will not do. Factual allegations must be enough to

raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Pursuant to Federal

Rule of Civil Procedure 12(b)(6), a claim will be dismissed if it fails to plausibly state a cause of

action.

## ARGUMENT

### POINT I

### PLAINTIFFS' CLAIMS AGAINST SED FAIL FOR LACK OF STANDING AND ON SOVEREIGN IMMUNITY GROUNDS

Plaintiffs do not allege any facts to show that the DOE had any part in auditing,

notifying, conducting the hearing, or assessing charges. The hearing record shows that it did

not. *See* Roberts Dec., Exh. A. Thus, the case should be dismissed as against SED for lack of

standing, as well as sovereign immunity.

### A.    Plaintiffs Lack Standing to Sue SED

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d at 113.  To meet that burden, a plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue" and the court "need not 'credit a complaint's conclusory statements without reference to its factual context.'" *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145, 146 (2d Cir. 2011) (Per Curiam) (quoting *Iqbal*, 556 U.S. at 686).

"The Supreme Court has called Article III standing perhaps the most important of the case-or-controversy doctrines placing limits on federal judicial power." *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006) (quotation marks omitted). "Three elements comprise the 'irreducible constitutional minimum' of standing: the individual initiating the suit must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *United States v. Smith*, 945 F.3d 729, 736 (2d Cir. 2019) (quotation marks omitted).

Plaintiffs bear the burden of establishing these essential requirements against the Defendants, for each claim asserted, and for each type of relief sought.  *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010). Conclusory allegations are not enough to satisfy those elements.  *Robinson v. Sessions*, 721 F. App'x 20, 23 n.3 (2d Cir.), *cert. denied*, 138 S. Ct. 2584 (2018) (Summary Order).

Here, Plaintiffs have not alleged, nor can they show, harm fairly traceable to SED. While this requirement is not an onerous one, Plaintiffs must establish some causal relationship between SED and their alleged injury. *Liu v. United States Congress,* 834 Fed, App'x. 600, 604 (2d Cir. 2020). (citations omitted).  Causation may thus be said to focus on whether a particular party is

appropriate. *Id.* at 605 (quoting *Fla. Audubon Soc. v. Bentsen,* 94 F.3d 658, 663 (D.C. Cir. 1996) (*en banc*)).

By way of example, in *Libertarian Party* v. *Cuomo,* 970 F.3d 106, 117 (2d Cir. 2020), the plaintiffs sued Governor Cuomo and various government officials for injunctive and declaratory relief and money damages, alleging that they were denied pistol permits. As to those plaintiffs that were able to show injury-in-fact, the Second Circuit found that the plaintiffs still lacked standing because they could not show that the injury was fairly traceable to the named defendants. Instead, the court found that the denial of pistol permits was fairly traceable to the judges, who denied the individual permits, not the named defendants. *Id.* at 117.

In contrast, in *Connecticut Citizen Defense League v. Cuomo,* 465 F.Supp.3d 56, 67 (D. Conn. 2020), the plaintiffs seeking injunctive relief were able to show injury-in-fact traceable to the Commissioner and Governor. This was because the Governor issued the challenged executive order under attack and the Commissioner announced that he was suspending fingerprinting at certain facilities and acknowledged that he persuaded the Governor to suspend the statutory fingerprint collection requirements. *Id.*

Here, Plaintiffs do not allege that SED took any action or threatened to take action against them. While Plaintiffs allege in conclusory terms that SED "is empowered to adjudicate parental requests or appeals following exclusion from schools …, and is tasked with implementing and enforcing …, the mandatory educational instruction and supervision of school requirements," they do not allege that SED cited Plaintiffs for violation of PHL § 2164, held a hearing, reached a determination, or assessed a penalty. Instead, by Plaintiffs' own admission, the actions about which they complain—enforcing the vaccine mandate, notifying various schools of violations, conducting a hearing, and assessing a penalty—were all taken by the DOH. As Plaintiffs

specifically alleged, the DOH—not the SED— "recently levied crippling financial penalties against the Amish and their schools, with threats of considerably greater future fine." Dkt. No. 10 at 7. Nor are there allegations that SED forbade any of the Amish students from pursuing an education because he/she/they were not vaccinated or that she threatened or will threaten to shut down the schools. Because Plaintiffs alleged no injury fairly traceable to SED, they lack standing to sue it.

**B.**     **Sovereign Immunity Bars Plaintiffs' Claims against SED**

"[R]egardless of the nature of the relief sought," suits in federal court which name states as defendants are proscribed by the Eleventh Amendment, unless Congress has abrogated that state's Eleventh Amendment immunity, or the state has waived such immunity by unambiguously consenting to the suit. *Pennhurst State School & Hosp. v. Halderman,* 456 U.S. 89, 100 (1984). This immunity unquestionably extends to suits again state officials like the Commissioner of SED.

The Eleventh Amendment bars Plaintiffs' claims for prospective injunctive relief against Commissioner Rosa unless the "legal fiction" of *Ex Parte Young* applies.   It does not. Preliminarily, a "plaintiff's failure to name the proper defendant is 'fatal to the claim.'" *HealthNow N.Y., Inc. v. New York,* 739 F. Supp. 2d 286, 295 (WDNY Sept. 2010) (quoting *Confederated Tribes & Bands of Yakama Indian Nation v. Locke*, 176 F.3d 467, 469 (9th Cir. 1999)). The general authority to enforce the laws of the state is not sufficient to name a state officer as a defendant in an action.  *HealthNow New York, Inc.,* 739 F. Supp. 2d at 294-5, *aff'd on other grounds*, 448 F. App'x 79 (2d Cir. 2011) (Summary Order).  The official must have "both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Citizens Union of N.Y. v. AG of N.Y.,* 2017 U.S. Dist. LEXIS 97514, *8 (S.D.N.Y. Jun. 23, 2017) (collecting cases).

Plaintiffs do not, nor can they, allege that Commissioner Rosa had some connection with enforcing PHL § 2614 against them, much less demonstrated a willingness to exercise that duty here. As noted above, other than naming Commissioner Rosa, they do not allege any action by Commissioner Rosa. Indeed, Plaintiffs' counsel previously acknowledged that the DOH is charged with implementing and enforcing the vaccine mandate. *See Perez v. Department of Health,* No. 21-cv-1203, Dkt. No. 2, Compl. Thus, Plaintiffs' claims against Commissioner Rosa are also barred by sovereign immunity.

## POINT II

### PLAINTIFFS CANNOT SUSTAIN THEIR HEIGHTENED BURDEN OF DEMONSTRATING  A CLEAR SHOWING OF ENTITLEMENT AND IRREPARABLE HARM

"The seriousness of federal judicial interference with state civil functions has long been recognized," and the Supreme Court has "consistently required that when federal courts are confronted with requests for such relief, they should abide by standards of restraint that go well beyond those of private equity jurisprudence. *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 603, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). As Justice Holmes said many years ago, "no injunction ought to issue against officers of a State clothed with authority to enforce the law in question, unless in a case reasonably free from doubt and when necessary to prevent great and irreparable injury" and this rule "should be strictly observed." *Massachusetts State Grange v. Benton,* 272 U.S. 525, 529 (1926).

"Even greater caution is appropriate where a federal court is asked to interfere by means of injunctive relief with a state's executive functions, a sphere in which states typically are afforded latitude." *Reynolds v. Giuliani*, 506 F.3d 183, 198 (2d Cir. 2007) (reversing district court's grant of permanent injunctive relief directing New York City defendants to comply with specified

provisions of federal and state law as related to food stamp program) (citing *Rizzo v. Goode*, 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)); *see also Huffman*, 420 U.S. at 603 (requiring federal courts to "abide by standards of restraint that go well beyond those of private equity jurisprudence" when asked to enjoin state officials). "In such cases, we must keep in mind the 'integrity and function' of state institutions, as well as the delicate balance that must be maintained between a federal court's exercise of its equitable power and a state's administration of its own affairs." *Reynolds*, 506 F.3d at 198 (citing *Rizzo*, 423 U.S. at 378–80) (internal citations omitted).

Moreover, where a movant not only seeks to restore the *status quo ante*, but also requests an order that commands an affirmative act or mandates a specific course of conduct, a heightened standard applies: a preliminary injunction may only be granted "upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 406 (2d Cir. 2011) (citation omitted). Thus, as stated in *N.Y. ex rel. Schneiderman v. Actavis PLC,* Plaintiff is required to show a "clear" or "substantial" likelihood of success and make a "strong showing" of irreparable harm. 787 F.3d 638, 650 (2d Cir. 2015) (citing *Beal v. Stern*, 184 F.3d 117, 123 (2d Cir. 1999) and *Doe v. N.Y. Univ.*, 666 F.2d 761, 773 (2d Cir. 1981)).

Plaintiffs argue that, since (some) Amish children have always attended school without vaccines, this is the status quo. But this ignores that they seek to restore the *status quo ante—i.e.,* the religious exception that pre-dated the 2019 legislative amendment. It also ignores that, rather than contest their failure to abide by the law, Plaintiffs fully admitted the schools violated the law for years. Dkt. No. 1, Ex. C. Moreover, Plaintiffs seek an affirmative act of repealing the 2019 amendments and vacating financial penalties in place since December 2022. Consequently, Plaintiffs are required to make a clear showing of likelihood of success on the merits and

irreparable harm. Plaintiffs fall woefully short as detailed below.

As importantly, on their unsupported say-so, Plaintiffs argue that they do not have the financial means to pay the penalties and this will result in the schools having to close. But Plaintiffs offer nothing but conclusory assertions concerning their alleged financial constraints. Nor do Plaintiffs explain why this purported fact is legally relevant.  If Plaintiffs felt that the financial penalties were excessive, they could have, but failed to, bring a proceeding pursuant to Article 78 of the New York Civil Practice Law and Rules.  Plaintiffs' financial condition does not impact whether New York's laws comport with the Free Exercise clause of the Constitution.

In any event, a financial penalty is not a basis for injunctive relief. *See e.*g. *Lawsky v. Condor Capital Corp.*, 2015 U.S. Dist. LEXIS 96347, *32 (SDNY July 2015) ("Courts have long held that monetary harm can never amount to irreparable harm");  *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) ("[I]t has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages is adequate compensation a preliminary injunction will not issue.").

## **POINT III**

### **PLAINTIFFS' FIRST AMENDMENT CLAIM FAILS REQURING DENIAL OF MOTION FOR PRELIMINARY INJUNCTION AND DISMISSAL OF COMPLAINT**

Plaintiffs' First Amendment claim is legally deficient and fails for three reasons. First, it is foreclosed by Supreme Court and Second Circuit precedent, which hold, as a matter of law, that conditioning school enrollment on vaccination does not violate the Free Exercise Clause. Second, PHL § 2164 is a neutral law of general applicability and is therefore subject only to a rational basis review, which it satisfies. Third, even if PHL § 2164 was subject to strict scrutiny, it would satisfy that standard. Because Plaintiffs cannot even sustain a plausible claim, they cannot show that they are likely to proceed on the merits and their motion for a preliminary injunction fails on this basis

alone.

A.    **Plaintiff's Free-Exercise Claim is Foreclosed by Supreme Court and Second Circuit Precedent.**

Supreme Court and Second Circuit precedent establish that the state does not violate the free exercise clause by requiring children to be vaccinated in order to attend school.

Since 1902, the United States Supreme Court has upheld the right of the states to enact and enforce laws requiring citizens to be vaccinated. *See Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11 (1905). In *Jacobson*, the Board of Health in Cambridge, Massachusetts enacted a regulation to that effect. Plaintiff argued that the law violated the Fourteenth Amendment and that compulsory vaccination against one who objects to it, no matter the reason, was nothing short of an assault upon such person. 197 U.S. at 26. There, the Court broadly recognized that the Massachusetts law did not "invade[] <u>any right</u> secured by the Federal Constitution." *Id.* at 38 (emphasis added).

The Supreme Court considered another mandatory vaccination law seventeen years later— this time one aimed at schoolchildren—in *Zucht v. King,* 260 U.S. 174, 176-77 (1922). The Supreme Court relied upon *Jacobson* to reject due process and equal protection challenges to a compulsory school vaccination law. There, public officials excluded the plaintiff from public and private schools because she did not have the required certificate and refused to submit to vaccination. The Supreme Court concluded that "[*Jacobson*] had settled that it is within the police power of a State to provide for compulsory vaccination…." *Id.* at 176.[13]

---

[13]    The New York Court of Appeals has also long held that statutes excluding unvaccinated children from public schools are constitutional. *Viemester v. White,* 179 N.Y. 235, 241-42 (1904) (finding that "[n]o right conferred or secured by the Constitution was violated by that law, or by the action of the school authorities based thereon explaining that mandatory vaccination requirement operate impartially upon all children and was designed both for their protection and the "protection of all the people of the state."); *see also Fosmire v. Nicoleau,* 75 N.Y.2d 218, 226

Subsequently, in *Prince*, the Court rejected a free exercise challenge to a child labor law that prohibited parents from allowing their minor children to sell religious merchandise in public places. *Id.* at 159-61. Citing *Jacobson,* the Court said parents "cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. *The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death*." *Id.* at 166-67 & n.11 (emphasis added). Acting as parens patriae, the state may restrict the parent's control and the state's authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion. *Id.* at 166. The Court further emphasized that "[p]arents may be free to become martyrs themselves. But it does not follow they are free ... to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves." *Id.* at 170.

The Second Circuit has been equally steadfast in rejecting free-exercise challenges to mandatory school vaccination statutes. In *Phillips v. City of New York,* 775 F.3d 538 (2d Cir. 2015), *cert. denied,* 577 U.S.822, 136 S.Ct. 104 (2015), the Second Circuit addressed the constitutionality of New York's school vaccination requirements that, at the time, permitted exemptions on both medical and religious grounds. *Id.* at 540. The plaintiffs' children received religious exemptions but were excluded from school pursuant to an emergency ordinance following an outbreak of chicken pox. *Id.* at 540-41. The district court dismissed the plaintiffs' free-exercise claim and the Second Circuit affirmed, finding that mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause. *Id.* at 543. Although

---

(1990) ("There is no question that the State can adopt compulsory vaccination laws to protect the public from the spread of disease.").

the since-repealed law permitted a religious exemption at that time, the Second Circuit said that the law would have been constitutional *even without a religious exemption*. *Id.* (emphasis added). It emphasized that "New York could constitutionally require that *all children* be vaccinated in order to attend public school," and that by allowing religious exemptions, "New York law *goes beyond* what the Constitution requires ..." *Id.* (emphasis added).

More recently, in *Patriots*—a decision that Plaintiffs, tellingly, neglect to mention—the Second Circuit reaffirmed that both it and the Supreme Court have "consistently recognized that the Constitution embodies no fundamental right that in and of itself would render vaccine requirements imposed in the public interest … unconstitutional." 17 F.4th at 293 (citing *Jacobson*, 197 U.S. at 25-31, 37; *Phillips*, 775 F.3d at 542-43). Further, the Second Circuit made clear that, even after the Supreme Court's decision in *Fulton or Roman Catholic Diocese*, any contention that *Jacobson* and *Phillips* were implicitly overruled by the Supreme Court "finds no support in caselaw." *Id.* at 293; *see also Harris v. Univ. of Mass.*, 557 F. Supp. 3d 304, *314 (D. Mass. Aug. 27, 2021) (citing *Phillips* and holding that university was "under no constitutional obligation to offer a religious exemption to its Vaccine Requirement").

What is more, soon after the Legislature repealed the religious exemption in 2019, parents of disabled school-age children sought a preliminary injunction to prevent its implementation. *V.D. v. State*, 403 F.Supp.3d 76 (E.D.N.Y. Aug. 19, 2019). Finding that the plaintiffs were unlikely to succeed on the merits, the court rejected plaintiffs' application. As the court said, "conditioning school enrollment on vaccination has long been accepted by the courts as a permissible way for states to inoculate large numbers of young people and prevent the spread of contagious diseases; a state's compulsory immunization law is a proper exercise of police power; and such legislation is supported by a state's strong interests in protecting the public health and welfare." *Id.* at 87

24

(internal citations omitted).

Likewise, in *We the Patriots v. Conn.*, the plaintiffs specifically challenged the removal of a religious exemption for school vaccines after the Connecticut Legislature, like the New York Legislature, amended the school-vaccine mandate to allow only for medical exemptions. 579 F.Supp.3d 290 (D. Conn. Jan. 11, 2022). Adhering to precedent from the earlier Second Circuit decision in *Patriots,* the District Court acknowledged that the reasoning of *Jacobson, Zucht,* and *Prince,* as viewed by the Second Circuit, "suggest[] that vaccination as a condition of school admission does not violate the Free Exercise clause," *id.* at 305 (citations omitted), and found that Connecticut's decision to eliminate religious exemptions did "not alter this conclusion" because religious exemptions to vaccine mandates "go[ ] beyond what the Constitution requires," *id.* at 306 (citing *Phillips,* 775 F.3d at 543), and the statute was subject only to rational basis review. *Id.*

This rule has been repeatedly followed and applied in New York State courts addressing this issue. *See, e.g., F.F. v N.Y.*, 194 A.D.3d 80 (3d Dept. 2021), app. denied, app. dismissed, 37 N.Y.3d 1040, (N.Y. 2021), *cert. denied*, 142 S. Ct. 2738 (U.S. 2022) (Religious exemption previously created a benefit to the covered class, and the elimination of the exemption subjects those in the previously covered class to vaccine rules that are generally applicable to the public; the sole purpose of the repeal of the religious exemption is to make the vaccine requirement generally applicable to the public at large in order to achieve herd immunity.); *McCartney v. Austin,* 31 A.D.2d 26, 27 (3d Dept. 1969) ("That statutes of this nature, and section 2164 in particular, are within the police power and thus constitutional generally is too well established to require discussion.") (citing *Jacobson*).

A chorus of district and out-of-circuit cases also reaffirm as much. *See, e.g., We the Patriots,* 579 F.Supp.3d at 30-306; *V.D. v. State*, 403 F. Supp. 3d at 86 (citing *Phillips* as support

in upholding State Legislature's repeal of religious exemption to childhood immunization law); *Workman v. Mingo Co. Bd. of Ed.,* 419 Fed. Appx. 348, 356 (4th Cir. 2011), *cert. denied,* 565 U.S. 1036 (2011) (rejecting free-exercise and substantive due-process challenge to state law that refused to admit plaintiff's daughter to school without immunizations, relying principally on *Jacobson, Zucht* and *Prince*);  *Nikolao v. Lyon,* 875 F.3d 310, 316 (6th Cir. 2017) (recognizing as in *Phillips, supra,* that plaintiff had "no right to an exemption" and citing *Jacobson, supra,* for the proposition that compulsory vaccination laws with only medical exemptions do not violate any federal constitutional right); *Watkins-El v. Dept. of Educ.,* 2016 U.S. Dist. LEXIS 139860, *7 (E.D.N.Y. Oct. 6, 2016) ("The Second Circuit has explicitly held that the immunization requirements of Public Health Law § 2164 violate neither the Free Exercise Clause of the First Amendment nor the Due Process clause of the Fourteenth Amendment."); *Caviezel v. Great Neck Public Schools,* 739 F.Supp.2d 273, 285 (E.D.N.Y. 2010) ("[T]he Court finds that the free exercise clause of the First Amendment does not provide a right for religious objectors to be exempt from New York's compulsory inoculation law." ), *aff'd,* 500 Fed. App'x 16 (2d Cir. 2012);

Because Plaintiffs have no constitutional right to a religious exemption, they have not stated a plausible claim, much less demonstrated a likelihood of success on the merits. Accordingly,  Plaintiffs' motion for a preliminary injunction should be denied and the Complaint dismissed.

**B.    Plaintiffs' Argument that Strict Scrutiny Applies Has Been—and Should Be— Steadfastly Rejected.**

 "[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 141 S.Ct. at 1876; *Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 531(1993) ("[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest

even if the law has the incidental effect of burdening a particular religious practice."). "Neutrality and general applicability are interrelated and ... failure to satisfy one requirement is likely an indication that the other has not been satisfied." *Lukumi,* 508 U.S. at 531.

"In terms of neutrality, the Supreme Court has been clear that the '[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices *because of their religious nature.'" Emilee Carpenter, LLC v. James,* 575 F.Supp.3d 353, 381 (W.D.N.Y. Dec. 13, 2021) (citing *Fulton,* 141 S.Ct. at 1877 (emphasis added)). In other words, "if the object of a law is to infringe upon or restrict practices *because of their religious motivation*, the law is not neutral." *Id.* (citing *Lukumi,* 508 U.S. at 533) (emphasis added). "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* __ U.S. __, 138 S. Ct. 1719, 1731 (2018)(quoting *Lukumi,* 508 U.S. at 540).).

"Where the government seeks to enforce a law that is neutral and of general applicability,' the government 'need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices.' "*CompassCare v. Cuomo,* 465 F. Supp. 3d 122, 150 (N.D.N.Y. June 5, 2020). If, however, a law is not neutral towards religion or is not generally applicable, it falls outside the boundaries of *Smith*. Then, for such a law to survive, it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531-32. Consequently, Plaintiffs must show that they are likely to succeed on their claim that PHL § 2164 is not a neutral or generally applicable rule.

The Supreme Court has held that "compulsory vaccination laws" are among the neutral, generally applicable laws that do not require religious exemptions under the First Amendment. *Smith,* 494 U.S. at 888-89; *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam) (Justice Gorsuch noting that vaccine mandates are essentially a rational-relation issue). And, the Second Circuit has confirmed that that school vaccination mandates are subject only to rational basis review. *Phillips,* 775 F.3d at 543. Indeed, "no court appears ever to have held" that "strict scrutiny be applied to immunization mandates." *Goe v. Zucker,* 43 F.4th 19, 31 (2d Cir. 2022). And, in *Patriots,* the Second Circuit found that strict scrutiny did not apply to a vaccine mandate that, like here, included a medical but not religious exemption. *See generally* 17 F.4th 266.

Nonetheless, Plaintiffs insists that the Court must apply strict scrutiny to the vaccine mandate at issue here. Not only do the above-cited binding precedents foreclose this argument, but the concrete facts also prove otherwise.

### 1.    The Statute is Neutral

Under *Smith*, a "neutral law of general applicability" is subject to rational basis review even if it burdens a particular religious practice. *Patriots,* 17 F.4th at 280 (citing *Smith,* 494 U.S. at 878-79 and *Lukumi,* 508 U.S. at 531). As the Second Circuit said in *Patriots*, "[t]he teaching of *Smith* is that a state can determine that a certain harm should be prohibited generally, and a citizen is not, under the auspices of her religion, constitutionally entitled to an exemption." *Id.* (citing *Cent. Rabbinical Cong. of the U.S. v. N.Y.C. Dept. of Hlth. & Mental Hygiene*, 763 F.3d 183, 196 (2d Cir. 2014).

Section 2164 is facially neutral. It contains no reference to religion. It does not target religion or "single out [religion] for especially harsh treatment." *Brooklyn,* 141 S. Ct. at 66. It does

28

not single out students, teachers, parental groups or indeed anyone who declines vaccination on religious grounds. It requires each child to be vaccinated and requires public, private, and religious schools to exclude an unvaccinated child unless said child within 14 days submits proof of vaccination or adequate documentation establishing that the vaccination is medically contraindicated. *See* PHL §§ 2164 (7)(8).

"The absence of a religious exception to a law does not, on its own, establish non-neutrality such that a religious exception is constitutionally required." *Patriots,* 17 F.4[th] at 282. In *Patriots,* the Second Circuit held that a New York rule requiring certain healthcare employees to be vaccinated and authorized a medical but not religious exemption was neutral and generally applicable. The Second Circuit reasoned that the rule was neutral because it "require[d] all covered employees *who could safely receive the vaccine* to be vaccinated." *Id.* (emphasis added). It applied whether an employee was eager to be vaccinated or strongly opposed, and it applied whether an employee's opposition or reluctance was due to philosophical or political objections to vaccine requirements, concerns about the vaccine's efficacy or potential side effects, or religious beliefs. The absence of a religious exception to a law does not[] establish non-neutrality such that a religious exception is constitutionally required. *Id*.

The legislative history of the 2019 amendment to Public Health Law § 2164 amply demonstrates that the Legislature was guided not by religious hostility, but rather by scientific data, including information from medical professionals, in deciding how best to respond to an escalating public health crisis and to protect vulnerable children who cannot receive vaccines for medical reasons, children who cannot make medical decisions for themselves, and other immunocompromised individuals. *See supra*, sec. A His. & Leg. Rec.; *see also* Declaration of Debra Blog ("Blog Dec.").

Specifically, the sponsors' memoranda in both the Senate and the Assembly make clear that the Legislature was motivated by concern for public health. *See* Sponsor Memo, 2019 N.Y. Senate Bill S2994A; Memorandum in Support of Legislation, 2019 N.Y. Assembly Bill A2371. The legislative floor debates provide further evidence of that valid legislative concern. In the Senate, bill sponsor Senator Hoylman noted that the measles outbreak, which was "ballooning before our eyes," had infected by that time at least 924 people across the State of New York, out of 1,022 cases nationwide. Transcript, Senate Debate ("Senate Tr."), at 5380.[14] Senator Hoylman expressed concern for those who cannot be vaccinated for medical reasons, including children with cancer or who are otherwise immunocompromised, pregnant women, seniors, and individuals with HIV. Senate Tr. 5382; *see also* Senate Tr. 5400, 5404, 5417 ("The point of this bill is to protect innocent children, . . . from infecting other children and immunocompromised individuals, seniors, people with cancer, infants, pregnant women."). The floor debate in the Assembly is similar. *See, e.g.*, Transcript, Assembly Debate ("Assembly Tr."), at 67[15] ("We have people, children who cannot be vaccinated and they have a right to be protected from being exposed to diseases which could kill them. There are people with compromised immune systems, people with—and I'm talking about children now—people who are receiving chemotherapy, for example . . . ."); *see also* Assembly Tr. 98, 101. The legislative record thus demonstrates that legislators were making a rational—and non-hostile—distinction between individuals whose health could be compromised by receiving vaccinations and others. Their attention to this distinction underscores the public health purpose of the law.

Nor does the removal of the religious exemption suggest that the statute targets religious

---

[14] https://www.nysenate.gov/transcripts/floor-transcript-061319txt

[15] https://nystateassembly.granicus.com/DocumentViewer.php?file=nystateassembly_8c58f742b2b59522cb1cfb4aa5 3273a8.pdf&view=1.

objectors. Repealing a religious exemption that was not constitutionally required in the first place does not treat religious objectors more harshly than secular groups, but instead subjects them to the same requirements of others. In any event, then-Judge Gorsuch observed: "[s]urely the granting of a religious accommodation to some in the past doesn't bind the government to provide that accommodation to all in the future, especially if experience teaches the accommodation brings with it genuine safety problems that can't be addressed at a reasonable price. If the rule were otherwise, it would only invite the unwelcome side effect of discouraging [the government] from granting the accommodation in the first place . . . ." *Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th Cir. 2014).

Indeed, the Supreme Court recently reaffirmed that the constitutional guarantee of religious freedom does not confer on religious objectors "a general immunity from secular laws." *Our Lady of Guadalupe Sch. V. Morrissey-Berru,* __ U.S. __, 140 S.Ct. 2049, 2060 (2020). Here, the impetus for PHL § 2164 was not religious animus but the measles outbreak that threatened the public health and safety. As the Legislative history makes clear, vaccination rates dropped precipitously, and the rate of religious exemptions eclipsed that of medical exemptions. *See* Dec. ¶ 10. As a result, pockets of outbreaks sprung up in religious communities, which lead to a longer lasting and more impactful outbreak than others that have occurred in the United States in the past. *Id*. at 7, 15-16.

### 2.    The Statute is Generally Applicable

General applicability does not require universality, as "[a]ll laws are selective to some extent." *Lukumi,* 508 U.S. at 542-43. Rather, "[t]he general applicability requirement prohibits the government from 'in a selective manner impos[ing] burdens only on conduct motivated by religious belief.' " *Cent. Rabbinical Cong. of the U.S.,* 763 F.3d at 196 (quoting *Lukumi,* 508 U.S.

at 542-43).

PHL § 2164 imposes the same vaccination requirements on all school children regardless of religion, and does not impose any special obligations only on those children whose opposition to vaccines is religiously motivated. Children who are not medically exempt but whose parents object to vaccines for secular reasons must comply with the requirements. Thus, PHL §2164 is generally applicable.

Plaintiffs, however, argue that the provision authorizing medical exemptions undercuts the law's general applicability because (1) it creates a mechanism for individualized exemptions; and (2) it renders the law substantially underinclusive. *Id.*, at 32. Neither argument has merit.

### i.    Mechanism for Individualized Exemptions[16]

"A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton,* 141 S.Ct. at 1877. Such laws "create[] the risk that administrators will use their discretion to exempt individuals from complying with the law for secular reasons, but not religious reasons." *Patriots,* 17 F.4th at 288. For instance, in *Smith,* the Supreme Court held that a statute making applicants eligible for benefits upon a showing of "good cause" for their unemployment was not generally applicable because it gave administrators discretion to deny benefits to individuals who

---

[16] Plaintiff also cite *to M.A. v Rockland Cty. Dept. of Health*, 53 F.4th 29 (2d Cir 2022). This matter is clearly distinguishable. There, the Court held that a reasonable juror could find there was evidence of religious animus. *Id.* at 38.  In the matter at hand, there is no evidence of religious animus and no reasonable dispute that the repeal was motivated by anything other than protection of the public health, based on the legislative record.  *See F.F. v. State*, 194 A.D.3d 80, 86-87 (App. Div. 3rd Dep't 2021). It also differs as here, unlike in *Rockland*, (1) there is no factual dispute as to who the compulsory vaccine law applies to, *i.e.*, only to children who were unvaccinated for religious reasons or to children who were unvaccinated for any reason other than medical need, including but not limited to religious reasons; and (2) there is no genuine dispute as to what governmental interest the law is intended to serve. *Id.* at 39. The plain language of the law very clearly states that the vaccine requirement applies to any unvaccinated child unless said child within 14 days submits proof of vaccination or adequate documentation establishing that the vaccination is medically contraindicated. *See* PHL §§ 2164 (7)(8). Further, there can be no question that the state's interest in protecting the health and safety of its citizens by requiring school vaccines serves a compelling interest.

did not work for religious reasons, but grant them to those who did not work for other reasons. 494 U.S. at 884. Similarly, in *Fulton*, the Supreme Court held that a law giving a city official "sole discretion" to grant or deny exemptions to an anti-discrimination law had created a system of individualized exemptions because it "invite[d] the government to decide which reasons for not complying with the [law] are worthy of solicitude." 141 S.Ct. at 1878-79.

In *Patriots,* the Second Circuit explained that "an exemption is not individualized simply because it contains express exceptions for objectively defined categories of persons." *Patriots,* 17 F.4th at 288 (citations omitted). If the exemption is "tied to particularized, objective criteria," it does not "afford unfettered discretion that could lead to religious discrimination . . . ." *Id.*(citing *Storman, Inc.,* 794 F.3d at 1081-82). Thus, "[t]he mere existence of an exemption procedure, absent any showing that secularly motivated conduct could be impermissibly favored over religiously motivated conduct, is not enough to render a law not generally applicable and subject to strict scrutiny." *Id.* at 288-89 (internal quotation marks omitted).

As in *Patriots,* the medical exemption provides for an objectively defined category of people to whom the vaccination requirement does not apply: those who present a certification from a physician attesting that they have a pre-existing condition that render vaccination detrimental to their health. *Id.; see* Blog Dec.¶¶ 29, 33. Such an exemption, the Second Court reasoned, "affords no meaningful discretion to the State or employers . . . ." *Id*.

The Second Circuit in *Patriots* also rejected the plaintiff's argument that the medical exemption was discretionary in nature because the medical workers who recommend the health exemptions " must use their medical judgment to determine whether a particular individual has a contraindication or precaution against receiving the vaccine . . . ." *Id*. The court explained that "*Smith* itself specifically held that a scheme that included a type of medical exemption--by not

criminalizing the use of controlled substances when prescribed by a medical practitioner--was nonetheless generally applicable . . . ." *Id.* at 290 (citing *Smith,* 494 U.S. at 874).

The same is true of  PHL §2164. Here, New York's law does not provide a broad discretionary scheme under which officials may consider claims of religious hardship alongside other requests for individualized exemptions. Instead, it contains only a single medical exemption that is narrow and clearly defined. The exemption applies only if a specific immunization is medically contraindicated, 10 N.Y.C.R.R. § 66-1.3(c), and only when consistent with a nationally recognized evidence-based standard of care, *id.* § 66-1.1(l). A child is thus entitled to an exemption if and only if these objectively defined criteria are met. *See, e.g., Doe v. San Diego Unified School Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021) (medical exemption to student COVID-19 vaccination mandate did not provide a "mechanism for 'individualized exemptions'" given "rigidity of the medical exemption"); *Patriots*, 17 F.4th at 288-90; *Does 1-6 v. Mills*, 16 F.4th 20, 30 (1st Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022).

This provision plainly is not an impermissible "individualized exemption," as it applies to an objectively-defined category of individuals: those who obtain the required statement from their medical provider. It gives no discretion to government officials to decide whether to grant the exemption if the proper medical-provider statement is obtained. That the medical professionals have limited discretion to decide whether, in their professional opinion, a particular vaccination is contraindicated, is irrelevant because the statute "leave[s] no room for the State to favor impermissible secular reasons for declining vaccination over religious reasons." *Patriots,* 17 F.4th at 290; *see* Blog Dec.¶¶ 29, 32-3, 36-7, 39-41.

Plaintiffs allege that a disparity in the number of medical exemptions granted in three random schools compared to others in that area is a clear indication that school administrators have

sole discretion in granting medical exemptions. Plaintiffs' theory is flawed. Plaintiffs' allegations, based off of cherry-picked data plucked from a general immunization report, fails to provide context and does not account for numerous variables and possibilities, *e.*g. how big is the A Plus Kidz Academy versus other schools in the area?, What is the enrollment size?, What are the characteristics and medical needs of the enrolled students? etc. Said information is needed in order to properly determine if the actual percentage of medical exemptions granted in a particular school are comparable to a singular other school in the same area and/or and to draw comparisons based on the similarity of the enrolled student population. *Id*. at 43. Additionally, Plaintiffs' are attempting to manipulate this data to argue that all children are equal in their medical needs. No two children are the same in their medical needs and the needs of the children in one school may vary drastically. Finally, a zero percent medical exemption rate does not mean that the administrators at one school are denying all medical requests as a matter of practice and/or personal preference - it could simply mean that no medical exemptions were requested at all.

Plaintiffs' counsel have in prior cases highlighted the rigorous and limited nature of PHL § 2164's medical exemption, stating that it is "effectivley limied to children who are severely immunocompromised or who have had anaphylaxis (life threatening allergic reaction) or encephalopathy (brain damage) from a prior dose of the same vaccine." *Perez v. Zucker*, 21-cv-1203, Dkt. No. 2, Compl. ¶ 18 (N.D.N.Y. Nov. 3, 2021).

### ii.    The Statute is Neither Underinclusive Nor "Overbroad"

Plaintiffs' contentions as to the law's purported underinclusiveness fare no better. The school vaccination law serves two related goals. First, it aims to protect the health of children while they are physically present in the school environment. Second, it aims to protect the health of the public in general against disease outbreaks both in and outside of school; it does this by serving as

the apparatus that ensures that, the vast majority of children—who will quickly grow into the vast majority of adults—are vaccinated. *See, e.g.,Viemeister v. White*, 179 N.Y. 235, 241 (1904) (New York's school vaccination law operates "impartially upon all children in the public schools, and is designed, not only for their protection, but for the protection of all the people of the state").

As compared to the religious exemption, the medical exemption does not pose a comparable threat to the State's interests, for two reasons. First, the medical exemption advances—rather than endangers—the State's interest in protecting the health of schoolchildren. It makes clear that a child need not receive a vaccine that would threaten that child's health. *See, e.g., Doe*, 19 F.4th at 1178; *We the Patriots USA*, 17 F.4th at 284-88; *Does* 1-6, 16 F.4th at 30-31.

Second, although the medical exemption may raise the risk of an exempted child transmitting a vaccine-preventable disease, that exemption does not endanger the State's interests to the same degree as the religious exemption. Prior to the repeal, the number of religious exemptions far exceeded medical exemptions. *See* Blog Dec.¶¶ 10, 13. In the school year before the repeal, the number of religious exemptions was over five times greater than the number of medical exemptions. *Id* at 10; Assembly Tr. at 70-71. The health risks associated with religious exemptions—both to the exempt individuals and their communities—were further exacerbated by the facts that (i) such exemptions tended to cluster geographically[17] and (ii) the rate of such exemptions had been increasing. *See* Senate Tr. at 5384-85, 5388-89, 5399; Assembly Tr. at 58-59.

---

[17] Multiple studies have documented the phenomenon of geographic clustering of non-medical exemptions, which are associated with an increase in the risk of outbreaks of vaccine-preventable diseases. *See, e.g.*, Amer Imdad et al., *Religious Exemptions for Immunization and Risk of Pertussis in New York State*, 2000-2011, 132 Pediatrics 37, 38-40 (2013); Saad B. Omer et al., *Geographic Clustering of Nonmedical Exemptions to School Immunization Requirements and Associations With Geographic Clustering of Pertussis*, 168 Am. J. Epidemiology 1389, 1394-95 (2008).

The medical exemption's narrow scope and limited duration also differentiate it from the religious exemption. A medical exemption does not apply across the board but rather is limited to the specific vaccination that is medically contraindicated. 10 N.Y.C.R.R. § 66-1.3(c). Children with medical exemptions therefore often receive some, if not most, of the vaccines required by New York law. Religious exemptions do not face any similar constraint. Indeed, Plaintiffs cite nothing to suggest they have religious objections to only some of the required vaccines. *See* Dkt. No. 1. Further, the medical exemption is only valid until a vaccine "is found no longer to be detrimental to the child's health," P.H.L.§ 2164(8), with the duration specified in the child's medical records, 10 N.Y.C.R.R. § 66-1.3(c). Religious exemptions are not similarly time limited or periodically reassessed, and plaintiffs likewise cite nothing to suggest their religious objections are temporary.

Plaintiffs also fail to allege any facts to substantiate their contention that unvaccinated adults undermine the State's interest in the same or similar way as religious exemptions for children. They cite no allegations that suggest that the law's inapplicability to adults contributed, as the religious exemption did, to declining vaccination rates that rendered areas susceptible to outbreaks. Indeed, they fail to allege any facts to suggest that there is even an appreciable number of unvaccinated adults in schools, much less an appreciable number who are unvaccinated for non-medical secular reasons rather than religious ones. *See Tandon*, 141 S. Ct. at 1296 (general applicability looks to whether the law treats "comparable secular activity more favorably than religious exercise"). Nor could they likely do so, given the ubiquity of established vaccination mandates. Nearly every adult present in a New York school who grew up in the United States lived somewhere with a mandatory school vaccination law. *See supra* at 3. And, for over two decades, any adult who has immigrated to the United States has been subject to the federal law that generally requires that adults be vaccinated against several diseases to be deemed admissible to the United

States. *See* 8 U.S.C. § 1182(a)(1)(A); U.S. Citizenship & Immigr. Servs., *Vaccination Requirements* (last updated Dec. 21, 2022)(internet).

Moreover, petitioners overlook a crucial difference between adults and children. Children, by their very environment and nature, pose a higher transmission risk. In contrast to teachers or other staff, they tend to spend more time commingling in close proximity, whether in the hallways, in the cafeteria, or on the playground.

Plaintiffs also argue that the general applicability of the vaccine law should be assessed by whether a religious exemption for these particular Plaintiffs would cause comparable harm to a medical exemption. *See* Dkt. No. 1 ¶94. That argument makes no sense. For one thing, plaintiffs are seeking a statewide injunction, not one limited to these particular plaintiffs. More fundamentally, the test for general applicability (as its name suggests) looks at the overall scope of a challenged policy to determine whether it is substantially underinclusive or [overbroad] at achieving its stated objectives. *See, e.g., Lukumi*, 508 U.S. at 543-46. The question is thus not whether DOH could safely allow these individual plaintiffs to remain unvaccinated—just as, in *Smith*, it would have been immaterial whether the two individual plaintiffs could have been safely exempted from Oregon's controlled-substance law. *See* 494 U.S. at 878-79. Rather, the question is whether the vaccination law "impose[s] burdens only on conduct motivated by religious belief," *Lukumi*, 508 U.S. at 543, or instead treats claims for religious exemption the same as other comparable exemption claims. That inquiry necessarily looks beyond the facts of these individual plaintiffs.

Additionally, despite the  Plaintiff's blanket unsupported statement that the religious exemption was repealed due to misuse, legislative history demonstrates something very different. As discussed above, the impetus for the repeal were statewide declining vaccination rates and a

severe measles outbreak which threatened to remove measles from the list of eradicated diseases in the U.S. *See generally* Blog Dec. ; *see also* sec. A His. & Leg. Rec, *supra*.

Likewise, Plaintiffs' assertion that the legislature "could have confronted this concern by, for example, instituting a standardized method for reviewing applications for religious exemptions to ensure they are granted only to those who, like Plaintiffs, plainly have sincere religious beliefs" is not plausible. Dkt. No. 1, ¶ 94.  The Second Circuit has made clear that the government violates the [constitutional rights] when it evaluates and determines what are "proper" religious beliefs. *See Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 425-26 (2d Cir. 2002). Thus, to do what Plaintiffs suggest would violate the very constitutional rights plaintiffs are seeking to protect.

## C.    Plaintiffs' Hybrid Arguments Fare No Better

Recognizing that they cannot prevail on their First Amendment claim, Plaintiffs, nonetheless, contend that strict scrutiny applies because they present a hybrid-right claim based on a mixing bowl of religious, parental, and free speech/association rights.[18] But this, again, ignores Second Circuit precedent rejecting this argument. As the Second Circuit said, "[w]e too can think of no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiffs asserts have been violated." *Leebaert v. Harrington,* 332 F.3d 134, 144 (2d Cir. 2003); *see We the Patriots,* 579 F.Supp.3d at 310 (rejecting alternate hybrid-rights theory, stating "[t]his Court will adhere to Second Circuit precedent which does not support a heightened level of scrutiny based on a hybrid-rights theory."); *Emilee Carpenter LLC,* 575 F.Sup.3d at 384

---

[18] Preliminarily, neither the Plaintiff-schools nor Plaintiff Wengerd are parents of school-aged children subject to the 2019 vaccination requirements. They, thus, do not have standing to sue. While two Plaintiffs hold themselves out as parents, they say nothing about their children, including their age. Given Plaintiffs' own submission, which shows that a two-year old child, listed as a student at Pleasant View School (*see* Roberts Dec., Exh. B, p.70 , was not even subject to the vaccine requirements, Plaintiffs' bare allegation that they are parents, Dkt. 1, ¶ 9, is insufficient to show that they have suffered an injury-in-fact due to the vaccine mandate.

—

n. 17 ("Plaintiff cannot succeed under a 'hybrid rights' theory … because the Second Circuit does not recognize such claims."); *Caractor v. City of New York Dep't of Homeless Servs.,* 2013 WL 2922436, *11 n.10 (S.D.N.Y.  June 14, 2013) (to the extent plaintiff asserted a higher level of scrutiny based on hybrid argument, it was foreclosed by Second Circuit precedent). The Sixth Circuit also views the hybrid rights exception as "completely illogical," *Kissinger v. Board of Trustees of Ohio state Univ., Coll. Of Veterinary Medicine,* 5 F.3d 177, 180 (6th Cir. 1993); *see also Prater v. City of Burnside, Ky.,* 289 F.3d 417, 430 (6th Cir. 2002) (rejecting church's claim that city violated its "hybrid rights" that combined a free exercise, free speech, freedom of assembly and Fifth Amendment takings claim); *cf. Pleasant View Baptist Church v. Beshear,* 838 Fed. Appx. 936, 941 (6th Cir. 2021) (Donald, J. concurrence) ("The Constitution is not a mixing bowl for rights that when considered in the aggregate are entitled to a higher level of scrutiny compared to when those exact same rights are viewed in isolation.").  For its part*,* the Supreme Court has described the hybrid distinction drawn by *Smith* as "ultimately untenable," *Lukumi,* 508 U.S. at 567, or, more recently, noted in the *concurrence*, various circuit court interpretations of *Smith's dictum*. *Fulton,* 141 S. Ct. at 1918 (Barrett, J. concurrence).

Apart from Second Circuit precedent precluding such claim, Plaintiffs' characterization of the mandate as forcing them to vaccinate their child is overstated. In *Goe v. Zucker,* 43 F.4[th] at 30-31, for instance, the Second Circuit said that the plaintiffs' contention that the state was forcing parents to vaccinate their child was "overstated" and found, instead, that the "State is not forcing any child to be vaccinated against her parents' will." The same is true here. Parents still have a choice: they may homeschool their child, relocate to a different state, or vaccinate their child, as numerous other Amish parents have done according to Plaintiffs' own proffer. Thus, "[a]lthough

[the plaintiffs] have a hard choice to make, they do have a choice." *Patriots,* 17 F.4th at 293-94.[19]

Moreover, it is well-established that there is no fundamental right to education, and thus the deprivation of a "right to pursue an education" does not trigger strict scrutiny. *Plyler v. Doe,* 457 U.S. 202, 223 (1982); *Phillips,* 775 F.3d at 542 n.5 (holding that New York's mandatory school vaccination requirement was within the State's police power and that, in any event, substantive due process challenge to mandatory vaccination law would fail under traditional constitutional analysis because "there is no substantive due process right to public education") (quoting *Bryant v. N.Y.S. Educ. Dep't,* 692 F.3d 202, *217* (2d Cir. 2012)); *see also Doe v. Zucker,* 520 F. Supp. 3d 218, *258 (N.D.N.Y. Feb. 2021) ("Plaintiffs' right to an education under New York State law is limited by the New York's mandatory school vaccination requirement, and '[t]he case law clearly establishes that [conditioning school enrollment on vaccination has long been accepted by courts as a permissible way for states to inoculate large numbers of young people and prevent the spread of contagious diseases'") (*quoting V.D.,* 403 F.Supp.3d at 87); *Whitlow,* 203 F. Supp. 3d at 1086, 1091 (holding that plaintiffs were unlikely to succeed on merits of their free exercise challenge to repeal of religious exemption, despite right to education being enshrined in California constitution); *Brown v. Smith,* 24 Cal. App. 5th 1135, 1145-46 (2018) (same).

While parents, as a general proposition, have a liberty interest in parenting, the Second Circuit has made clear that "rational basis review is appropriate" when a parental right is invoked against state regulation. *Immediato v. Rye Neck Sch. Dist.,* 73 F.3d 454, 461 (2d Cir. 1996). And,

---

[19] Only two of the Plaintiffs are alleged to be parents of children who attend Amish schools and neither the three school districts, nor Mr. Wengerd, can claim that *their* parental rights were infringed. Thus, the school districts and Mr. Wengerd lack standing to contest Second Circuit precedent foreclosing a hybrid-rights claim. As to Messrs. Miller and Smucker, they make no specific claims with respect to their children, including no allegation as to the ages of their children or how the vaccine law applies to each, much less no claim as to why homeschooling, while not a *preference,* is foreclosed as an option. Nor do they link their children to any penalty imposed by the DOH on the school.

while a "parents' liberty interest in the custody, care, and nurture of their children resides 'first' in the parents, [it] does not reside there *exclusively,* nor is it 'beyond regulation [by the state] in the public interest'". *Fields v. Palmdale Sch. Dist.,* 427 F.3d 1197, 1204 (9th Cir), quoting *Prince,* 321 U.S. 158, 166; *see Parents for Privacy v. Barr,* 949 F.3d at 1231. "Thus, [a parent] cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds". *Prince,* 321 U.S. at 166, 64 S.Ct. 438; *see Phillips,* 775 F.3d at 543.

Plaintiffs cite *Wisconsin v. Yoder,* 406 U.S. 205 (1972), but *Yoder* concerned compulsory school attendance, not immunization against contagious diseases, and it does not assist Plaintiffs. In fact, the *Yoder* Court specifically said that the case was "not one in which any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred," and that a parent's power, "even when linked to a free exercise claim, may be subject to limitation under *Prince.*" *Id.* at 233-234. In marked contrast here, public safety and the health of school-aged children was the driving force behind the state's repeal of the religious exemption. Plaintiffs cite to no case, and defendants are aware of none, in which a hybrid-rights theory was applied to public health and safety legislation.

To the extent Plaintiffs claim that PHL § 2164 is unconstitutional because it forces parents to choose between their religious beliefs and ensuring their children receive an education they erroneously claim they are constitutionally entitled to, *Phillips* and the Supreme Court's decisions in *Jacobson, Zucht,* and *Prince* squarely establish that "mandatory vaccination  as a condition for admission to school does not violate the Free Exercise Clause." *Phillips,* 775 F.3d at 543.

Plaintiffs' free speech and free association suggestions fare no better. "[F]reedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 61, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006).

42

Expressive conduct, however, is protected by the First Amendment if it is "conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative". *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 294, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984). Given this two-part test, plaintiffs' compliance with Public Health Law § 2164 is merely conduct, not constitutionally protected speech. Plaintiffs remain free to express whatever views they may have on the subject of vaccination.

The right to freedom of association protects "[t]he right to associate for the purpose of engaging in those activities protected by the First Amendment." *Emilee Carpenter, LLC v. James*, 575 F. Supp. 3d 353, 371 (W.D.N.Y. 2021). But as it may with respect to free speech, the "government may engage in some conduct that incidentally inhibits protected forms of association." *Fight Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996). Public Health Law § 2164 does not meaningfully restrict Plaintiffs' abilities to associate for religious purposes as alleged by Plaintiffs. First, Plaintiff's children could get vaccinated to continue to attend their schools as other Amish children who have been vaccinated have done. Second, Plaintiffs' children could associate in other physical spaces, such as churches, to engage in protected religious activities. Ultimately, because PHL § 2164 only incidentally affects Plaintiffs' abilities to associate, it does not violate their freedom of association under the First Amendment. *See Mongielo v. Hochul*, 2023 WL 2307887, at * 11 (W.D.N.Y. Mar. 1, 2023) (holding that mask mandate in school settings did not violate rights to freely associate because restrictions on children's ability to interact were only imposed when children refused to weak masks); *Fradys v. Rondeau*, 2022 WL 1289674, at *3 (S.D.N.Y. Apr. 29, 2022) ("Courts have correctly held that mask requirements do not violate the First Amendment because . . . [they] impose at most a *de minimis* burden on [an] individual's ability to associate.").

43

**D.    Even if Strict Scrutiny Applied, the Statute Satisfies It**

Even if strict scrutiny were to apply, New York's vaccination statute would satisfy the test. "A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (quoting *Lukumi*, 508 U.S. at 546). Just as secular exemptions may sometimes trigger strict scrutiny, so too they may sometimes prevent laws from surviving that review, whether by signifying that the government's interest is not truly compelling or by showing that the government's means are not adequately tailored. *See, e.g., Fulton*, 141 S. Ct. at 1881–82; *Tandon*, 141 S. Ct. at 1296–97. And just as Justice Alito's opinions for the Third Circuit illuminate how to distinguish exemptions that trigger strict scrutiny from those that do not, a circuit-court opinion by then-Judge Gorsuch—*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014)—illuminates how to distinguish exemptions that fail strict scrutiny from those that pass it.

Here, there is no question that the governmental interest served by New York's vaccination statute—preventing dangerous diseases—is compelling. *See, e.g., Brooklyn*, 141 S. Ct. 63, 67 (2020) (per curiam); *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997). And New York "hasn't acted in a logically inconsistent way" (*Yellowbear*, 741 F.3d at 61) by continuing to allow medical exemptions. There is both "a qualitative" and a "quantitative difference between the particular religious exemption requested and [the] secular exception[] already tolerated" (*id*.): Qualitatively, unlike a religious exemption, the medical exemption advances public health by protecting from the physical harm that vaccination would inflict on them those who cannot safely be vaccinated. Quantitatively, because the number of students who claimed a religious exemption was more than five times greater than the number who claimed a medical one (*see* Blog Dec. ¶ 10), allowing religious exemptions poses a much greater threat to New York's efforts to maintain

herd immunity and prevent the spread of disease.

Moreover, New York's "differential treatment" of medical and religious exemptions "furthers [a] distinct compelling governmental concern" (*Yellowbear*, 741 F.3d at 61): Allowing a medical exemption and eliminating the religious exemption both advance the state's interest in protecting from harm children whose medical conditions preclude them from being safely vaccinated. These particularly vulnerable children include those who have weakened immune systems or are allergic to vaccine components. *See, e.g.*, Ken Alltucker, *Do 'the right thing': People who can't get vaccinated during a measles outbreak rely on the healthy*, USA TODAY (Apr. 11, 2019), https://bit.ly/3cmjVFx. Just as "the government has a compelling interest in not subjecting citizens to laws they can't realistically avoid breaking" (*Yellowbear*, 741 F.3d at 61), so too it has a compelling interest in not attempting to vaccinate children whose medical condition precludes immunization—as well as safeguarding those vulnerable children's health by disallowing exemptions that could cause other children to infect them.

Likewise, the Fourth Circuit's decision in *Workman*—a decision the Second Circuit has explicitly "agree[d]" with, *Phillips*, 775 F.3d at 540—is squarely on point. *Workman* involved a free exercise challenge to West Virginia's mandatory school vaccination law, which, similar to PHL § 2164, permitted health exemptions but not religious ones. *Workman*, 419 Fed. Appx. at 352. The Fourth Circuit held that, "assuming for the sake of argument that strict scrutiny applies, prior decisions from the Supreme Court [*Jacobson* and *Prince*] guide us to conclude that [the] vaccination laws withstand such scrutiny." *Id.*, 353. The court found that "the state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest." *Id.*, 353.

Furthermore, states have a compelling interest in proactively ensuring vaccination rates do not fall to problematic levels. *See Whitlow*, 203 F. Supp. 3d at 1090 (observing that state's

compelling interest "does not depend on or need to correlate with the existence of a public health emergency," and that state's "objective of immunization is not served by a law that allows for [religious exemptions], whether the[religious exemption] rate is 2% or 25%") (emphasis added); *F.F. v. State of N.Y.*, 114 N.Y.S.3d 852, 867-68 (Sup. Ct. 2019), aff'd, 143 N.Y.S.3d 734, 741 (3d Dept. 2021).

Accordingly, the State had a compelling interest in repealing its religious exemption in order to maximize the percentage of school students vaccinated against communicable diseases, and this compelling interest existed regardless of then-current circumstances or vaccination rates. As noted above, the Immunization Data indicates that under-vaccination was slowly but steadily becoming a problem in New York, and that the increasing number of students claiming the religious exemption was a chief cause of it. *See* Blog Dec.¶¶ 9-19. In light of these trends, the state clearly had a compelling interest in taking proactive measures to ensure that under-vaccination did not develop into another public health emergency. As other courts have found, the governmental interest in protecting the public health and safety, particularly that of children for whom vaccines are medically unsafe and of otherwise immunocompromised individuals, is sufficiently compelling to outweigh the free exercise claims that plaintiffs assert here. *See Workman*, 419 Fed. App'x at 353; *Brown*, 24 Cal. App. 5th at 1145; *Sherr*, 672 F. Supp. at 88.

"To meet the 'narrowly tailored' requirement, courts ask whether the policy at issue was 'the least restrictive means of achieving' the government's compelling interest." *W.D.*, 2020 U.S. Dist. LEXIS 33515 at *82 (quoting *Thomas v. Review Bd. Of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981)).

As set forth above, because the state has a compelling interest in maximizing school vaccination rates and the health and safety of the public, the state would have been justified in

excluding all unvaccinated students. Therefore, by permitting a restrictive medical exemption, §
2164 is drawn even more narrowly than necessary to satisfy strict scrutiny. *See Whitlow*, 203 F.
Supp. 3d at 1091 (repeal of religious exemption was narrowly tailored because state's interest in
achieving "total immunization" would not be "served by a law that allows for [religious
exemptions], whether the [exemption] rate is 2% or 25%"); *see also* Phillips, at 543 ("[b]ecause
the State could bar [the plaintiffs'] children from school altogether, a fortiori, the State's more
limited exclusion during an outbreak of a vaccine-preventable disease is clearly constitutional").

Further, the amendment was properly targeted to address the particular public health
problem at hand. The Legislature was aware of the following facts: New York had become the
epicenter of an outbreak of measles, a disease that had been eradicated in the United States since
2000. There was a statewide trend of decreasing immunization rates, rates that had reached
alarmingly low levels in certain school districts. *See e.g.* Blog Dec.¶12. And data showed a marked
increase in non-medical exemptions in the years proceeding this decrease in immunization rates.
*Id.* at 10, 13. While immunization rates had not yet reached alarmingly low levels on a statewide
basis, the Legislature was not required to wait for that to happen, but rather could take preventative
action to stop further outbreaks. *See Whitlow*, 203 F. Supp. 3d at 1091. And the Legislature did so
by addressing directly one of the primary causes of the decrease in immunization rates—increased
reliance on the non-medical exemption—by eliminating that exemption. The amendment was thus
crafted to ameliorate the precise public health threat facing the State.

To be sure, Plaintiffs' own submission proves that several parents thought that the health
risks to their children, themselves, and/or their communities was significant enough to warrant
vaccinating their children. As Plaintiffs make clear, school-aged children socialize within the
communities. *See generally* Dkt. No. 1. That Plaintiffs disagree with these parents is an insufficient

basis to subject other children and their communities to the deadly risk of invalidating the statute and, once again, facing community outbreaks like that previously experienced in Amish communities. *See* Blog Dec. ¶¶ 15-18, 21.

Further, as discussed in detail above, the alternatives proposed by the Plaintiffs' should not be considered as less restrictive means for achieving the state's compelling interest. *See supa* section B.

### E.    Plaintiffs Do Not Even Try to Satisfy the Rational-Relationship Test.

"Under rational basis scrutiny, 'laws are accorded a strong presumption of validity' and must be upheld 'if there is any conceivable state of facts that could provide a rational basis' for the law." *Doe v. Zucker,* 520 F.Supp.3d 217, 253 (N.D.N.Y. 2021), *aff'd, Goe v. Zucker,* 43 F.4[th] 19 (2d Cir. 2022), *cert. denied,* 143 S.Ct. 1020 (2023) (citing *Heller v. Doe,* 509 U.S. 312, 319-20 (1993)). "[I]t is not the state that must carry the burden to establish the public need for the law being challenged; it is up to those who attack the law to demonstrate that there is no rational connection between the challenged ordinance and the promotion of public health safety or welfare." *Id.* (citing *Beatie v. City of New York,* 123 F.3d 707, 712 (2d Cir. 1997)).

Plaintiffs do not suggest that the state mandate does not meet the rational-relationship test. In fact, they have not even tried to argue that there is no rational basis for the law. Nor can they. The law is abundantly clear that the state has a legitimate interest in requiring vaccination generally and of school-aged children in particular. *See Jacobson,* 197 U.S. at 38 (mandatory vaccination was "in the interest of the population as a whole."); *Phillips,* 775 F.3d at 542 ( ); *Goe v. Zucker,* 43 F.4[th] at 32 ("clearly" there was a legitimate state objective for the narrowed medical exception to vaccines: "protecting communities from serious, vaccine-preventable diseases through immunization.").

### POINT IV

### THE BALANCE OF EQUITIES TIPS OVERWHELMINGLY IN DEFENDANTS' FAVOR

Plaintiffs also failed to demonstrate that the public interest weighs in favor of enjoining PHL § 2164. When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge. *Patriots,* 17 F.4th at 295 (citing *New York v. United States Dep't of Homeland Sec.,* 969 F.3d 42, 58-59 (2d Cir. 2020). Here, Defendants have an indisputable compelling interest in ensuring that school children are vaccinated. There was a statewide trend of decreasing immunization rates, rates that had reached alarmingly low levels in certain school districts and data showed a marked increase in non-medical exemptions in the years proceeding this decrease in immunization rates. *See* Blog Dec.*,* ¶10.  It is well established that fully vaccinated individuals are less likely to spread infectious diseases to other people, including people who cannot get vaccinated because they are too young, or they have a weakened immune system. *Id*.at 44-58.  Therefore, a concerted public health effort is required to address the spread of all contagious diseases in a community.  For some contagious diseases such as measles, even one case is considered an outbreak that requires an immediate response. *Id.* at 49. Thus, taking proactive steps to prevent cases or outbreaks of a contagious disease is far preferable is in the best interest of the public.

### CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction and grant Defendants' Motion to Dismiss.

Dated: July 31, 2023
Buffalo, New York

LETITIA JAMES
Attorney General of the State of New York

Attorney for Defendants

BY: /s/ *Denetra D. Roberts*
DENETRA D. ROBERTS
DANIEL R. MAGUIRE
Assistant Attorney General, of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, NY 14202
(716) 853-8400
Denetra.Roberts@ag.ny.gov
Daniel.Maguire@ag.ny.gov