**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
**BUFFALO DIVISION**

|  |  |
|---|---|
| **JOSEPH MILLER, individually and on behalf of his minor children attending an Amish school in Clymer and as a board member of that school; EZRA WENGERD, as representative of all Amish schools in the State of New York; JONAS SMUCKER, individually and on behalf of his minor children; DYGERT ROAD SCHOOL, PLEASANT VIEW SCHOOL a/k/a TWIN MOUNTAIN SCHOOL, SHADY LANE SCHOOL,** | Civil Action No. 1:23-cv-00484-EAW |
| *Plaintiffs,* | |
| -against- | |
| **DR. JAMES V. MCDONALD, in his official capacity as Commissioner of Health of the State of New York, and DR. BETTY A. ROSA, in her official capacity as Commissioner of Education of the State of New York,** | |
| *Defendants.* | |

### PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS [ECF 25] AND REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION [ECF 25-1]

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................. 1

    A.  The Amish Plaintiffs' Sincere Religious Beliefs are Substantially Burdened ................... 1

    B.  Medical Exemptions are Permitted and Reviewed on a Discretionary, Individualized Basis ................................................................................. 2

    C.  New York Permits Over 97,000 CVL Non-Compliant Children to Attend School While Seeking to Exclude Around 50 Amish Children from School ........................... 5

    D.  Of Six Mandated Vaccines, Three Do Not Prevent Transmission, a Fourth is for a Disease Not Transmitted in School, and a Fifth is a Live Virus that Can Spread from Vaccinee ........................................................................ 5

    E.  Measles and Measles Vaccine ............................................................. 8

    F.  Amish Children are Healthier than the Non-Amish Children in New York ................. 9

    G.  New York Fails to Address Material Facts About These Vaccine Products and Does Not Restrict the Unvaccinated in Virtually Any Other Setting ............................. 10

STANDARDS OF REVIEW ........................................................................... 11

ARGUMENT ............................................................................................... 12

    I.  PLAINTIFFS ASSERT APPROPRIATE CLAIMS AGAINST MS. ROSA IN HER OFFICIAL CAPACITY, HAVE STANDING TO DO SO, AND SOVEREIGN IMMUNITY DOES NOT BAR THOSE CLAIMS ................... 12

    II.  AS APPLIED TO PLAINTIFFS, THE CVL VIOLATES THE FIRST AMENDMENT ...................................................................... 15

        A.  Plaintiffs' Free Exercise Claims are Supported, Not Foreclosed, by Supreme Court and Second Circuit Precedent ........................................... 15

i

B.  Strict Scrutiny Applies Here, and Defendants Failed to Demonstrate the
CVL is Generally Applicable Under *Fulton* ............................................................... 17

C.  Defendants Cannot Demonstrate the Challenged Statute Is Neutral and
Generally Applicable Under *Tandon* ....................................................................... 22

    1.  New York permits a host of comparable secular activities that make it
unconstitutional to not permit an Amish-specific religious exemption ............... 25

        a)  Administrative exceptions through lax enforcement ............................... 27

        b)  Unvaccinated adults in the school system is comparable activity ........... 29

        c)  Unvaccinated homeschooled children also entail comparable
activity................................................................................................... 30

        d)  Unvaccinated adults and children outside of school ................................ 30

        e)  The CVL is underinclusive because it ignores other diseases ................. 30

        f)  Medical exemptions are comparable activity under *Tandon* ................... 31

    2.  Collectively, the kaleidoscope of secular activities New York permits also
undermine the legality of its zealous attack on the Amish ................................. 32

D.  Strict Scrutiny Applies on Alternative Grounds Because This Case Involves
Recognized "Hybrid Rights" ..................................................................................... 34

E.  The CVL and its Enforcement is Not Neutral ........................................................... 35

F.  The CVL Cannot Survive Strict Scrutiny .................................................................. 35

    1.  The State failed to demonstrate its interests are sufficiently "compelling" .......... 35

        a)  The proposed government interests are insufficiently compelling relative
to each Amish Plaintiff .......................................................................... 37

        b)  In abstract terms, the proposed government interests are nonetheless
insufficiently compelling ....................................................................... 41

2. The CVL fails strict scrutiny on alternative grounds as it is not narrowly tailored ...................................................................................... 43

    a) Less restrictive means exist and can be seamlessly implemented ............ 44

    b) The CVL is substantially under-inclusive.................................................. 45

    c) The CVL is also substantially overbroad .................................................. 46

III. PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE HARM ...................... 49

IV. THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR ......................... 50

CONCLUSION.......................................................................................................... 50

CERTIFICATE OF SERVICE ................................................................................... 51

# TABLE OF AUTHORITIES

## Cases

*A.H. v. French*,
　985 F.3d 165 (2d Cir. 2021).................................................................. 50

*Agudath Israel of Am. V. Cuomo*,
　983 F.3d 620 (2d Cir. Dec. 28, 2020) ............................................. 12, 50

*Archdiocese of Washington v. WMATA*,
　897 F. 3d 314 U.S. App. D.C. 461 (D.C. Cir. 2018) ............................ 35

*Ashcroft v. Iqbal*, 5
　56 U.S. 662 (2009)................................................................................. 11

*Babbitt v. Farm Workers Nat'l Union*,
　442 U.S. 289 (1979)................................................................................ 14

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007)................................................................................ 11

*Bosarge v. Edney*,
　2023 U.S. Dist. LEXIS 67439 (S.D. Miss. April 17, 2023) ....... 18, 20, 21, 49

*Brown v. Entm't Merchs. Ass'n, Brown*,
　564 U. S. 786 (2011) ........................................................................ 29, 40

*Brown v. Hot, Sexy and Safer Productions*,
　68 F. 3d 525 (1st Cir. 1995).................................................................. 35

*Cantwell v. Connecticut*,
　310 U.S. 296 (1940)......................................................................... 15, 34

*Cayuga Nation v. Tanner*,
　824 F.3d 321 (2d Cir. 2016)................................................................... 14

*Chambers v. Time Warner, Inc.*,
　282 F.3d 147 (2d Cir. 2002).................................................................. 11

*Church of Lukumi Babalu Aye v. City of Haileah*
　508 U.S. 520 (1993) ...................................................................... passim

*Col. Fin. Mgmt. Officer v. Austin*,
　2022 U.S. Dist. LEXIS 153590 (M.D. Fla. Aug. 18, 2022) .................. 21

*Cornerstone Christian Schools v. University Interscholastic League*,
    563 F. 3d 127 (5th Cir. 2009) ............................................................... 35

*Covino v. Patrissi*,
    967 F.2d 73 (2d Cir. 1992)...................................................................... 50

*Dahl v. Bd. of Trs. of Western Mich. Univ.*,
    15 F.4th 728 (6th Cir. 2021) ....................................................... 18, 20, 21

*Dairy Mart v. Nickel*,
    411 F.3d 367 (2d Cir. 2005).................................................................... 13

*Department of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990)...................................................................... passim

*Desclafani v. Pave-Mark Corp.*,
    2008 WL 3914881 (S.D.N.Y. Aug. 22, 2008) ........................................ 27

*Doster v. Kendall*,
    54 F.4th 398 (6th Cir. 2022) ........................................... 38, 40, 42, 43

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................................................ 49

*Employment Div. v. Smith*,
    494 U.S. 872 (1990)................................................................................ 34

*Ex parte Young*,
    209 U.S. 123 (1908)................................................................................ 12

*Fink v. Time Warner Cable*,
    714 F.3d 739 (2d Cir. 2013).................................................................... 11

*Fox et al. v. Makin, et al.*,
    2023 WL 5279518 (D. ME. Aug. 16, 2023) .............................. 17, 43, 45

*Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*,
    170 F.3d 359 (3d Cir. 1999).......................................................... 17, 20

*Fulton v. City of Philadelphia*,
    141 S.Ct. 1868 (2021)...................................................................... passim

*Goe v. Zucker*,
    43 F.4th 19 (2d Cir. 2022) ...................................................................... 20

*Gonzales v. O Centro Espirita,*
   546 U.S. 418 (2006) ................................................................ 25, 36, 37, 38

*Hedges v. Obama*,
   724 F.3d 170 (2d Cir. 2013) ................................................................ 14

*Int'l Dairy Foods Ass'n v. Amestoy,*
   92 F.3d 67 (2d Cir. 1996) ................................................................ 12

*Jacobson v. Massachusetts,*
   197 U.S. 11 (1905) ................................................................ 15, 20

*Knife Rights, Inc. v. Vance*,
   802 F.3d 377 (2d Cir. 2015) ................................................................ 14

*Leger v. Kalitta,*
   2018 WL 2057142 (E.D.N.Y. Jan. 26, 2018) ................................................................ 27

*M.A. v. Rockland Cnty. Dep't of Health*,
   53 F.4th 29 (2d Cir. 2022) ................................................................ passim

*Mast v. Fillmore Cnty.*,
   141 S. Ct. 2430 (2021) ................................................................ 15, 27, 37, 44

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007); ................................................................ 14

*N.Y. Progress & Prot. PAC v. Walsh*,
   733 F.3d 483 (2d Cir.  2013) ................................................................ 12, 50

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................ 50

*Paulsen v. County of Nassau,*
   925 F.2d 65 (2d Cir. 1991) ................................................................ 49

*Phillips v. City of New York*,
   775 F.3d 538 (2d Cir. 2015) ................................................................ 16

*Pierce v. Society of Sisters*,
   268 U.S. 510 (1925) ................................................................ 34

*Prince v. Massachusetts,*
   321 U.S. 158 (1944) ................................................................ 15

*Rabbinical Cong. of the U.S. v. N.Y.C. Dep't of Hlth. & Mental Hygiene,*
    763 F.3d 183 (2d Cir. 2014) ................................................................. 33

*Roberts v. United States Jaycees,*
    468 U.S. 609 (1984) ............................................................................. 34

*Rochester Drug Co-op., Inc. v. Hiscox Ins. Co.,*
    466 F. Supp. 3d 337 (W.D.N.Y. 2020) ................................................. 12

*Rom. Cath. Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020) .......................................................... 15, 20, 22, 49

*San Jose Christian College v. Morgan Hill,*
    360 F. 3d 1024 (9th Cir. 2004) ............................................................ 35

*Schulz v. Williams,*
    44 F.3d 48 (2d Cir. 1994) .................................................................... 13

*Seals 1-26 v. Biden,*
    578 F. Supp. 3d 822 (N.D. Tex. 2022) ...................................... 20, 21, 22

*Suazo v. Ocean Network Express,*
    2023 U.S. Dist. LEXIS 35245 (S.D.N.Y. Mar. 2, 2023) ....................... 3, 13

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ............................................................................. 14

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) .................................................................. passim

*Thomas v. Chicago Park Dist.,*
    534 U.S. 316 (2002) ............................................................................. 18

*Thoms v. Maricopa Cnty. Cmty. Coll. Dist.,*
    No. CV-21-01781-PHX-SPL (D. Ariz. Nov. 5, 2021) ............................ 21

*U.S. Navy Seals 1-26 v. Biden,*
    27 F.4th 336 (5th Cir. 2022) .......................................................... 42, 43

*V.D. v. State,*
    403 F.Supp.3d 76 (EDNY 2019) ......................................................... 16

*Verizon Md. v. Pub. Serv. Comm'n of Md.,*
    535 U.S. 635 (2002) ............................................................................. 13

*We the Patriots United States v. Conn. Office of Early Childhood Dev.*,
  2023 U.S. App. LEXIS 20156, ---F.4th --- (2d Cir. Aug. 4, 2023) ................................. passim

*We the Patriots USA, Inc. v. Hochul*,
  17 F.4th 266 (2d Cir. 2021) ......................................................................... 16, 26, 42

*Whole Woman's Health v. Jackson*,
  142 S. Ct. 522 (2021) ................................................................................................. 13

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) .............................................................................................. 34, 36

*Zucht v. King*,
  260 U.S. 174 (1922) ..................................................................................................... 15

**Statutes**

10 NYCRR §§ 66 ................................................................................................. 2, 3, 19, 21

42 U.S.C. §§ 300aa-11 ..................................................................................................... 11

New York Educational Law § 310, § 6-a. ...................................................................... 13

New York Educational Law § 305 ................................................................................... 13

New York Public Health Law §2164 ....................................................................... passim

Public Health Law 2500-e, Laws of New York, 1990, 1995, 1999, 2004, 2005, and 2015 ........ 11

## INTRODUCTION

It is uncontested that the Amish Plaintiffs hold sincere religious beliefs that preclude them from vaccinating the around 50 schoolchildren at issue in this case, and that those beliefs are substantially burdened by N.Y. Pub. Health Law §2164 (compulsory vaccination law, "**CVL**" or "**PHL 2164**"). Defendants have levied six-figure penalties against Plaintiffs for educating their children in their own one-room schools, on their own property, and insist they must violate their religious beliefs and overturn their centuries-old way of life or flee from New York, just as they had to do over 200 years ago when fleeing from persecution to settle here, ironically, for religious freedom.

Much, if not all, of Defendants' response and motion to dismiss is predicated upon the false premise that this case is about eliminating mandates or involves a facial challenge to the CVL, seeking to enjoin the law statewide. To be clear, that is not the issue presented to the Court. As the complaint reflects, this case involves a challenge to the CVL "as applied" specifically to the Amish Plaintiffs. ECF 1 ("declare that [the CVL] is unconstitutional **as applied to Plaintiffs and their schools**") (emphasis added). To the extent Plaintiffs' preliminary injunction motion in any way suggests broader relief, we disavow it, as Plaintiffs cannot seek more than requested in the complaint.

## FACTUAL BACKGROUND

### A.    The Amish Plaintiffs' Sincere Religious Beliefs are Substantially Burdened

It is uncontested that the Amish Plaintiffs' beliefs are sincerely held, religious, and substantially burdened by the CVL. *See* ECF 1 ¶¶ 12-16, 39, 41, 46, 52, 55; Ex. A, Declaration of Ezra Wengerd. Also undisputed is that the Amish Plaintiffs requested that the State grant them a religious exemption so they could educate their children consistent with their religious beliefs. *See Id.* ¶ 42 ("We plead with you + beg for pardon + grace with the help of God, that you can again grant

us our freedom of religious, for the exemption of immunization for our children on religious and ethical grounds"). In response, government officials informed the Amish that medical exemptions to the CVL are available but religious exemptions are categorically prohibited. *Id.* ¶¶ 43, 50.

**B.    Medical Exemptions are Permitted and Reviewed on a Discretionary, Individualized Basis**

New York permits medical exemptions while religious exemptions are not permitted. *See* ECF 1 ¶ 50. Defendants do not contest that requests for medical exemptions are granted (or denied) after government officials review each request on a case-by-case basis. *See* PHL § 2164(2)(a). Nor do they contest that the two steps in that review contain individualized discretion.

First, a family obtains a "signed, completed medical exemption form approved by the NYSDOH [New York State Department of Health ("**DOH**")] … from a physician licensed to practice medicine in New York State certifying that immunization may be detrimental to the child's health, containing sufficient information to identify a medical contraindication to a specific immunization" that is "consistent with ACIP guidance or other nationally recognized evidence-based standard of care." 10 NYCRR §§ 66-1.1(l) and 66-1.3(c) implementing PHL § 2164(8) ("If any physician … certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable.") As the statute and regulations plainly dictate, physicians possess discretionary authority regarding each medical exemption request.

Even the "ACIP guidance" that New York advises "health care practitioners consult" in considering a medical exemption provides subjective criteria, including contraindications that plainly require subjective judgment such as "encephalopathy (e.g., coma, decreased level of consciousness, prolonged seizures) not attributable to another identifiable cause, within 7 days of administration of previous dose of DTP or DTaP" or "family history of altered immunocompetence" for MMR vaccine, and instructs medical providers that "certain factors

might lead a provider to consider current, recent, or upcoming anesthesia/surgery/ hospitalization as a precaution" and that:

> Events or conditions listed as precautions should be reviewed carefully. Benefits of and risks for administering a specific vaccine *to a person under these circumstances* should be considered. If the risk from the vaccine is *believed* to outweigh the benefit, the vaccine should not be administered. If the benefit of vaccination is *believed* to outweigh the risk, the vaccine should be administered. Whether and when to administer DTaP to children with proven or suspected underlying neurologic disorders *should be decided on a case-by-case basis*.

https://www.cdc.gov/vaccines/hcp/acip-recs/general-recs/contraindications.html (emphasis added).[1]

At the second level of review, school administrators possess unfettered discretionary power to accept or deny a physician's recommendation for a medical exemption. *See* PHL § 2164(7)(a) and 10 NYCRR § 66-1.3(c)). School administrators regularly exercise their discretion to either accept or deny medical exemption requests. *See* Exs. B and C (declarations from parents concerning the process to obtain medical exemptions). Different outcomes can be and *are* reached, depending on which administrator reviews the request. *Id*. This process often has little do with the actual health or clinical care of any child, but rather is a mostly discretionary decision as to whether, in the subjective discretion of the school administrator, a child qualifies.

Creating even more subjectivity, schools may, but are not required to, submit a medical exemption to DOH to obtain its *opinion* on whether the exemption is "valid" but need not abide by that opinion. Moreover, families and doctors are often met with contempt and threats when seeking a medical exemption; many students seeking an exemption **are those who have been**

---

[1] The Court can take judicial notice of material contained on government websites. *Suazo v. Ocean Network Express*, 2023 U.S. Dist. LEXIS 35245, at *16 (S.D.N.Y. Mar. 2, 2023).

**previously harmed from a vaccine** and need to be exempt from future vaccines. *See* Ex. D, Declaration of Dr. James Neuenschwander ¶ 85.[2]

The other fiction put forth by Defendants is the hypothetical child they purport to protect: a child in school who is vulnerable to serious harm from the tiny number of infectious diseases for which vaccines can prevent transmission but who is not vulnerable to serious harm from the diseases for which vaccination increases the likelihood of transmission (discussed *infra*) and also not vulnerable to serious harm from the around 1,400 other known pathogens. *Id.* ¶ 86. This child is fictitious. The reality is that *if* a child is vulnerable to serious harm from measles, for example, such a child is susceptible to serious harm from any of the diseases for which vaccines increase the risk of transmission (discussed *infra*), from diseases for which a vaccine exists but is not mandated (like Covid or influenza), or from the around 1,400 other pathogens for which no vaccine exists. *Id.* Meaning, a child susceptible to serious harm from an infectious disease is simply not in school because there is no child who is selectively susceptible to serious harm from only the few diseases for which vaccination can prevent transmission and is mandated to attend school. *Id.* DOH does not even exclude children from school for six weeks after chicken pox vaccine despite FDA's package insert for this vaccine clearly explaining that a vaccinated child can spread the chicken pox virus during this period. *Id.* ¶¶ 23-24.

While DOH focuses on a fictional child, in reality, there is not a single unvaccinated child in any Amish school at issue who has or needs a medical exemption and DOH identifies no such child. *See* Ex. A ¶ 13. Hence, Defendants seek to exclude real Amish children from school for a mythical child who does not exist in their community or otherwise.

---

[2] Defendants repeatedly refer to "medically vulnerable" children but this is not the legal or medical standard to obtain a medical exemption from the requirements of the CVL.

**C.     New York Permits Over 97,000 CVL Non-Compliant Children to Attend School While Seeking to Exclude Around 50 Amish Children from School**

Defendants did not challenge Plaintiffs' claim that around 66,000 children currently enrolled in New York schools are non-compliant with the CVL. ECF 1 ¶ 67. The reason is now clear: it is because the 66,000-student estimate was well *below* the actual number. The Blog Declaration confirms that among students in all New York schools only "96% in the 2021-2022 school year" had all required vaccines. ECF 25-3 ¶ 19. The 4% amounts to over 97,900 students who are permitted to attend school in New York without mandated school vaccines. *See* https://data.nysed.gov/enrollment.php?state ("K-12 Enrollment: 2,448,537"). DOH also does not claim to have taken any enforcement action against any school in which these 97,900 children are located other than the tiny, miniscule portion thereof in Amish schools.

The 97,000 CVL non-compliant children were and are permitted to attend schools across the state, while Defendants seek to categorically prohibit the Amish from educating around 50 of their children on Amish property in Amish schools. When Plaintiffs attempted to educate their children consistent with their religious beliefs, six-figure financial penalties were levied against them, and the State does not contest it has not levied penalties against non-Amish schools for non-Amish children presently out of compliance with the CVL. ECF 1 ¶¶ 46, 71.

**D.     Of Six Mandated Vaccines, Three Do Not Prevent Transmission, a Fourth is for a Disease Not Transmitted in School, and a Fifth is a Live Virus that Can Spread from Vaccinee**

Defendants do not contest that three of the six vaccines at issue **do not prevent infection and transmission** – they are merely at best personal protection – and a fourth vaccine is for a disease not transmitted in a school setting. ECF 1 ¶ 95; ECF 10 at 22; Ex. D ¶¶ 7-22.

Defendants do not and cannot contest that IPV (polio vaccine), DTaP (diphtheria, tetanus, and pertussis vaccine) and MenACWY (meningococcal vaccine) do not contribute to herd

immunity – they are for personal protection. Indeed, CDC explains IPV vaccine "does not stop transmission of the virus," "pertussis vaccines do not prevent colonization … and do not exert any herd immunity effect," "[t]etanus … does not spread from person to person," and "MenACWY vaccines have provided protection to those vaccinated, but probably not to the larger, unvaccinated community (population or herd immunity)." ECF 1 ¶ 95; Ex. D ¶¶ 14, 19. As for the HepB vaccine, CDC confirmed it has no records of a single instance of "transmission of Hepatitis B in an elementary, middle or high school setting." ECF 1 ¶ 95; Ex. D ¶ 21. This is because HepB is not transmitted in a school setting. Ex. D ¶ 22.

While the foregoing is contrary to what is commonly assumed about these products, the facts above are not in dispute by CDC, FDA, or Defendants. Again, these products may reduce symptoms if the recipient is infected, but they exert no influence on that person becoming infected and transmitting the pathogen. ECF 1 ¶ 95; Ex. D ¶¶ 9-11, 17. They are not designed to create, nor do they result in herd immunity. *Id.* To the contrary, since these products reduce symptoms, but do not prevent infection and transmission, those vaccinated with these products are more likely to asymptomatically spread the pathogen. Ex. D ¶¶ 17, 33, 43. For example, while there are less symptomatic cases of pertussis since use of pertussis vaccine, the amount of circulating pertussis bacteria has not declined and, by many estimates, increased. *Id.* Hence, excluding Amish children from school for refusing this product is nonsensical. They are less likely than the vaccinated to infect others with pertussis in school because they are more likely to have symptoms and stay home. *Id.*

As for the fifth required vaccine, the chicken pox vaccine, this product is – unlike the foregoing products – a live virus vaccine. *Id.* ¶ 23. Meaning there is, albeit modified, live chicken pox virus in each dose. *Id.* Those vaccinated with this live virus can infect others with the chicken

pox virus for up to six weeks after receipt of the live vaccine. *Id.* This is why its package insert, approved by FDA, explains "that transmission of varicella vaccine virus (Oka/Merck) resulting in varicella infection including disseminated disease may occur between vaccine recipients (who develop or do not develop a varicella-like rash) and contacts susceptible to varicella including healthy as well as high-risk individuals" and that "[d]ue to concern for transmission of vaccine virus, vaccine recipients should attempt to avoid whenever possible close association with susceptible high-risk individuals for up to six weeks following vaccination" including "[i]mmunocomposed individuals [and] [p]reganant women … [and] [n]ewborn infants of mothers without documented history of varicella." *Id.* Nonetheless, New York does not exclude children vaccinated with this product from school for six weeks after vaccination. The reason they (like unvaccinated children) need not be excluded from school is because anyone immunocompromised to a degree chicken pox could seriously harm them are *not* in school (because if this virus can seriously harm them, so can the around 1,400 other known pathogens), pregnant women have virtually all previously been exposed to chicken pox, and newborns do not attend school. *Id.* ¶ 24.

Defendants do not and cannot contest the foregoing – which covers five of the six mandated school vaccines. Instead, the Blog Declaration makes various claims about some of these vaccines that are either irrelevant or incorrect, as detailed in Dr. Neuenschwander's declaration. Ex. D ¶ 5 and generally. For example, the Blog Declaration's discussion of polio fails to note that there were zero cases of polio in 1966, the year before the polio vaccine was first required for school in New York in 1967; that even prior to vaccination, there were only a few hundred cases annually of tetanus in the entire United States; and that the vaccinated are more likely to spread pertussis bacteria than the unvaccinated. *Id.* ¶¶ 17, 28, 39, 43.

Critically, whatever value the five vaccine products discussed above may have, New York is seeking to prohibit the Amish from educating their children as they have done for hundreds of years for refusing to engage in conduct that provides personal protection at best. If the Court allows this to stand, then there are very few Amish practices on which New York cannot trample since the government can (and often has) argued it is likely "safer" for the Amish to abandon various traditional practices (which courts have fortunately not countenanced).

### E.    Measles and Measles Vaccine

The only vaccine required for school not yet discussed, and the one Defendants focus on, is the measles vaccine. Defendants also justified the repeal of New York's religious exemption based on a 2018-2019 uptick in measles cases. ECF 25-1 at 31(the "impetus for [the CVL] was … the measles outbreak"). New York recorded 1,090 cases of measles in that period with no deaths, and no measles cases recorded amongst the Amish. ECF 25-3 ¶ 8; Ex. A ¶ 16.

Similarly, the Blog Declaration focuses primarily on measles cases in New York in 2018-2019, blaming these cases on pockets of under-vaccination, while ignoring that **none occurred in the Amish community** (and that a major contributor was "measles parties," purposefully exposing children to measles to obtain immunity – the only alternative for those wanting their children to return to school without the vaccine).[3]

The Blog Declaration also fails to objectively explain the efficacy of the measles vaccine. The facts are that measles mortality declined by over 98% between 1900 to 1962 before the first measles vaccine was introduced in 1963; and in the years directly before 1963, there were around 400 annual measles deaths in the entire United States amounting to one death for every 500,000 people in the United States prior to any measles vaccine existing and when extreme

---

[3] *See*  https://www.youtube.com/watch?v=ndkoAqcPUg8 at 25:40; *see also* Ex. A ¶ 16.

underdevelopment still existed in pockets of the country which greatly increases the risk of harm from measles. Ex. D ¶¶ 62-63.[4] The Blog Declaration is also not transparent about the safety of this product. For example, CDC discloses MMR can cause, *inter alia*, "seizure," "deafness," "long-term seizures, coma, or lowered consciousness," "brain damage," and FDA and Merck disclose thirty-six other serious harms – most immune, neurological, or immune-mediated harms – with evidence of a causal relationship with MMR. *Id.* ¶ 58. Moreover, Dr. Blog also ignores uncontested robust evidence that measles confers a survival advantage, including increasing overall life expectancy by halving the lifetime risk of dying from heart disease. *Id.* ¶ 58-59.

Regardless, removal of a religious exemption with a goal of raising vaccination rates for measles (or other diseases) is fruitless when it comes to the Amish; excluding them from school for refusing vaccines will not change the level of vaccination in their community. Due to religious convictions, the families at issue are prohibited from vaccinating and have made clear they cannot vaccinate. ECF 1 at 39; Ex. A ¶ 6.

### F.    Amish Children are Healthier than the Non-Amish Children in New York

There are a total of 26 families that have approximately 50 children in the three Amish schools at issue. Among these 26 families, there are 168 unvaccinated children in total (in or out of school) and not a single one has a diagnosed medical condition or other health issues that arose after birth. Ex. A ¶ 14. In contrast, among 168 children outside of the Amish community, on average and based on background rates in the U.S., one would expect that at least 9 would have food allergies, 31 would have environmental allergies, 10 would have asthma, 4 would have Autism Spectrum Disorder, and 15 would have ADHD. Ex. D ¶ 77.

---

[4] In contrast, CDC estimates 244,000 deaths from Covid in 2022 and around 35,000 deaths annually from influenza. *See* https://www.cdc.gov/mmwr/volumes/72/wr/mm7218a4.htm; *see also* https://www.cdc.gov/flu/about/burden/index.html.

**G.    New York Fails to Address Material Facts About These Vaccine Products and Does Not Restrict the Unvaccinated in Virtually Any Other Setting**

For the state to mandate a product that, at best, provides personal protection without any option for a religious exemption is destructive to religious freedom. For example, heart disease kills over 700,000 Americans every year (https://www.cdc.gov/heartdisease/facts.htm); this is over a hundred times more deaths, according to DOH's own estimates, than would occur if everyone in America stopped vaccinating for every disease tomorrow, ECF 25-3 ¶ 51 (notably, DOH's estimate is also grossly inflated when looking at each disease at issue). Hence, following its current logic, DOH could argue that religious beliefs can be violated for any mandate that arguably reduces heart disease, including requiring statins, certain diets, certain heart healthy activities, etc. While DOH wants children to receive pertussis, tetanus, etc., vaccines, and argues the more uptake the better, excluding the Amish from school for refusing is merely punitive.

Defendants nonetheless take advantage of the common misconceptions about the products at issue to paint an inaccurate picture of their efficacy and purported benefit. That DOH in fact grasps the realities regarding these products is reflected by the fact that children can be educated in New York in unlimited numbers without vaccinations, including when meeting formal school education requirements, as long as it is no more than 50 percent of their formal educational instruction for school. *See* https://www.nysed.gov/nonpublic-schools/home-instruction-questions-and-answers ("Parents providing home instruction [] may [] have their children instructed in a group situation for particular subjects but not for a majority of the home instruction program.").

It is also why DOH does not require any adults in virtually any context, including schoolteachers, to receive these products, keeping in mind that most adults would not have been required to receive most of these products for school themselves since, as of 1986, there were only three routine vaccines in the U.S. It was only after 1986, the year Congress gave pharmaceutical

companies immunity for liability for injuries caused by childhood vaccines, that the explosion in the vaccine schedule occurred. *See* 42 U.S.C. §§ 300aa-11. And with it, New York first required the recombinant HepB vaccine (first licensed in 1986) for school as of 1990 (Public Health Law 2500-e, Laws of New York, 1990, chapter. 634), varicella vaccine (first licensed in 1995) as of 2003 (L. 1999, ch. 416), pertussis and tetanus vaccines as of 2007 (L. 2004, ch. 207), and conjugate meningococcal vaccine (first licensed in 2005) as of 2015 (L. 2015, ch. 401). Ex. D ¶ 70. This means that most adults in the State, who comprise about 79 percent of the state's population,[5] were never subject to most of the State's school vaccine requirements. *See* ECF 1 ¶¶ 66-67.

DOH leaves the "unvaccinated" – meaning as God created them – alone in virtually every other area of life because it is aware of the actual facts regarding the vaccine products at issue but seeks to distract by weaving together random cases of certain diseases among the Amish over the last few decades to generate an anecdotal-driven hyperbolic picture to crush the Amish way of life.

## STANDARDS OF REVIEW

<u>Motion to Dismiss</u>: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In conducting that analysis, the Court must accept as true all factual allegations, and draw all reasonable inferences in favor of the plaintiffs. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013). In considering a motion to dismiss, only the allegations in the complaint are reviewed, and affidavits and other evidence are not permitted. *Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002).

---

[5] *See* https://www.census.gov/quickfacts/NY.

Preliminary Injunction: In the Second Circuit, a prohibitory injunction may be granted on a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Rochester Drug Co-op., Inc. v. Hiscox Ins. Co.*, 466 F. Supp. 3d 337, 348 (W.D.N.Y. 2020). In cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996); *see also Agudath Israel of Am. V. Cuomo*, 983 F.3d 620 (2d Cir. Dec. 28, 2020). Likelihood of success on the merits is "the dominant, if not the dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

While this Response addresses the law that is largely the same as to both the preliminary injunction and the motion to dismiss, Plaintiffs have addressed the distinctions where applicable.

## ARGUMENT

I.    **PLAINTIFFS ASSERT APPROPRIATE CLAIMS AGAINST MS. ROSA IN HER OFFICIAL CAPACITY, HAVE STANDING TO DO SO, AND SOVEREIGN IMMUNITY DOES NOT BAR THOSE CLAIMS**

Defendants' arguments regarding standing and sovereign immunity relative to Ms. Rosa are inter-related. For the avoidance of doubt, to the extent Defendants suggest that the claims are against the Department of Education, they are not. They are brought only against Ms. Rosa and only in her official capacity. Further, because Plaintiffs' claims are for prospective injunctive and declaratory relief, not money damages, *Ex parte Young*, 209 U.S. 123, 130-131 (1908) applies. *Ex parte Young* permits suits for prospective declaratory and injunctive relief against state officers who enforce a statute or have a sufficient connection with a statute regarding its enforcement, and such claims are not barred by sovereign immunity. *Ex parte Young* provides a "a narrow exception grounded in traditional equity practice – one that allows certain private parties to seek judicial

orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021).

To determine whether *Ex parte Young* applies, the court must conduct a "straightforward inquiry" into whether the complaint (1) "alleges an ongoing violation of federal law" and (2) "seeks relief properly characterized as prospective." *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *see also Dairy Mart v. Nickel*, 411 F.3d 367, 372 (2d Cir. 2005).

The allegations against Ms. Rosa, in her official capacity, are that she adjudicates appeals from exclusion from school orders, under N.Y. Educ. Law § 310, and that she is tasked with implementing and enforcing, and does implement and enforce, the mandatory educational instruction and supervision of school requirements pursuant to the authority granted to her in N.Y. Educational Law § 305(1) and (2). ECF 1 ¶11; *See* N.Y. Educ. Law § 310, § 6-a ("Ms. Rosa is empowered to adjudicate appeals of actions "[b]y a principal, teacher, owner or other person in charge of any school in denying a child admission to, or continued attendance at, such school for lack of proof of required immunizations in accordance with [PHL] section [2164].") Thus, injunctive relief, particularly relief directed to PHL § 2164, is relief that must involve Dr. Rosa.

"It is well-settled that a state official may properly be made a party to a suit seeking to enjoin the enforcement of an allegedly unconstitutional act if that official plays *some role* in the enforcement of the act." *Schulz v. Williams*, 44 F.3d 48, 61 fn.13 (2d Cir. 1994). In *Schulz*, the court observed that while other Defendants may have had a more direct role, the Board Defendants were also proper parties because they had some connection with respect to the challenged law. So too with Dr. Rosa, in light of her powers under N.Y. Educ. Law § 310, § 6-a.

As for Defendants' claims regarding standing, "[t]o establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the

conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (alterations adopted). Pre-enforcement challenges to statutes are "cognizable under Article III." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016). A plaintiff has suffered an injury-in-fact and has standing to bring suit when facing "threatened enforcement of a law" that is "sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 158-59. Specifically, a plaintiff "satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 159; *see also Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013) (a plaintiff has "standing to make a pre[-]enforcement challenge when fear of [enforcement] under an allegedly unconstitutional statute is not imaginary or wholly speculative") (quotation marks and citation omitted). A plaintiff need not first "'expose himself to liability before bringing suit to challenge . . . the constitutionality of a law threatened to be enforced.'" *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015), quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007); *see also Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). And, as is relevant to this case given prior enforcement of the challenged act against these Plaintiffs, "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Susan B. Anthony List*, 573 U.S. at 164 (quotations omitted).

Here, and curiously, while Defendants challenge Plaintiffs' standing to sue Dr. Rosa who is empowered to hear appeals for denials of exemptions under PHL § 2164, Defendants do not suggest that Plaintiffs do not have standing, either generally, or specifically, to challenge PHL § 2164. Instead, they suggest that injunctive relief against Dr. Rosa would not remedy their harm. Yet, if Plaintiffs' children are denied the ability to attend their own Amish schools, because

administrators are fearful of further fines, the appeal of such denials may need to run to Dr. Rosa. Accordingly, the elements of connection and redressability are met.

## II. AS APPLIED TO PLAINTIFFS, THE CVL VIOLATES THE FIRST AMENDMENT

### A. Plaintiffs' Free Exercise Claims are Supported, Not Foreclosed, by Supreme Court and Second Circuit Precedent

Defendants begin their attack by falsely asserting that precedent forecloses Plaintiffs' claims. ECF. 25-1 at 22-26. They are wrong. First, and as explained below, because the challenged statute is not generally applicable under *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021), *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) and *Mast v. Fillmore Cnty.*, 141 S. Ct. 2430, 2432 (2021), Defendants' contention that precedent supports their position is simply incorrect.

Defendants' reliance on *Jacobson v. Massachusetts,* 197 U.S. 11 (1905), *Zucht v. King*, 260 U.S. 174 (1922) and *Prince v. Massachusetts,* 321 U.S. 158 (1944) and their progeny is outdated and misplaced. All three are dated cases and none involved a secular exemption scheme that did not permit religious exemptions (or a mandate with lax enforcement except against religious minorities). In the last two years, the Supreme Court has made clear that policies that permit secular but not similar religious activity will not be tolerated. *See, e.g., Fulton*, 141 S. Ct. at 1877; *Tandon*, 141 S. Ct. at 1296; *Rom. Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).

If that were not enough to distinguish these cases, all three pre-date the general applicability test in *Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). Two of the three were also issued prior to incorporation of the Free Exercise Clause against the states. *Cantwell v. Connecticut*, 310 U.S. 296 (1940). Moreover, *Jacobson* involved a vaccination-or-fine scheme in the context of an ongoing outbreak, *Zucht* did not involve a Free Exercise claim whatsoever, and *Prince* is mere *dicta* in the context of truancy laws regarding distribution of religious literature.

15

And if all of that were not enough, this case does *not* facially challenge a vaccine mandate, rather just the lack of a religious exemption for the Amish Plaintiffs; and, moreover, the core holding in those cases was that the government can enact mandates of vaccines that prevent transmission (which is not applicable to four of the six vaccines at issue in this case) in furtherance of a general police power that did not involve a recognized fundamental right (freedom of religion here) which applies to all the vaccines at issue in this case. Plaintiffs do not suggest these cases have been overruled, but instead submit they are not applicable.

Defendants next turn to *Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015), which simply did not involve the issues presented here. The *Phillips* Court dealt with a *Jacobson*-type claim, that is, a general substantive due process claim reviewed under rational basis, because, at the time, New York offered religious exemptions. That is not this case. And in any event, *Phillips* predates *Fulton* and *Tandon* which constituted a sea change in free exercise jurisprudence.[6]

And Defendants' citations to a number of cases at ECF 25-1 at 25-26, all of which predate *Fulton*, 141 S. Ct. at 1877 and *Tandon*, 141 S. Ct. at 1296, are inapposite.

That, then, leaves us with *We the Patriots United States v. Conn. Office of Early Childhood Dev.*, 2023 U.S. App. LEXIS 20156, ---F.4th --- (2d Cir. Aug. 4, 2023) ("**WTP2**").[7] *WTP2* is distinguishable, as we explain below, for a variety of reasons. First, the exemption scheme there,

---

[6] Defendants castigate Plaintiffs for not citing *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021). But *Hochul* involved automatic medical exemptions for adults in healthcare settings based on a physician diagnosis which alone renders it entirely distinguishable, as well as, *inter alia*, separate asserted governmental interests, namely "all hands on deck" to respond to a full-blown pandemic, no evidence of pretext for the asserted interest, evidence of different risks between exemption types measured against plaintiffs seeking a state-wide religious exemption for all health care workers, and the record was sparse on comparability. *Id.* at 280-290. None of that is the case here. Similarly, Defendants' citation to *V.D. v. State*, 403 F.Supp.3d 76 (EDNY 2019), which did not involve Free Exercise, has no applicability.

[7] Defendants cite the District Court case, but the Second Circuit is the appropriate case for analysis.

like *Hochul*, 17 F.4th 266, involved automatic medical exemptions that were not reviewed by the Government in its discretion, and on that basis, the Second Circuit found the scheme was not discretionary. *Id.* at *34-*35. As explained above and below, that is not the New York scheme.[8]

**B.    Strict Scrutiny Applies Here, and Defendants Failed to Demonstrate the CVL is Generally Applicable Under *Fulton***

Plaintiffs are likely to prevail on their Free Exercise claims[9] because the CVL fails the general applicability test under *Fulton*. Where "the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Fulton*, 141 S. Ct. at 1877 (quoting *Smith*, 494 U.S. at 884). The CVL permits discretionary secular exemptions, but government officials have made clear to Plaintiffs their requests for religious exemptions are categorically prohibited under New York law.

In repealing its religious exemption but leaving the medical exemption intact, the state made a conscious choice that non-vaccination for secular reasons was "worthy of solicitude," but that non-vaccination for religious reasons must be eliminated. *See Fulton* 141 S. Ct. at 1878. Thus, the statute fails the general applicability test from the outset. *See, e.g., Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999).

---

[8] In the same way, and unlike this case, there was not substantial under-inclusiveness, nor, as exists here with hopelessly conflicted asserted governmental interests, evidence of pretext.

[9] It would be improper to dismiss as Plaintiffs have adequately plead sufficient facts which must be taken as true to sustain this claim because it is "plausible" that: (i) there is a discretionary medical exemption review process; (ii) comparable secular activity is permitted; and (iii) that the CVL is not narrowly tailored and is both under- and over-inclusive. ECF 1 ¶¶ 8-9, 12-16, 22-29, 38-42, 61-68, 71, 81-96. *See, also, M.A. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29 (2d Cir. 2022) (factual issues existed on comparability between religious and medical exemptions, precluding summary judgment); *see also Fox et al. v. Makin, et al.*, 2023 WL 5279518, at *7, *10 (D. ME. Aug. 16, 2023) (denying motion to dismiss a facial *and* as applied Free Exercise challenge to Maine's compulsory vaccination law).

Defendants argue the medical exemption scheme is generally applicable under *Fulton* and *Smith* because it purportedly relies upon "objectively defined" criteria and therefore government officials cannot favor secular conduct above religious conduct when granting exemptions. ECF 25-1 at 33-34. Defendants are wrong for three reasons.

**First**, this case involves many more exceptions to the CVL than just a medical exemption. The policy underlying the CVL is purportedly to "protect the health of children while they are physically present in the school environment" through vaccination. ECF 25-1 at 35. But, as a practical matter, even putting aside the hundreds of thousands of New York school teachers not required to have any vaccines, New York has administratively granted over 97,900 non-medical exceptions by not enforcing the CVL for students not vaccinated for secular reasons. *Supra* p. 5. And it is well settled that "[g]ranting waivers" to favored groups, or denying to disfavored groups, "would of course be unconstitutional." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002). Thus, even if the medical exemption scheme was generally applicable (which it is plainly not, see *supra*), the CVL lacks general applicability because, as a practical matter, New York permits school attendance without mandated vaccines, provided one does not request a religious exemption.[10]

**Second**, whether strict scrutiny is triggered does not depend on whether a secular exemption is based on objective criteria (which, in any event, is not the case here, see *supra* p. 2-3 and Exs. B and C). *Fulton* also involved secular criteria, just like the CVL. 141 S. Ct. at 1875 (the "agency must conduct a home study during which it considers statutory criteria"). What makes for an individualized exemption scheme, as explained in *Fulton*, is when criteria are applied on a case-by-

---

[10] It also defies logic for Defendants to argue a vaccine mandate with *both* a religious and medical exemption is <u>not</u> generally applicable, ECF 25-1 at 34. but one with *only* a medical exemption is generally applicable. *See, e.g., Dahl v. Bd. of Trs. of Western Mich. Univ.*, 15 F.4th 728, 733-734 (6th Cir. 2021); *Bosarge v. Edney*, 2023 U.S. Dist. LEXIS 67439, at *27 (S.D. Miss. April 17, 2023).

case basis by government officials to approve or deny a request. *Fulton,* 141 S. Ct. at 1879. Defendants do not suggest that is not the case here; they merely gloss over *Fulton* to suggest government officials do not have the discretion that the statute, on its face, in fact affords them. *See* 10 NYCRR §§ 66-1.1(l) and 66-1.3(c) implementing PHL § 2164(8).

The fact that PHL § 2164(8) is discretionary is plain from its face. It requires an individualized physician determination that a particular vaccine *may* be detrimental to the health of the child. And, as provided in 10 NYCRR § 66-1.3(c), even after the medical exemption forms have been completed, "[t]he principal or person in charge of the school may require additional information supporting the exemption." Under *Fulton,* if a state reserves the authority to "grant exemptions based on the circumstances underlying each application," it must provide a compelling reason to exclude the possibility for a religious exemption from its scheme. *Fulton,* 141 S. Ct. at 1877. *Fulton* does not speak about objective criteria but about whether the particular circumstances or attributes of an exemption applicant drives the exemption process. Defendants' suggestion that objective criteria would somehow save the instant scheme is directly belied by both the facts (the criteria are not objective) and the holding in *Fulton.*

Moreover, at the second level of the review process, school officials are delegated enormous independent and personalized discretion to override a physician's medical recommendation, including the ability to require additional information and ultimately make the final discretionary decision to grant or deny a medical exemption. *See supra* p. 2-3; Exs. B and C. In fact, the State recently defended this delegation of broad discretionary power to school officials and prevailed.

*Goe v. Zucker*, 43 F.4th 19, 33 (2d Cir. 2022). This facet of NY's vaccination scheme fundamentally distinguishes this case from *We the Patriots*, 2023 U.S. App. LEXIS 20156.[11]

At bottom, *Smith* and *Fulton* are concerned about unconstitutional partiality against religious conduct, not whether an exemption scheme contains objective criteria. For example, if DOH stated only males (an objective criteria) can apply for employment, without stating "females may not apply," such a policy would invoke similar constitutional issues as exist here. Here, in addition to the categorical favoritism for secular conduct already manifest in the statutory scheme, the Amish Plaintiffs have *actually* experienced the unconstitutional bias the Supreme Court was so concerned about in *Fulton* and *Smith* when an Amish representative requested that DOE allow them to seek a religious exemption and was categorically rejected.[12] *See* ECF 1 ¶¶ 42-43. Additionally, federal courts across the country have struck down mandatory vaccination schemes under the First Amendment, even though those policies had clearly defined medical exemptions, because the consideration of such medical exemptions involved judgment on a case-by-case basis, just as New York's scheme does. *See, e.g., Bosarge,* 2023 U.S. Dist. LEXIS 67439, at *27; *Dahl*, 15 F.4th at 733-734; *Seals 1-26 v. Biden*, 578 F. Supp. 3d 822, 838 (N.D. Tex. 2022).

---

[11] Defendants incorrectly claim Justice Gorsuch in *Cuomo* indicated vaccine mandates only trigger rational basis. Rather, Gorsuch observed *Jacobson* was pre-incorporation of the First Amendment into the substantive due process clause and did not involve comparability issues presented here.

[12] An exemption scheme creating secular but not religious exemptions triggers strict scrutiny even if the secular exemptions are *not* subject to individualized review. In such cases, the unconstitutional bias is baked into the regulation. *See, e.g., Newark Lodge*, 170 F.3d at 365 ("While the Supreme Court did speak in terms of 'individualized exemptions' in *Smith* and *Church of Lukumi Babalu Aye v. City of Hialeah* 508 U.S. 520 (1993), it is clear from those decisions that the Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations. If anything, this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption" for secular objections "but not for individuals with a religious objection").

**Third**, even if an objectively defined secular exemption scheme could somehow allow the government to avoid strict scrutiny (and *Fulton* is clear it cannot), the medical exemption at issue is *not* based on objective criteria. The CVL instructs physicians to refer to CDC guidelines when determining whether a contraindication or a precaution exists, potentially entitling a child to a medical exemption, and these guidelines plainly include subjective criteria as discussed *supra* p. 2-3, including specifically stating certain criteria "should be decided on a case-by-case basis." 10 N.Y.C.R.R. § 66-1-1(l). If that were not enough, New York school administrators then subjectively examine the medical exemption request on a case-by-case basis, and, irrespective of whether the request meets or fails the CDC criteria, are empowered to accept or deny the physician's recommendation as discussed *supra* p. 2-3. Hence, in New York, unlike *We the Patriots*, medical exemptions are subject to individualized discretion at multiple levels where administrators have unfettered discretion to grant or deny them. Thus, the exemption scheme is exactly the type of "individualized" and "discretionary" review that invokes strict scrutiny under *Fulton* and *Smith*.

Where vaccination mandates burden religious beliefs, federal courts applying recent Supreme Court precedent have struck down such policies at a blistering pace. *See, e.g., Bosarge*, 2023 U.S. Dist. LEXIS 67439, at *27; *Dahl*, 15 F.4th 728 (6th Cir. 2021); *Seals 1-26 v. Biden*, 578 F. Supp. 3d 822 (N.D. Tex. 2022); *Col. Fin. Mgmt. Officer v. Austin*, 2022 U.S. Dist. LEXIS 153590 (M.D. Fla. Aug. 18, 2022); and *Thoms v. Maricopa Cnty. Cmty. Coll. Dist.*, No. CV-21-01781-PHX-SPL, at *16 (D. Ariz. Nov. 5, 2021).

In sum, New York's unique medical exemption scheme triggers strict scrutiny under *Fulton* and *Smith,* and, for the reasons more fully described below, the CVL cannot withstand strict scrutiny as applied to these Plaintiffs. In any event, because the verified complaint is clear there is an individualized exception scheme under the CVL, Plaintiffs have presented a plausible claim that

the challenged statute is not generally applicable, precluding dismissal under Rule 12(b). *See Rockland Cnty. Dep't of Health*, 53 F.4th 29, 39.

###### C.    Defendants Cannot Demonstrate the Challenged Statute Is Neutral and Generally Applicable Under Tandon

Even if Defendants could somehow evade strict scrutiny under *Fulton,* the CVL, relative to the Amish, lacks neutrality and general applicability under *Tandon,* 141 S. Ct. 1294. Government regulations "are not neutral and generally applicable and therefore trigger strict scrutiny under the free exercise clause of the First Amendment, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296 (*citing Diocese of Brooklyn*, 141 S. Ct. at 67); ECF 1 ¶¶ 61-71, 91-96 (pleading comparability issue).

Defendants claim the CVL escapes *Tandon*'s reach because medical and religious exemptions do not encapsulate "comparable activity." ECF 25-1 at 36-39. According to the Supreme Court, this is an unsupportable position. *See Tandon,* 141 S. Ct. at 1297 (in the context of policies to mitigate infectious diseases, holding government cannot "assume the worst when people [exercise their religion] but assume the best when people [engage in secular activities]"). Not vaccinating for religious reasons is not only comparable to not vaccinating for medical reasons, the two activities are the same; thus, the CVL triggers strict scrutiny for this reason alone. *See also Seals*, 578 F. Supp. 3d 822, 838 (in the context of vaccination mandates, "no matter how small the number of secular exemptions by comparison [to number of religious exemptions], *any* favorable treatment . . . triggers strict scrutiny under [*Tandon*] and the First Amendment").

Nonetheless, Defendants contend medical exemptions do not comprise comparable secular activity under *Tandon*, alleging children unvaccinated for religious reasons pose a greater threat to New York's public health goals than children unvaccinated for non-religious reasons. Comparability turns on "the asserted government interest that justifies the regulation at issue," and

"[c]omparability is concerned with the risks various activities pose." *Rockland County,* 53 F.4th at 38. Defendants fail to address the risks in this as-applied challenge regarding these Plaintiffs.

Hoping to avoid strict scrutiny, Defendants propose three distinct and mutually exclusive government interests (going to the pretext concern not present in *We the Patriots,* 2023 U.S. App. LEXIS 20156, but present here): (1) preventing transmission of "vaccine-preventable diseases" in school settings, ECF 25-1 at 36; (2) ensuring schoolchildren unvaccinated for medical reasons are not injured by vaccines and are not exposed to pathogens, but only at school, *Id.* at 36; and (3) protecting the "health of the public in general" against pathogens.[13] *Id.* at 35.

Regarding the first interest, even if pretending all mandated vaccines prevent transmission, permitting any unvaccinated people in schools, either adults or children unvaccinated for secular reasons, equally undermines the State's purported goal. So, too, does permitting roughly 97,900 CVL non-compliant children to attend school. But as applied Plaintiffs, who live separately from the rest of society, prohibiting them from gathering in school for beyond fifty percent of their formal instruction, but not for instruction up to that or in any other context, makes no sense.

As for the second interest, ensuring the protection of children unvaccinated for medical reasons is meritless. First, the Amish Plaintiffs have no unvaccinated medically vulnerable children in their schools and hence the goal is inapplicable in this as-applied challenge. Indeed,

---

[13] Defendants also put forward a number of subcategories to these overarching goals that either do not apply to Plaintiffs or will never be realized within the Amish community through prohibiting religious exemptions. Defendants argue they possess compelling interests to: (1) maintain community herd immunity, ECF 25-1 at 44-5, i.e., the third alleged interest; (2) increase vaccination rates in schools, *Id.* at 35, i.e., the second alleged interest; (3) decrease religious exemption rates, *see Id.* at 47 (stating repeal of the religious exemption was "crafted to ameliorate the precise public health threat facing the State," which in Defendants' view was an increased "reliance on religious exemptions") – which is itself evidence of animus towards religious beliefs – but in any event is tied to the second and third asserted interests; and (4) respond to an uptick in measles cases in community, i.e., the third asserted interest. *Id.* at 38-9. None of these goals are advanced by eliminating the religious freedoms of these Amish because of inability to vaccinate their children due to sincere religious beliefs.

there are 26 families within the three Plaintiff schools which collectively have 168 unvaccinated children (in and out of school) and not one needs or would need a medical exemption. In addition, this purported interest is not furthered for the reasons discussed below and is further undermined by the ability of over 97,900 CVL non-compliant children to attend school and adults with unknown vaccination status to be present in school.

With regard to protecting the "health of the public in general" against diseases for which vaccines are mandated, this ignores that most vaccines mandated for school do not prevent transmission as discussed *supra* at p. 5-8, is otherwise undermined by the ability of over 97,900 CVL non-compliant children, medically exempt children, and adults to attend or be present in school; and is also undermined by every other communal activity outside of school.

The State's *post-hoc* asserted interests are also at war with each other. On one hand, the State enrolls medically exempt children in school but not religiously exempt children to purportedly on grounds it needs to protect the former from the latter. On the other hand, it claims it must exclude unvaccinated children from school to protect the public, yet lets the unvaccinated medically exempt children attend school.

Again, Defendants' position requires pretending the six mandated vaccines can prevent infection and transmission. *Supra* p. 5-8. Defendants' position also requires ignoring the reality that vaccinated children are more likely to spread certain pathogens for which they are vaccinated. *Supra* p. 6-7. It further ignores the true efficacy profile of all the products at issue as well as the fact that most diseases at issue were eliminated from New York prior to any mandate, let alone a mandate without a religious exemption. Ex. D ¶¶ 28, 40, 45, 49, 71. In the end, the analysis of whether to crush the Amish way of life should be driven by facts, not fiction.

Regardless, even accepting that the State's proposed objectives are not *post-hoc* litigation tactics crafted to escape strict scrutiny (and they are), New York permits a kaleidoscope of comparable secular activities that contradict its claim that it cannot permit a limited religious exemption for Plaintiffs. *Rockland*, 53 F.4th at 41-42 (The "general-applicability test embraces a purposivist approach that is vulnerable to manipulation and arbitrariness.") (Parks, concurring).

      1.    <u>New York permits a host of comparable secular activities that make it unconstitutional to not permit an Amish-specific religious exemption</u>

Critically, where First Amendment violations are at issue, courts cannot rely on "broadly formulated" governmental interests, but must "'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espirita,* 546 U.S. 418, 431 (2006). Accordingly, the question in this case "is not whether the [Government] has a compelling interest in enforcing its [mandate] *generally*, but whether it has such an interest in denying an exception" from that requirement to the Amish Plaintiffs *specifically*. *Fulton*, 141 S. Ct. at 1881.

Defendants suggest *Fulton's* to-the-plaintiff standard should not apply on grounds that "plaintiffs are seeking a statewide injunction, not one limited to these particular plaintiffs." ECF 25-1 at 38. That is false because the complaint in this action *only* sought relief against the CVL specifically "as applied" to Plaintiffs and hence relief is limited thereby. *See* ECF 1 at 37 (seeking injunctive relief to prohibit "enforcing N.Y. Public Health Law § 2164 against Plaintiffs" and declaratory relief that the CVL "is unconstitutional as applied to Plaintiffs and their schools").

The Amish-specific relief sought here materially distinguishes this case from *We the Patriots,* 2023 U.S. App. LEXIS 20156, where an organizational plaintiff (with no limitation on

membership) sought a statewide injunction.[14] Here, the Court can issue a limited injunction against CVL to the extent it burdens the Amish Plaintiffs' religious beliefs, and otherwise leave it intact.

Defendants argue that religious exemptions are more dangerous to its goals than medical exemptions because more children may utilize the religious exemption. ECF 25-1 at 36. Defendants' position, however, ignores the well-pleaded allegations which make clear Plaintiffs are seeking an as-applied challenge for the Amish. ECF 1 ¶¶ 61-68, 71, 91-96. Assuming *arguendo* all the products at issue prevent transmission, which they do not, the risk comparison as applied to these Plaintiffs falls flat given the uniqueness of these Plaintiffs - children who have, for centuries, divorced themselves from modern technology and societal interactions. Further, New York permits non-vaccination for secular reasons in virtually every other life scenario in New York yet claims it cannot accommodate the religious convictions of a handful of Amish Plaintiffs seeking to educate a group of their children on their own property in their own schools. This is not a credible position, and no case suggests that it is.

New York allows the following "comparable secular activities:" (1) granting functional exemptions, due to lax enforcement, to an estimated 97,900 CVL non-compliant schoolchildren who have not claimed any exemption, *see* ECF 1 ¶ 67; (2) allowing unvaccinated adults to work in the school system; (3) permitting homeschooled children to congregate in unlimited numbers in educational settings without vaccination requirements; (4) permitting children who have not been vaccinated against Covid, flu, and numerous other diseases for which vaccines exist, or the around 1,400 pathogens for which no vaccine exists, to attend school; (5) allowing citizens to congregate

---

[14] The limited Amish-specific relief also distinguishes this case from *We the Patriots*, 17 F.4th at 266.

*en masse* for every activity imaginable without any vaccine mandates; and (6) permitting medical exemptions.[15]

### a)    Administrative exceptions through lax enforcement

If the risks Defendants feign from unvaccinated students were real, they would focus on the over 97,900 CVL non-compliant students in New York schools who have not sought any religious exemption rather than focus on the few Amish children in their own schools who seek to decline vaccination for religious reasons. Having shown extraordinary flexibility with the CVL, the State cannot credibly argue permitting the Amish a religious exemption would be unacceptable. *See, e.g., Mast*, 141 S. Ct. at 2432 (where a state permits exceptions to a public health policy, it "must offer a compelling explanation why the same flexibility extended to others cannot be extended to the Amish."); *see also id.* at 2432 (the issue was "not whether the [government] had a compelling interest in enforcing its [requirement] *generally*, but whether it has such an interest in denying an exception" from that requirement to the Amish *specifically*).

The number of CVL non-compliant children in New York schools is well over 1,000 times the number of children to which injunctive relief would apply here, another fact that materially distinguishes this case from *We the Patriots*. In contrast to what the *Patriots* Court confronted in Connecticut, New York could advance its purported goals to an exponentially greater degree by enforcing the CVL against a tiny fraction of these over 97,000 CVL non-compliant students and

---

[15] For purposes of Defendants' motion to dismiss, these allegations must be accepted as true. Further, because the allegations are derived from government sources, they constitute competent evidence that preclude summary judgment. *See, e.g., Leger v. Kalitta*, 2018 WL 2057142, at *3 (E.D.N.Y. Jan. 26, 2018). In fact, this documentation could properly support a grant of summary judgment in Plaintiffs' favor. *See Desclafani v. Pave-Mark Corp.*, 2008 WL 3914881, at *5 n.7 (S.D.N.Y. Aug. 22, 2008) ("any facts subject to judicial notice may be properly considered in a motion for summary judgment."). Factual development will permit the parties to more clearly articulate why these unvaccinated children do, or do not, constitute "comparable secular activity" under *Tandon*.

their schools. In fact, the Blog Declaration makes clear the overall school vaccination rate increased only 3% following repeal of the religious exemption while an even greater percent of students (4%) still remain out of compliance (ignoring, of course, that the 3% of children excluded from school did not evaporate but often joined homeschool coops where they learn daily with groups of other children and otherwise regularly gather with other children and adults). *See* Ex. B; ECF 25-3 ¶ 19. Had the State focused on the non-compliant instead of the religious, it could have gained an even larger increase in school vaccination rates.[16]

Dr. Blog richly attributes the State's lackadaisical enforcement approach to alleged insufficient resources. *See* ECF 25-3, Decl. of Blog ("[While] DOH conducts annual surveys of school vaccination rates, it does not have the capacity to audit all survey findings for every school in NYS yearly"). But the State apparently has no trouble mustering resources to enforce the CVL against a religious minority that has, for centuries, lived apart from the rest of society, levying ruinous six-figure penalties they cannot afford. If Defendants enforced the CVL against the schools with the over 97,900 non-compliant children, it could collect $195,800,000[17] per day until each child complied and easily fund an enforcement wing for the CVL. Dr. Blog does not explain why the imposition of $195,800,000 in fines would not be sufficient to enforce the CVL statewide, and the failure to do so demonstrates the issue *here* is religious discrimination, not funding.

---

[16] Defendants, however, know the real profile of the products at issue and hence know that even these over 97,000 students are not a concern. Defendants' policy is about the punitive exclusion from school of those who profess beliefs contrary to Defendants' beliefs about vaccination. There is no indication that these over 97,000 CVL non-compliant children's parents hold beliefs at odds with those preferred by Defendants – they are just non-compliant – but the Amish apparently dared profess beliefs to the contrary and hence were targeted for exclusion from their schools or, otherwise, the state.

[17] Defendants imposed a $2,000 per child penalty on the Amish schools, which represented one day of non-compliance for each child, arguing that this assessment was generous towards the Amish as the penalties assessed could have "resulted in a much higher penalty." ECF 25-2 at 175 of 187.

That the State singled out the Amish, and is not otherwise meaningfully enforcing the CVL, further underscores its non-neutrality and further distinguishes this case from *We the Patriots*, raising obvious "doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular [group]." *Brown v. Entm't Merchs. Ass'n, Brown*, 564 U. S. 786, 802 (2011).

The exceptions to the CVL the state permits through non-enforcement, and the attendant comparability analysis this dynamic provokes, is similar to what the Second Circuit confronted in *Rockland Cnty. Dep't of Health*, 53 F.4th 29, 39 (overturning the grant of summary judgment because exceptions to vaccination policy generated factual questions for purposes of *Tandon's* comparability test). Obviously, because Plaintiffs have adequately plead that there is comparability and government non-neutrality that would preclude summary judgment, even without discovery, Plaintiffs have advanced a "plausible" claim for purposes of opposing dismissal under Rule 12(b). And the State's lax, except for Amish-specific enforcement of the CVL is just one factor of many more weighing heavily in favor of injunctive relief.

b)      *Unvaccinated adults in the school system is comparable activity*

Maintaining the fiction that all the vaccines at issue prevent transmission (or even most) and the fiction that schools are hermetically sealed off from the outside world, New York has no vaccine mandate for adults working in schools, effectively providing them a secular exemption.

Defendants' attempt to distinguish children from adults is nonsensical, and, factually, false. ECF 25-1 at 38. Adults and children can both become infected and transmit any of the around 1,400 known pathogens. Ex. D ¶ 24. As for the few pathogens for which vaccines are mandated, vaccinated children and adults are, for example, more likely to spread pertussis in school as they are at least equally as likely to be infectious but less likely to have symptoms and know to stay home. Ex. D ¶ 17. Even putting this aside, and perhaps recognizing they are splitting hairs,

29

Defendants further argue there is not "an appreciable number of unvaccinated adults in schools," ECF 25-1 at 37, but when it comes to actual proof of this, Defendants offer none. New York, in fact, does not even bother to track vaccination rates for adults working in schools despite the fact most adults working in schools were never subject to most of the vaccine mandates at issue in this case as discussed *supra* p. 10-11. This again reflects that they understand the facts about the pharmaceutical products at issue, discussed *supra* p. 5-8 (though they don't disclose those facts to the Court) which is why even large numbers of unvaccinated teachers are plainly acceptable.

c)   *Unvaccinated homeschooled children also entail comparable activity*

Perhaps even more problematic for Defendants' argument is that New York allows an unlimited number of children to congregate in a school setting[18] without showing proof of vaccination. This too constitutes comparable activity under *Tandon*.

d)   *Unvaccinated adults and children outside of school*

The state also allows unvaccinated adults and children, whatever their reason for opting out of vaccination, to congregate *en masse* outside of school without vaccination requirements. This too constitutes comparable activity. *See Tandon,* 141 S. Ct. at 1297 (comparability "is concerned with the risks various activities pose, not the reasons why people gather").

e)   *The CVL is underinclusive because it ignores other diseases*

The State has also severely undermined its goal of controlling "all"[19] diseases by failing to explain why it does not (under its logic) mandate for school the numerous other vaccines that exist,

---

[18]   *See*   https://www.nysed.gov/nonpublic-schools/home-instruction-questions-and-answers ("Parents providing home instruction to their children may arrange to have their children instructed in a group situation for particular subjects but not for a majority of the home instruction program.").

[19] *See* ECF 25-1 at 49 (asserting New York has a compelling interest to counteract the potential spread of "**all** contagious diseases in a community" (emphasis added)).

including for Covid and influenza, or why it does not take precautions regarding the around 1,400 other known pathogens for which no vaccines exist. *See supra*, p. 4.

Moreover, to the extent the State's public health objective is to prevent medically exempt children from exposure to diseases, exclusively in school, the State is not being forthcoming. As discussed *supra* p. 4, there is no such thing as a child *only* susceptible to serious harm from the narrow set of pathogens for which vaccines are mandated (even assuming they each prevent transmission, and none increase the risk of transmission). Indeed, if a child can be seriously harmed from chicken pox, such a child is not attending school because she or he could be seriously harmed from any of the around 1,400 other known pathogens.

But even assuming this fictional child existed (it doesn't), and applying Defendants' *post-hoc* argument in that regard, Defendants would require everyone in school, including adults, every child (including the over 97,000 CVL non-compliant children), and all those entering school buildings to be vaccinated, would exclude those vaccinated for chicken pox for six weeks after vaccination, would take precautions for the other around 1,400 pathogens, and would exclude children vaccinated for, *inter alia*, pertussis. *See supra* at p. 4. New York doesn't do these things because it knows the child it created *post-hoc* is a myth. The State does not discuss that the real reason most medical exemptions are sought is due to prior injury from a vaccine. *See supra*, p. 3-4. Regardless, there are no medically exempt children in the Amish schools at issue. Ex. A ¶ 13.

f)    *Medical exemptions are comparable activity under Tandon*

In relation to the Amish Plaintiffs, medical exemptions also constitute comparable activity under *Tandon*. There are around 50 Amish children who would benefit from an injunction. In contrast, outside the Amish community, there are over 3,000 medical exemptions. ECF 25-3 ¶ 42.

Additionally, considering that New York permits medically exempt children to cluster in schools, Defendants' argument that children unvaccinated for religious reasons pose an unacceptable risk because they tend to "cluster geographically" is unpersuasive. ECF 25-1 at 36. For example, for the 2021-22 school year, medical exemptions were granted to 50% of children attending A Plus Kidz Academy, 30% of children attending Duane Lake Academy, and 17% of children at the Marilyn David Girls Academy. *See* ECF 1 ¶ 27. Having demonstrated its approval for unvaccinated children to cluster in school settings, provided they are unvaccinated for secular reasons, New York can likewise permit the Amish to educate their children.

Notably, Plaintiffs are indisputably incapable of vaccinating their children for religious reasons and will continue to congregate at church and in endless other social settings. For religious reasons, they also cannot abandon their communal way of life. Thus, the only effect of the CVL as applied to Plaintiffs is to strip their ability to educate their children consistent with their religious beliefs.

In sum, even maintaining the fictions about the products at issue, the State permits non-vaccination for secular reasons in at least six distinct ways that undermine its stated goals to a greater extent than allowing Plaintiffs to continue educating their children in their isolated community, on their land, in their schools, as they have done for centuries. Maybe most ironic is that Defendants, in their zealous attempt to push their way of life on the Amish, ignore that the Amish children are healthier than the general population of children in New York by several factors. *See supra* at p. 10.

2.     <u>Collectively, the kaleidoscope of secular activities New York permits also undermine the legality of its zealous attack on the Amish</u>

The Second Circuit recently explained that, in the context of policies intended to counteract the spread of infectious diseases, *Tandon's* comparability analysis demands examination of

"aggregations of individual behavior" that potentially undermine the government's stated interests. *We the Patriots*, 2023 U.S. App. LEXIS 20156, at * 40. Defendants propose that the comparable activities Plaintiffs identify should be examined individually, in a vacuum. However, that position makes no sense, considering infectious diseases spread just as easily in school as in many other settings, and that most of the vaccines at issue do not prevent transmission.

In *Tandon,* California similarly argued that its goal in containing Covid could be logically restricted to certain activities (religious gatherings), without comparing the relative risk of permitting gatherings for secular activities (e.g., shopping, haircutting, and shopping). The Supreme Court rejected this nonsensical approach, reasoning that comparability "is concerned with the risks various activities pose, not the reasons why people gather." *Tandon,* 141 S. Ct. at 1297. Again, New York permits its citizens to decline vaccination for secular reasons and to congregate *en masse* for every activity imaginable. Collectively, the activities allowed pose an exponentially greater trespass to the State's purported interests than an Amish-specific religious exemption. Thus, this case is materially different from the facts and arguments in *We the Patriots*.

In *We the Patriots*, the organizational plaintiffs sought statewide relief, potentially extending to all Connecticut families that may assert religious objections without defining the members of this group or establishing they have sincerely held religious beliefs. The Amish, in contrast, are a cohesive, self-governing, and isolated community who the government concedes are unable to vaccinate their children for religious reasons. The Amish also have age-old practices for addressing disease including staying in bed and refraining from attending communal activities when sick. Ex. A ¶ 15. Thus, the proper risk comparator here is between the specific religious group seeking exemption—not an undefined group of parents who may potentially seek religious exemption statewide—and the secular activities the government allows. *See Rabbinical Cong. of*

*the U.S. v. N.Y.C. Dep't of Hlth. & Mental Hygiene*, 763 F.3d 183 (2d Cir. 2014) (holding law intended to counteract infectious disease failed general applicability test on under-inclusivity grounds as it pertained to the Orthodox Jewish community).

New York permits non-vaccination in a host of comparable scenarios which in isolation pose a significantly greater trespass to the State's purported public health goals than allowing Plaintiffs a religious exemption. Collectively, the many circumstances in which New York permits citizens to opt out of vaccination for secular reasons pose a greater trespass to its goals, dictating strict scrutiny and injunctive relief under *Tandon*. Because factual issues are already present regarding *Tandon's* comparability analysis, Plaintiffs have obviously advanced a plausible claim, precluding dismissal under Rule 12(b). *See Rockland County*, 53 F.4th at 39.

### D. Strict Scrutiny Applies on Alternative Grounds Because This Case Involves Recognized "Hybrid Rights"

Defendants suggest the hybrid rights discussion in *Smith* is *dicta*. ECF 25 at 40. Yet *Smith* relied on the holdings of prior Supreme Court cases which established that hybrid right situations trigger strict scrutiny. *Smith*, 494 U.S. at 881-882, *citing Cantwell*, 310 U.S. at 304-307 (freedom of speech hybrid rights), *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (freedom of parents to direct their children's educations), *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (same), and *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) (association hybrid right).

This case is a quintessential case involving hybrid rights of the same types, in similar contexts, where the U. S. Supreme Court has previously recognized hybrid rights. Take *Yoder*, 406 U.S. 205. There, as here, at issue was a combination of both religious liberty and the right to educate the young, as applied to the Amish. Defendants fail to explain why *Yoder* does not govern here, nor can they. Indeed, none of the hybrid rights cases have been overturned, and *Smith* merely made clear that they were each still good law. In addition, members of the U.S. Supreme Court

have expressed their ire when courts have disregarded *Smith*'s holding and refused to recognize hybrid-rights. *Fulton*, 141 S. Ct. 1868, 1888 (Alito, Thomas, Gorsuch, concurring).

Contrary to Defendants' assertions, courts across the country have found that hybrid rights claims like those here trigger strict scrutiny. *See, e.g., Archdiocese of Washington v. WMATA*, 897 F. 3d 314, 331, 437 U.S. App. D.C. 461 (D.C. Cir. 2018); *Brown v. Hot, Sexy and Safer Productions*, 68 F. 3d 525, 539 (1st Cir. 1995); *Cornerstone Christian Schools v. University Interscholastic League*, 563 F. 3d 127, 136, n. 8 (5th Cir. 2009); *San Jose Christian College v. Morgan Hill*, 360 F. 3d 1024, 1032-1033 (9th Cir. 2004). Plaintiffs maintain *Smith*'s hybrid rights analysis stands as settled law, and that the hybrid rights presented here are subject to strict scrutiny. Also, for preservation purposes, Plaintiffs submit *Smith* should be overruled in favor of a stand-alone Free Exercise right on par with other fundamental rights.

### E.    The CVL and its Enforcement is Not Neutral

Defendants have failed to adequately address the neutrality issues raised in the Complaint, as well as in the opening preliminary injunction papers, all of which Plaintiffs reincorporate here by reference. ECF 1 ¶¶ 38-58, 60, 69-72; ECF 10 at 15-16. On that basis alone, a preliminary injunction should be issued and Defendants' motion to dismiss denied.

### F.    The CVL Cannot Survive Strict Scrutiny

#### 1.    The State failed to demonstrate its interests are sufficiently "compelling"

A law fails strict scrutiny where the government fails to demonstrate sufficiently compelling interests. *Church of Lukumi,* 508 U.S. at 531. Defendants lack adequately compelling objectives to mandate Plaintiffs to vaccinate as a prerequisite to educating their children on their own property as they have done for centuries. Justifying the CVL in broad generic terms divorced from the Amish Plaintiffs' specific situations, Defendants propose three distinct and mutually

exclusive primary interests:[20] (1) mitigating against the spread of infectious diseases amongst schoolchildren, solely in school settings, (2) protecting "the health of the public in general both inside and outside of school," ECF 25-1 at 35; and (3) preventing medically exempt children from being injured by vaccines and from interacting with unvaccinated children.

For two distinct reasons, Defendants fail to articulate how these objectives are sufficiently compelling to survive strict scrutiny. First, when defending alleged First Amendment violations, the government cannot rely on "broadly formulated" abstract interests but must show it has a compelling interest in mandating vaccination specific to the Amish Plaintiffs. *Gonzales,* 546 U.S. at 431; *see also Fulton*, 141 S. Ct. at 1881; *Wisconsin v. Yoder*, 406 U.S. 205, 207 (1972) (holding that government's interest in a system of compulsory education was not so compelling to preclude a policy exception for the Amish plaintiffs). Defendants can never make this showing because the State permits non-vaccination for every activity imaginable, including in school (but wants to draw an artificial line when it comes to religious believers), and its asserted interests are otherwise not compelling when applied specifically to the Amish.

Second, even if Defendants were permitted to justify the CVL in broad abstract terms, the State cannot credibly argue it possesses sufficiently compelling interests to eradicate First Amendment protections where, as here, it has fundamentally undercut those supposedly vital goals (even when maintaining the fiction that all the vaccines at issue prevent transmission, which they don't, and the other fictions detailed *supra* at p. 5-9). *See Church of Lukumi*, 508 U.S. at 543-547. The State has fatally undermined its interests in numerous manners, including because the number of unvaccinated students in New York schools dwarfs the total number of Amish in New York.

---

[20] Defendants suggest a myriad of mutually exclusive interests that fall broadly under these interests. *See supra*, fn. 13.

a)     *The proposed government interests are insufficiently compelling relative to each Amish Plaintiff*

Defendants cite a series of pre-*Tandon* and *Fulton* cases for the general proposition that the "health and well-being of young children" and preventing infectious diseases statewide unquestionably constitute compelling interests for purposes of satisfying strict scrutiny. However, *Fulton* made clear that courts cannot rely on "broadly formulated" governmental interests when examining potential First Amendment violations, but must "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales*, 546 U.S. at 431. Accordingly, the State must demonstrate enforcing its vaccination mandate is adequately compelling relative to the Amish Plaintiffs specifically. *Fulton*, 141 S. Ct. at 1881; *see also Mast v. Cnty. of Fillmore,* No. A22-1534, 2023 Minn. App., LEXIS 235, at *4 (Mn. Ct. App., July 10, 2023) (holding wastewater regulation failed strict scrutiny after finding the government's asserted public health goals lacked a "compelling state interest specific" to the Amish plaintiffs).

Defendants argue *Fulton's* to-the-plaintiff compelling interest standard does not apply on grounds that Plaintiffs are seeking a statewide injunction, not one limited to these particular Plaintiffs, ECF 25-1 at 38; but again, that is *not* the case as Plaintiffs are seeking Amish-specific relief that will extend only to Plaintiffs.

Because it is facially apparent that medically exempt children severely undercut New York's claimed overarching goal to prevent "all"[21] infectious diseases throughout the State, Defendants attempt to resolve that contradiction by asserting it has another primary goal which is

---

[21] *See* ECF 25-1 at 49 (stating New York must "address the spread of ***all*** contagious diseases in a community") (emphasis added).

to ensure medically exempt children are not injured by vaccines.[22] Again, a child unvaccinated for medical reasons poses the same purported transmission risk as an Amish child who is unvaccinated for religious reasons. *See Doster,* 54 F.4th at 423 (holding the asserted government interests underlying mandatory vaccination policies are insufficiently compelling where medical exceptions are granted); *see also* Ex. D. ¶ 87 ("students unvaccinated for religious reasons or medical reasons do not present any different risk of transmission in school…").

The purported goal to shield medically exempt children from vaccine harm is itself also internally inconsistent and ignores the cruel reality that most medical exemptions are sought *because the child was injured by prior vaccination*. Ex. D ¶¶ 85-86. In fact, the pathway to receive a medical exemption—by demonstrating a "contraindication" or a "precaution"—is often substantiated only after a child is seriously injured by a vaccine. But more importantly for purposes of the strict scrutiny analysis under *Gonzales* and *Fulton*, New York's laudable goal to avoid injuring children through vaccination is inapplicable to Plaintiffs: there are no medically exempt unvaccinated children in the Amish schools in question, and the Defendants concede Plaintiffs are incapable of vaccinating their children due to firmly held religious convictions. Ex. A ¶¶ 6, 13.

Defendants, no doubt recognizing this defect, propose a sub-sub-*post-hoc*-goal: personal protection.[23] Defendants are apparently grasping at some interest to contend with the fact that 3 of the 6 required vaccines do not prevent infection or transmission, a fourth, HepB, is not for a disease transmitted in a school setting, and a fifth, chicken pox vaccine, can shed the virus to others for up to six weeks after vaccination. *See* ECF 1 ¶ 95; *see also supra* p. 5-7; Ex. D ¶¶ 7-23. However,

---

[22] *See* ECF 25-1 at 45 (asserting that the State has a "compelling interest in not attempting to vaccinate children whose medical condition precludes immunization" and "safeguarding those vulnerable children's health").

[23] *See id.* at 20-21 (stating there is "a strong public health interest in preventing children from experiencing the severe symptoms of these highly contagious diseases.").

mandating personal protection, when doing so tramples on religious freedoms of the Amish, is not a compelling state goal, particularly when it involves violating bodily autonomy and destroying a centuries-old way of life in a religious community which, by objective standards, has a far healthier population than the larger community of children in the State and the country. *Supra* p. 9-10.

Defendants' third goal—mitigating against the spread of infectious diseases—is also not compelling relative to the Amish. Again, it is inapplicable to four of the six mandated vaccines as discussed *supra* p. 5-7. As for the chicken pox vaccine, Defendants plainly are not concerned about spreading this virus in school as they do not exclude vaccinated children who, during the first six weeks after vaccination, can spread this virus. All that remains is the measles vaccine, and Defendants propose a series of related interests that either do not apply to Plaintiffs or will never be realized within the Amish community.

As a threshold matter, Defendants can never demonstrate their primary goal to mitigate against infectious disease is sufficiently compelling relative to the Amish Plaintiffs because the State permits medical exemptions and allows approximately 97,900 administrative exceptions due to non-enforcement of the CVL. These nearly one hundred thousand unvaccinated children, whatever their reason for declining vaccination, including secular reasons, undermine the kaleidoscope of interests Defendants propose to a much greater degree than the handful of unvaccinated Amish children at issue here. *See Tandon,* 141 S. Ct. at 1297 (holding that where "the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities"). The subgoals the government proposes likewise do not withstand minimal scrutiny.

In other words, New York claims it has compelling interests to force the Amish to violate their religious beliefs and to mandate them to abandon religious traditions that predate New York's

statehood. It is also a government objective that will never be realized, considering the Amish Plaintiffs will choose a martyr's death before vaccinating their children, ECF 1 ¶ 41, and considering that the Amish will continue to gather at church, community events and will have their children gather, irrespective of the CVL's requirements. *Id.* ¶ 91. Additionally, the State's objectives to increase vaccination rates in schools (though this says nothing about the overall vaccination rate of children in the state) and decrease the number of students with a religious exemption (which again says nothing about the overall vaccination rate in the state) have already been fulfilled: New York boasts it has done an excellent job of crushing the rights of the relatively small number – as compared to the over 97,000 CVL non-compliant children – of children who were attending school in New York with a religious exemption by expelling them from school (though again these children did not just evaporate).

While the government may "have a compelling interest in the abstract," that does not mean that it has one "in each marginal percentage point by which" it achieves its general goals. *Brown*, 564 U.S. 786, 803 n.9; *see also Doster,* 54 F.4th at 422 (holding the government did not possess a compelling interest in vaccinating a small fraction of airmen who declined vaccination for religious reasons). Because the State has already achieved very high vaccination rates throughout the State,[24] it cannot show its stated interests are adequately compelling, especially relative to Plaintiffs' unique circumstances.

Additionally, New York's objective to "maintain" herd immunity is pretextual and in any event is not compelling relative to the Amish. Allowing Plaintiffs to educate their children with a religious exemption would not materially endanger New York's alleged pursuit of herd immunity including because most of the mandated vaccines do not even prevent transmission, *supra* p. 5-7,

---

[24] *See* https://www.cdc.gov/mmwr/volumes/72/wr/mm7202a2.htm.

and the Amish are a tiny, insignificant percent of New York's population. Ex. A ¶ 18. Regardless, New York has conclusively demonstrated it does not believe in nor is it otherwise truly concerned about so-called herd immunity from vaccination, assuming that was even possible for most of the vaccines at issue. Indeed, the State does not even track vaccination rates for adults, comprising over 79 percent of New York's population, or even adults in schools, and Defendants' argument that there are not an appreciable number of unvaccinated adults in the state has no evidentiary support and is false. Again, most of the adults have never been required to receive most of the vaccines required under the CVL, and many of these vaccines were also only relatively recently licensed. *See supra* p. 10-11. Moreover, citizens from the 45 states that allow both religious and medical exemptions, as New York did until 2019, are free to move to New York, congregate *en masse*, and work in the educational system, without showing proof of vaccination. The estimated 97,900 children currently enrolled in New York schools, combined with medically exempt children, trespass on every one of the government's purported interests as does virtually every aspect of life outside of school that is permitted by the State without vaccination.

> b) *In abstract terms, the proposed government interests are nonetheless insufficiently compelling*

Even if the State was permitted to rely on broad abstract objectives to justify the CVL—which the Supreme Court has made abundantly clear is impermissible—it has failed to show a sufficiently compelling abstract interest because, through action and inaction, it has severely undercut any argument that universal vaccination of students is actually a public health imperative. A law "cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi*, 508 U.S. at 547.

The State contends medical exemptions do not undermine the government's public health objectives in the same manner that a religious exemption for the Amish would, and therefore that

it clearly possesses a compelling government interest to eradicate Plaintiffs' religious freedoms. ECF 25-1 at 36. But New York has fatally undermined its supposedly vital public health goals in six distinct ways, five of which are completely unrelated to the medical exemption as discussed *supra*, § II.C.1. New York has left "appreciable damage" to its "supposedly vital interests", irrespective of the relative risks between medically exempt children and children who remain unvaccinated for religious reasons, *Church of Lukumi*, 508 U.S. at 547, and, consequently, this case is materially distinguishable from *We the Patriots*, 2023 U.S. App. LEXIS 20156 and *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir. 2021).

In *Hochul*, New York confronted the narrow issue of whether medical workers caring for Covid patients were entitled to seek religious exemptions, and *We the Patriots* examined a facial challenge to a childhood vaccination scheme where the relief sought would apply statewide to any parent who sought a religious exemption. Unlike here, however, where lax enforcement reigns, New York in *Hochul* and Connecticut in *We the Patriots* had shown commitment to enforcing their vaccination requirements (demonstrating that the state actors at least actually believed they had a compelling interest rather than the *post-hoc*, exception-ridden, unenforced scheme here).

Because of lax enforcement and the sheer number of secular exemptions at issue, this case more closely resembles *Doster*, 54 F. 4th at 423 and *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 352 (5th Cir. 2022). The *Doster* and *Navy Seals* courts confronted military Covid vaccine mandates during the pandemic, declared to be the greatest public health crisis in the past century. The Navy in *Seals* and the Air Force in *Doster* advanced greater public health and national security interests than what Defendants can claim here. Even then, however, the military failed to substantiate sufficiently compelling justifications to eradicate the religious freedoms of servicemembers, largely because the government had shown through delayed and lax enforcement and through

42

granting many secular exceptions that the claimed government interests were not in fact compelling. *Doster*, 54 F. 4th at 423; *U.S. Navy Seals*, 27 F.4th at 352.

Moreover, even if New York was meaningfully enforcing the CVL (other than against the Amish), Defendants failed to explain how the asserted government interests are not otherwise fatally undermined by other aspects of this case. These under-inclusivity problems, when examined in isolation, would each fatally undermine every government interest Defendants propose. Collectively, the State's inaction in these areas demonstrate it lacks a sufficiently compelling interest—even when presented on a broad abstract level—to survive strict scrutiny.

2. <u>The CVL fails strict scrutiny on alternative grounds as it is not narrowly tailored</u>

The CVL cannot withstand strict scrutiny for independent reasons because it is not narrowly tailored. When strict scrutiny applies, a government policy survives "only if it advances interests of the highest order and is narrowly tailored to achieve those interests," meaning that "so long as the government can achieve its interests in a manner that does not burden [the religious beliefs of the Amish], it must do so." *Fulton*, 141 S. Ct. at 1881 (quotation omitted). Given this incredibly high standard, a law will survive strict scrutiny "only in rare cases." *Church of Lukumi*, 508 U.S. at 578. The Supreme Court has made clear that, just because a law targets infectious disease, strict scrutiny "is not watered down." *Tandon*, 141 S. Ct. at 1298; *see also Fox et al. v. Makin et al.*, 2023 WL 5279518, at *10 (finding it "plausible that [Maine's compulsory vaccination law] is not narrowly tailored to advance Maine's interests" for multiple reasons including that unvaccinated students aren't required to use any protective equipment and vaccines are not mandated for teachers).

A law can fail strict scrutiny for lack of narrow tailoring for a variety of reasons, including where: (1) options less restrictive of the plaintiffs' religious beliefs are available and the

43

government fails to take advantage of those less burdensome alternatives; (2) the law is underinclusive, failing to precisely meet the objectives it purportedly seeks to achieve; or (3) where the law is overbroad, meaning the policy captures more conduct than necessary to realize the government's goals. The CVL lacks narrow tailoring for each of these reasons.

> *a)    Less restrictive means exist and can be seamlessly implemented*

Defendants assert that forcing Plaintiffs to abandon their religious beliefs and their tradition of educating their children in group settings is the least restrictive option available. ECF 25-1 at 47. However, requiring Amish families to violate their religious beliefs so they can educate their children on their own property, as they have done for centuries, is the most restrictive option imaginable, and there are many alternatives the State could deploy to accomplish its purported public health goals, including the exclusion of those vaccinated for pertussis, the exclusion of those vaccinated for chicken pox for six weeks after vaccination, focusing on the over 97,000 CVL non-compliant who assert no basis for an exemption, quarantining those when infected (which can be harder to do with the vaccinated who, for certain diseases, have less symptoms but are equally infectious), etc. Notably, the Amish have centuries-old methods for dealing with disease, and boast childhood health that is far superior than that of the children in the rest of New York and the country. *Supra* p. 10-11.

Further, less restrictive means have been seamlessly implemented in the forty-five states that have religious exemptions (and those are state-wide, not just for an insular secluded tiny community). As such, New York can never show that similar methods would not be less restrictive relative to the Amish. *See Mast*, 141 S. Ct. at 2433 (stating the government failed to give proper weight to less restrictive alternatives by comparing practices in other states). Forty-five states have

found that they can further their stated purported goals and simultaneously allow families state-wide to freely exercise their First Amendment Rights. New York can do so for the Amish.

> b) *The CVL is substantially under-inclusive*

Under-inclusivity, namely the concept that the government does not address other problems and issues that equally undermine their interests, permeates the CVL. Under-inclusivity is a problem not only because it undermines asserted compelling interests, suggesting the interests are not in fact compelling, but also because it demonstrates the policy in question lacks narrow tailoring. *Church of Lukumi*, 508 U.S. at 578; *see also Fox et al. v. Makin et al.*, 2023 WL 5279518, at *10 (finding "it plausible that [the compulsory vaccination law] is not narrowly tailored to advance Maine's interest" as "[t]here is nothing in [the law] that requires unvaccinated students who attend school to use any sort of protective equipment" and the law "does not require teachers – who share the same classrooms and other school facilities as students – to be vaccinated at all.").

There are numerous under-inclusivity problems with Defendants' asserted goal to mitigate against the spread of infectious diseases. Specifically, the government: (i) is incredibly lax in enforcing the CVL (except when dealing with the Amish), permitting nearly one hundred thousand non-compliant students in school; (ii) does not require adults working in the school system to comply with the CVL; (iii); does not require any of the numerous other vaccines (including for Covid and flu) for admission to school nor take any measures for the around 1,400 other known pathogens for which no vaccines exist; (iv) does not take measures to exclude or prevent spread of disease from vaccinated students for diseases where the vaccine increases the risk of transmission; (v) permits adults and children to gather *en masse* outside of school without vaccination requirements or meaningful precautionary measures; (vi) permits homeschoolers to congregate in unlimited numbers without vaccination requirements; and (vii) allows medical exemptions.

According to Defendants, the CVL is not underinclusive because "the medical exemption advances—rather than endangers—the State's interest in protecting the health of schoolchildren." ECF 25-1 at 36. Critically, the claimed interest in protecting medically exempt children from being injured by vaccines is at war with other claimed interests and otherwise lacks merit. *Supra* § II.C.1.

Given the foregoing, Defendants pivot to effectively arguing that State policy demands preventing even the most remote chance of a measles outbreak. According to Defendants, based on this incredibly lofty objective, whatever method the State deploys for all vaccines (including ones that have nothing to do with measles) is unquestionably properly tailored to meet that supposed public health imperative.[25] However, Defendants do not contest the Amish Plaintiffs are incapable on religious grounds to give their children the measles vaccine. Plaintiffs, for religious reasons, also cannot stop gathering with their children and community in church, barn raisings, and other daily communal events. Excluding these children from school is simply punitive, not preventative, [26] and the CVL, as applied to the Amish, is underinclusive because it will not result in these Amish receiving the measles vaccine nor in any less intermingling. They will, however, continue to use their centuries-old traditions for disease – a lifestyle that has resulted in their children being far healthier than the larger population of children in the State and the country. *Supra*, p. 9.

c)    *The CVL is also substantially overbroad*

Overbreadth, the concept that the law does more than it needs to meet the asserted governmental interests, also permeates the CVL. *Church of Lukumi*, 508 U.S. at 578. The CVL's

---

[25] *See* ECF 25-1 at 47.

[26] Moreover, other evidence reveals eliminating non-medical exemptions does not achieve the interests Defendants propose. For instance, California repealed its personal belief exemption in 2015, but nonetheless, in the following years, there have been several measles outbreaks in California. *See* https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/measles.aspx.

overbreadth is demonstrated by the following: (i) New York requires four vaccines that do not prevent transmission in school and at best provide an undefined level of personal protection; (ii) New York removed the religious exemption in large part because of Legislators' expressed concern[27] that the process was being abused by parents who did not possess religious objections to vaccination, and in an overbroad stroke, stripped the ability of those who, like the Amish, undisputedly possess religious objections to vaccination; (iii) New York repealed the religious exemption for *all required vaccines* in reaction to an uptick in measles cases; (iv) New York prohibits religious exemptions in all schools, even those that do not have medically exempt children enrolled, including the Plaintiff Amish schools (for the purported interest in protecting medically exempt children); (v) New York has very high childhood vaccination rates and can permit the Amish to continue their way of life without meaningfully endangering its myopic vaccination goals, particularly considering less restrictive alternatives exist to satisfy its overarching public health goals; (vi) assuming the vaccines are as effective as Defendants contend, those who are vaccinated are protected against exposure to unvaccinated children; (vii) all diseases can never be fully prevented and thus segregation and quarantine are sufficient to meet the asserted government interests; (viii) New York can exclude children who are vaccinated for pertussis and other diseases where those vaccinated are more likely to be asymptomatic but at least equally as likely to become infected and transmit the relevant pathogen; (ix) New York can exclude children

---

[27] A vocal proponent for repealing the religious exemption, Senator Brad Hoylman, stated "Let's face it. Non-medical exemptions are essentially religious loopholes, where people often pay a consultant to worm their way out of public health requirements that the rest of us are following." NY Legislative Press Conference, May 6, 2019, *available at* https://youtu.be/wn5CI071U2w?t=8m11s (at 8:13-8:30). Further, the leading assembly sponsor of the repeal, Jeffrey Dinowitz, likewise publicly justified the repeal by claiming parents were abusing religious exemptions, stating "the problem is that most people in my opinion use [the religious exemption] as an excuse not to get the vaccinations for the kids. There is nothing in the Jewish religion, the Christian religion, or Muslim religion that suggests that you can't get vaccinated. It is just utter garbage." March 19, 2019.

who are vaccinated for diseases with live vaccines during the period following vaccination when it can spread to others; and (x) other states allow religious exemptions and do not have outbreaks.

Defendants' tepid attempt at addressing the CVL's plain overbreadth is restricted to an argument that it cannot lawfully determine what constitutes a "proper" religious objection to vaccination (in response to the argument that stripping the religious exemption was an extraordinary overreaction to the state's concern that some were abusing that exemption option). ECF 25-1 at 39. But the reality is that courts, employers, and governments have long understood how to sift wheat from chaff when it comes to religious sincerity.[28] In any event, that issue is not applicable here where New York does not contest the sincerity of the beliefs at issue in this case.

Defendants do not wrestle with possible less restrictive alternatives, but rather focus their narrow tailoring argument almost exclusively on the specter of a hypothetical measles outbreak. In so doing, Defendants further highlight the overbreadth of the law discussed *supra* at § II.F.2(b).

If the State's goal is to eliminate even the possibility for measles outbreaks, then requiring the Amish to violate their religious beliefs by injecting vaccines incapable of preventing outbreaks is obviously, without more, not a narrowly tailored solution relative to that objective. Considering these factors, the CVL is plainly overbroad, lacking the requisite narrow tailoring to survive strict scrutiny. *See Church of Lukumi*, 508 U.S. at 578 (holding the government may not create "an overinclusive statute, one that encompasses more protected conduct than necessary to achieve its goal."). Notably, Defendants do not even attempt to explain how their measles goal is furthered as to these Plaintiffs as the State concedes they are incapable of vaccinating their children because of their sincerely held religious beliefs.

---

[28] *See, e.g.* https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (discussing, e.g., vaccine exemptions, objective grounds for challenging sincerity, looking to past practices, requesting additional information and explanation.

Because it cannot withstand strict scrutiny, Plaintiffs are substantially likely to prevail on their First Amendment claims. *See Bosarge*, 2023 U.S. Dist. LEXIS 67439, at *27 (granting injunction against Mississippi's childhood vaccination law because "there was a method by which Mississippi officials could consider secular exemptions, particularly medical exemptions," but not religious exemptions) (citing *Fulton*, 141 S. Ct. at 1877). This Court should determine the same.

## III.   PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE HARM

Defendants do not actually address the legal presumption that a continued and ongoing violation of constitutional rights constitutes ongoing irreparable injury. Instead, they cite cases that are wholly distinguishable and do not involve constitutional violations. They suggest that permitting the State to impose crushing financial penalties against a religious minority for maintaining their religious beliefs somehow is not irreparable, disingenuously citing cases about monetary damages (but never acknowledging that Defendants are immune from such damages).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir. 1991) ("when deprivation of rights derives from allegations of a First Amendment violation, irreparable harm presumptively exists."). That extends to the loss of "free exercise rights 'for even minimal periods of time.'" *Tandon*, 141 S. Ct. at 1297. The violation of Plaintiffs' First Amendment rights alone constitutes irreparable injury as a matter of law. *Id.; see also Cuomo*, 141 S. Ct. at 67-68. "Religious adherents are not required to establish irreparable harm independent of showing a Free Exercise Clause violation because a 'presumption of irreparable injury . . . flows from a violation of constitutional rights.'" *Agudath Isr. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020); *see also, Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (noting that a plaintiff "has sufficiently demonstrated for preliminary injunction purposes that he may suffer irreparable harm arising from a possible deprivation of his constitutional rights").

"Because the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases 'the likelihood of success on the merits is the dominant, if not the dispositive, factor.'" *Id., citing N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

## IV.    THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR

The remaining injunction factors, balance of harms and public interest, merge where there is a loss of constitutional rights. *See Tandon*, 141 S. Ct. at 1297; *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Even though Plaintiffs believe they have shown a likelihood of success on the merits, if the Court believes that there are only serious questions regarding the merits, the balance of harms strongly favor injunctive relief. *A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021) (finding balance of harms tilts in favor of plaintiffs where there is a constitutional violation and the public interest is in favor of vindicating constitutional rights); *see also Agudath Isr. of Am.,* 983 F.3d 620, 637 ("No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal."). In the absence of an injunction, Plaintiffs will be forced to discontinue their centuries-old tradition of communal learning, potentially resulting in their children's educations being placed on hold for the duration of this case. On the other hand, the Amish communities have remained unvaccinated for hundreds of years, and, because the injunctive relief sought is limited to the Amish Plaintiffs and would not extend statewide to every member of the general public who may hypothetically seek a religious exemption, the balancing of harms weighs heavily in favor of an injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction and deny Defendants' Motion to Dismiss.

Dated: August 25, 2023.                    Respectfully submitted,

                                           /s/ *Elizabeth A. Brehm*
                                           SIRI & GLIMSTAD LLP
                                           Aaron Siri, Esq. (admitted PHV)
                                           Elizabeth A. Brehm, Esq.
                                           Walker D. Moller, Esq. (admitted PHV)
                                           745 Fifth Ave, Suite 500
                                           New York, NY 10151
                                           Tel: (212) 532-1091
                                           Fax: (646) 417-5967
                                           aaron@sirillp.com
                                           ebrehm@sirillp.com
                                           wmoller@sirillp.com

                                           Christopher Wiest (admitted PHV)
                                           25 Town Center Blvd., Suite 104
                                           Crestview, KY 41017
                                           Tel: (513) 257-1895
                                           Fax: (859) 495-0803
                                           chris@cwiestlaw.com

                                           *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2023, a true and correct copy of the foregoing was electronically filed with the Clerk of the District Court using its CM/ECF system and was served by CM/ECF on all counsel or parties of record.

Dated this 25th day of August, 2023.

                                           /s/ *Elizabeth A. Brehm*
                                           Elizabeth A. Brehm, Esq.