UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

JOSEPH MILLER, *individually and on behalf
of his minor children attending an Amish school
in Clymer and as a board member of that school*,
EZRA WENGERD, *as representative of all
Amish schools in the State of New York,* JONAS
SMUCKER, *individually and on behalf of his
minor children*, DYGERT ROAD SCHOOL,
PLEASANT VIEW SCHOOL *a/k/a Twin
Mountains School*, and SHADY LANE SCHOOL,

                Plaintiffs,

        v.

DR. JAMES V. MCDONALD, *in his official
capacity as Commissioner of Health of the State
of New York*, and DR. BETTY A. ROSA, *in her
official capacity as Commissioner of Education
of the State of New York*,

                Defendants.

———————————————————

**DECISION AND ORDER**

1:23-CV-00484 EAW

## <u>INTRODUCTION</u>

New York, like every other state in the nation, requires that schoolchildren be vaccinated against various contagious diseases, including measles, polio, varicella (chicken pox), and pertussis (whooping cough). *See* N.Y. Pub. Health Law ("PHL") § 2164(1), (7). Prior to amendments made in 2019, PHL § 2164 "provided two statutory exemptions from its school immunization requirements"—a medical exemption and a religious exemption. *Goe v. Zucker*, 43 F.4th 19, 25 (2d Cir. 2022), *cert. denied sub nom. Goe v. McDonald*, 143 S. Ct. 1020, 215 L. Ed. 2d 188 (2023). Under the now-repealed religious exemption,

"a child was not required to be immunized if that child had a parent or guardian who held 'genuine and sincere religious beliefs' against immunization." *Id*. (quoting PHL § 2164(9) (repealed 2019)).

In 2018 and 2019, the United States experienced a nationwide measles outbreak, with New York "as an epicenter." (*Id*.). In response, and recognizing that measles outbreaks within New York were "largely concentrated in communities with low immunization rates," the New York legislature repealed the religious exemption. *Id*.; *see also* Act of June 13, 2019, ch. 35, 2019 N.Y. Laws 153, 153-54. As such, an exemption is now available only "[i]f any physician licensed to practice medicine in [New York] certifies that . . . immunization may be detrimental to a child's health[.]" PHL § 2164(8).

Plaintiffs are three individual adherents of the Amish faith and three private Amish schools. (Dkt. 1 at ¶ 2). The individual plaintiffs have sincere religious objections to vaccines and run the plaintiff schools, where they "do not require proof of vaccination from students to attend school." (*Id*.). In March of 2022, the New York State Department of Health ("NYSDOH") charged the plaintiff schools with non-compliance with PHL § 2164. (*Id*. at ¶ 32). Following administrative proceedings (*see id*. at ¶¶ 36-53), NYSDOH issued an order sustaining the charges and imposing penalties of $52,000 against plaintiff Dygert Road School, $46,000 against plaintiff Pleasant View School a/k/a Twin Mountains School, and $20,000 against plaintiff Shady Lane School. (*Id*. at ¶¶ 54-56).

Plaintiffs thereafter commenced the instant action, asserting that PHL § 2164 violates their First Amendment right to freely exercise their religion and seeking injunctive

and declaratory relief.  (*Id.* at ¶¶ 59-108).[1]  Plaintiffs further move for a preliminary injunction, asking the Court to enjoin defendants from "implementing and enforcing" PHL § 2164 "unless they provide the option for a religious exemption."  (Dkt. 9 at 1-2). Defendants—Dr. James V. McDonald, in his official capacity as Commissioner of Health of the State of New York ("Dr. McDonald") and Dr. Betty A. Rosa, in her official capacity as Commissioner of Education of the State of New York ("Dr. Rosa")—oppose Plaintiffs' motion and have made their own request that the matter be dismissed on the merits.  (Dkt. 25).  Defendants have further argued that Plaintiffs' claims against Dr. Rosa must be dismissed for lack of standing and for lack of subject matter jurisdiction.  (*Id.*).

For the reasons that follow, the Court agrees with Defendants that Plaintiffs lack standing to assert their claims against Dr. Rosa.  Further, the Court finds that *We the Patriots USA Inc. v. Connecticut Office of Early Childhood Development,* 76 F.4th 130 (2d Cir. 2023), *petition for cert. filed* (U.S. Dec. 14, 2023) (No. 23-643), which was issued after the instant motions were filed but before briefing was complete, compels dismissal of Plaintiffs' remaining claims on the merits.  In *We the Patriots*, the Second Circuit affirmed the dismissal of a free exercise claim attacking Connecticut's mandatory school vaccination regime, which is not materially different from New York's.  However colorable Plaintiffs' claims may have been at the outset of this action, this Court is bound by the Second Circuit's intervening decision in *We the Patriots*.  Accordingly, the Court

---

[1]     As discussed below, Plaintiffs also allege that PHL § 2164 "implicates" their rights "to free speech, to associate, and to regulate the up bringing and education of their children."  (Dkt. 1 at ¶ 74).

grants Defendants' motion to dismiss and denies Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### I.   Factual Background

#### A.   New York's Mandatory Vaccination Laws

New York became the second state in the nation to impose vaccination requirements on schoolchildren in 1860, when it enacted a law allowing local school boards to deny admission to any child not vaccinated against smallpox. *See* Ch. 438, § 1, 1860 N.Y. Laws 761, 761. New York's vaccine mandate has evolved over time, and today schoolchildren in New York are required to be vaccinated against "poliomyelitis, mumps, measles, diphtheria, rubella, varicella, Haemophilus influenzae type b (Hib), pertussis, tetanus, pneumococcal disease, and hepatitis B[.]" PHL § 2164(2)(a). "No principal, teacher, owner or person in charge of a school shall permit any child to be admitted to such school, or to attend such school, in excess of fourteen days," unless the child presents acceptable evidence of vaccination. *Id*. § 2164(7)(a). "School" is defined in this context to "mean[] and include[] any public, private or parochial child caring center, day nursery, day care agency, nursery school, kindergarten, elementary, intermediate or secondary school." *Id*. § 2164(1)(a).

Prior to being repealed, PHL § 2164(9) provided: "This section shall not apply to children whose parent, parents, or guardian hold genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such children being admitted or received into school or attending school."

- 4 -

As discussed above, PHL § 2164(9) was repealed effective June 13, 2019, in response to a nationwide measles outbreak. *See* Act of June 13, 2019, ch. 35, 2019 N.Y. Laws 153, 153-54; *see also* New York Bill Jacket, 2019 A.B. 2371, Ch. 35 ("According to the Centers for Disease Control, sustaining a high vaccination rate among school children is vital to the prevention of disease outbreaks, including the reestablishment of diseases that have been largely eradicated in the United States, such as measles. According to State data from 2013-2014, there are at least 285 schools in New York with an immunization rate below 85%, including 170 schools below 70%, far below the CDC's goal of at least a 95% vaccination rate to maintain herd immunity.").

The current version of PHL § 2164 contains a single exemption: "If any physician licensed to practice medicine in [New York] certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable until such immunization is found no longer to be detrimental to the child's health." PHL § 2164(8). Regulations adopted by the NYSDOH further provide: "**May be detrimental to the child's health** means that a physician has determined that a child has a medical contraindication or precaution to a specific immunization consistent with ACIP [Advisory Committee on Immunization Practices] guidance or other nationally recognized evidence-based standard of care." 10 N.Y. Comp. Codes R. & Regs. ("NYCRR") § 66-1.1 (emphasis in original).

NYSDOH's regulations additionally provide:

 A principal or person in charge of a school shall not admit a child to school unless a person in parental relation to the child has furnished the school with one of the following:

(a) A certificate of immunization, as described in section 66-1.6 of this Subpart, from a health care practitioner or from NYSIIS or the CIR, documenting that the child has been fully immunized according to the requirements of section 66-1.1(f) of this Subpart.

(b) Documentation that the child is in process of receiving immunizations as defined in section 66-1.1(j) of this Subpart. A principal or person in charge of a school shall not refuse to admit a child to school, based on immunization requirements, if that child is in process.

(c) A signed, completed medical exemption form approved by the NYSDOH or NYC Department of Education from a physician licensed to practice medicine in New York State certifying that immunization may be detrimental to the child's health, containing sufficient information to identify a medical contraindication to a specific immunization and specifying the length of time the immunization is medically contraindicated. The medical exemption must be reissued annually. The principal or person in charge of the school may require additional information supporting the exemption.

*Id.* § 66-1.3.

B.       **Amish Education and Opposition to Vaccines**

"Members of the Amish faith are religiously committed to living separately from the modern world."  (Dkt. 1 at ¶ 1 (quotation omitted)).  That commitment requires them to grow their own food, make their own clothing, and use pre-industrial equipment in farming.  (*Id.*).  The Amish also educate their children "in the Amish way, with Amish teachers, in Amish schools, on Amish owned property."  (*Id.* at ¶ 2).  The plaintiff schools—Dygert Road School, Pleasant View School a/k/a Twin Mountain School, and Shady Lane School—are "Amish community schools that do not receive any public funding [and] are located within their respective Amish communities."  (*Id.* at ¶ 8).

Plaintiffs Jonas Smucker ("Smucker") and Joe Miller ("Miller") are "fathers of children who attend different Amish schools, and they are also both board members of their

children's respective schools." (*Id*. at ¶ 9). Specifically, Miller's children "attend an Amish-run school in Chautauqua County." (*Id*.).[2] Plaintiff Ezra Wengerd ("Wengerd") "was elected by the Amish community as a representative of all Amish schools in [New York] State to deal with issues with the State[.]" (*Id*.). "[M]any Amish"—including the individual plaintiffs—"maintain profound religious objections to vaccines." (*Id*. at ¶¶ 2, 9, 13).

### C.   State Administrative Proceedings Against the Plaintiff Schools

In November and December of 2021, NYSDOH audited the records of the plaintiff schools. (*Id*. at ¶ 31). On March 11, 2022, NYSDOH mailed a Statement of Charges and Notice of Hearing to the plaintiff schools, charging them with non-compliance with PHL § 2164. (*Id*. at ¶¶ 32-33). The Notice of Hearing advised that a hearing would be held on May 2, 2022, and that civil penalties of up to $2,000 per violation, as well as additional action authorized by the PHL, could be imposed. (*Id*. at ¶ 34).

A hearing was held before administrative law judge ("ALJ") Natalie J. Bordeaux on May 2, 2022. (*Id*. at ¶¶ 36-37, Ex. C). Wengerd represented the plaintiff schools at the hearing. (*Id*. at ¶ 38). He read a statement into the record indicating that the plaintiff schools were not in compliance with PHL § 2164 due to their sincere religious opposition to vaccination. (*Id*. at ¶¶ 38-39). Wengerd also advanced the argument that the plaintiff schools were operating as "home schools" under New York law, but indicated that individual homeschooling was "not an option" because "we believe in working together

---

[2]      The complaint is silent on the location of the school that Smucker's children attend.

and having our children together in a happy social life in our schools." (*Id*. at ¶¶ 44-45). Wengerd asked for a religious exemption from PHL § 2164. (*Id*. at ¶ 42). NYSDOH responded that there is no provision in PHL § 2164 allowing for a nonmedical exemption. (*Id*. at ¶ 43).

NYSDOH sought: a $52,000 penalty against Dygert Road School, representing the $2,000 maximum civil penalty for 26 students who were found to be non-compliant with PHL § 2164 for one day;  a $46,000 penalty against Twin Mountains School, representing the $2,000 maximum civil penalty for 23 students who were found to be non-compliant with PHL § 2164 for one day; and a $20,000 penalty against Shady Lane School on the grounds it was more probable than not that at least one student in attendance violated PHL § 2164 and would have attended the school for more than ten days, with each day of attendance constituting a separate violation. (*Id*. at ¶ 46). On May 25, 2022, the ALJ issued a report and recommendation concluding that all three of the plaintiff schools had violated PHL § 2164 and recommending that the charges be sustained, but further recommending that no penalties be imposed due to a lack of adequate notice. (*Id*. at ¶ 47, Ex. D).

NYSDOH issued exceptions to the ALJ's report and recommendation on June 21, 2022. (*Id*. at ¶ 49, Ex. E). Specifically, NYSDOH objected to the ALJ's recommendation that no penalties be assessed, contending that in light of "Respondents' admission that they violated the statute and their promise to continue violating the law of man, the failure to impose a penalty would amount to administrative nullification of a duly enacted law, in violation of the separation of powers doctrine inherent in the State Constitution." (*Id*. at ¶ 50 (internal citation and quotations omitted)). NYSDOH further contended that

"Respondents testified that they were aware of the requirements placed on them and made it clear that the matter could not be resolved with the Department because they have no intention of complying with the requirements," and that failing to impose a penalty would accordingly "send a clear message to the Respondents and every school in the State that violations of this type will not result in Department sanctions." (*Id*. at ¶ 51 (internal quotations omitted)).

In an order dated December 15, 2022, NYSDOH adopted the ALJ's recommendation that the charges be sustained, but rejected her recommendation that no penalties be imposed. (*Id*. at ¶ 54). The order explained that "Respondents testified that they were aware of the legal requirements but intend not to comply because of an irreconcilable conflict between their religious beliefs and PHL §2164" and that while there was no dispute about the genuineness of the religious objections, "the Legislature amended PHL § 2164 to remove the religious exemption, leaving medical exemptions as the only exception to the school immunization requirements in the statute." (*Id*. at ¶ 55 (citations omitted)). The order imposed a $52,000 penalty against Dygert Road School, a $46,000 penalty against Twin Mountains School, and a $20,000 penalty against Shady Lane School. (*Id*. at ¶ 56).

## II.    **Procedural Background**

Plaintiffs filed the instant action on June 2, 2023. (Dkt. 1). Shortly after commencing this litigation, Plaintiffs filed their motion for a preliminary injunction. (Dkt. 9). The parties thereafter entered into a stipulation providing that Defendants would not "seek, collect upon, or enforce" the December 15, 2022 order, or "issue any additional

violations concerning, or otherwise enforce, Public Health Law 2164 against Plaintiffs and any of the schools they represent" pending this Court's resolution of the preliminary injunction motion. (*See* Dkt. 19).

Defendants then filed their opposition to the preliminary injunction motion, as well as their competing motion to dismiss. (Dkt. 25). After Defendants filed their dismissal motion, but while briefing in this matter was still ongoing, the Second Circuit issued its decision in *We the Patriots*, which the parties addressed in their responses and replies. (*See* Dkt. 28; Dkt. 29). The Court heard oral argument on October 27, 2023, and reserved decision. (Dkt. 32).

## DISCUSSION

### I.   Defendants' Motion to Dismiss

The Court must resolve Defendants' pending motion to dismiss before turning to Plaintiffs' motion seeking to preliminarily enjoin enforcement of PHL § 2164. In other words, if Plaintiffs' lawsuit does not survive Defendants' motion to dismiss, then they are not entitled to any relief—injunctive or otherwise.

Defendants have moved for dismissal of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6), arguing that: (1) Plaintiffs lack standing to bring claims against Dr. Rosa; (2) Plaintiffs' claims against Dr. Rosa are barred by sovereign immunity; and (3) Plaintiffs' First Amendment claim is foreclosed by binding Supreme Court and Second Circuit precedent. (*See* Dkt. 25-1). For the reasons discussed below, the Court agrees that Plaintiffs lack standing to assert their claims against Dr. Rosa. The Court

further finds that Plaintiffs' claims against Dr. McDonald fail as a matter of law, and that dismissal of the complaint is accordingly required.

### A.      Legal Standard—Subject Matter Jurisdiction

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms, S.á.r.l*, 790 F.3d 411, 416-17 (2d Cir. 2015) (quotation and citation omitted).   "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).   "When considering a motion to dismiss for lack of subject matter jurisdiction . . ., a court must accept as true all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).   In addition, a court is not limited to the allegations in the complaint and can "refer to evidence outside the pleadings," *Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002), but it "may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. v. Attica Central Schools*, 386 F.3d 107, 110 (2d Cir. 2004).   "Indeed, a challenge to the jurisdictional elements of a plaintiff's claim allows the Court to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 289 F. Supp. 2d 392, 399 (S.D.N.Y. 2003) (quotation omitted), *aff'd*, 403 F.3d 76 (2d Cir. 2005).   "Where, as here, the defendant moves for dismissal under Rule 12(b)(1), Fed. R. Civ. P., as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the

- 11 -

complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (quotation omitted).

### B.    Plaintiffs Lack Standing as to the Claims Against Dr. Rosa.

Defendants argue that the Court lacks subject matter jurisdiction over Plaintiffs' claims against Dr. Rosa, in her official capacity as Commissioner of Education of the State of New York, because "Plaintiffs do not allege any facts to show that the [New York State Department of Education ("NYSDOE")] had any part in auditing, notifying, conducting the hearing, or assessing charges." (Dkt. 25-1 at 20).  According to Defendants, Dr. Rosa is therefore an inappropriate defendant, because: (1) Plaintiffs have not alleged harm traceable to NYSDOE; and (2) "Plaintiffs do not, nor can they, allege that Commissioner Rosa had some connection with enforcing PHL § 2614 against them, much less demonstrated a willingness to exercise that duty here." (*Id*. at 22-24).  For the reasons discussed below, the Court agrees that Plaintiffs lack standing with respect to their claims against Dr. Rosa.  Accordingly, the Court need not and does not reach Defendants' sovereign immunity argument.

"[T]he doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).  The Second Circuit has explained:

> To satisfy the requirements of Article III standing, plaintiffs must demonstrate "(1) [an] injury-in-fact, which is a concrete and particularized harm to a legally protected interest; (2) causation in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged

actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief."

*Hu v. City of New York*, 927 F.3d 81, 89 (2d Cir. 2019) (quoting *Selevan v. New York Thruway Auth.*, 711 F.3d 253, 257 (2d Cir. 2013)).  "These elements are not mere pleading requirements but rather an indispensable part of the plaintiff's case."  *Id.* (quotation and alteration omitted).

At the pleading stage, to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) based on lack of standing, a plaintiff must "allege facts that affirmatively and plausibly suggest that it has standing to sue."  *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).  "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements."  *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (quotation omitted).

Here, Plaintiffs' sole factual allegation about Dr. Rosa is that she "is empowered to adjudicate parental requests or appeals following exclusion from schools under N.Y. Educ. Law § 310, and is tasked with implementing and enforcing, and does implement and enforce, the mandatory educational instruction and supervision of school requirements pursuant to the authority granted to her in N.Y. Educational Law § 305(1) and (2)."  (Dkt. 1 at ¶ 11).  The Court agrees with Defendants that this vague allegation is insufficient to plausibly suggest standing.   In particular, Plaintiffs have not alleged Dr. Rosa, or NYSDOE, took or threatened to take any action against them with respect to PHL § 2164.  "Nor are there allegations that [Dr. Rosa or the NYSDOE] forbade any of the Amish

students from pursuing an education because he/she/they were not vaccinated or that she threatened or will threaten to shut down the schools." (Dkt. 25-1 at 23).

Plaintiffs argue in opposition that "if Plaintiffs' children are denied the ability to attend their own Amish schools, because administrators are fearful of further fines, the appeal of such denials may need to run to Dr. Rosa." (Dkt. 28 at 23-24). This speculative contention is insufficient to establish standing. *See, e.g., Butler v. Obama*, 814 F. Supp. 2d 230, 240 (E.D.N.Y. 2011) ("As the jurisprudence of the Supreme Court and Second Circuit has clearly articulated, . . . speculation is insufficient to confer Article III standing."). Only two of the plaintiffs are even alleged to have children attending Amish schools, and it is not alleged that those schools (which are not identified in the complaint with any specificity and of which Smucker and Miller are board members) have any intention of denying Smucker's or Miller's children the ability to attend school based on PHL § 2164. To the contrary, and as discussed below, Plaintiffs affirmatively allege that the Amish community will never comply with PHL § 2164. As such, while PHL § 2164(7)(b) provides that "[a] parent, a guardian or any other person in parental relationship to a child denied school entrance or attendance may appeal by petition to the commissioner of education in accordance with the provisions of section three hundred ten of the education law," Plaintiffs have not alleged a non-speculative scenario where such an appeal would occur.

Because Plaintiffs have not plausibly alleged that Dr. Rosa has played or will play in the future any role in the actions of which they complain—namely, the enforcement of PHL § 2164 against them via the imposition of fines—injunctive relief against Dr. Rosa

would not redress their alleged injury.  Accordingly, they lack standing to pursue their claims against her.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek.").  The Court dismisses those claims without prejudice for lack of subject matter jurisdiction.

### C.    Legal Standard—Failure to State a Claim

Defendants do not dispute that the Court has subject matter jurisdiction over Plaintiffs' claims against Dr. McDonald.  Accordingly, the Court turns to their merits-based arguments, made under Rule 12(b)(6).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).  "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

In considering a motion to dismiss, "as a fundamental matter, courts may take judicial notice of legislative history."  *Goe*, 43 F.4th at 29.  "The same is true for administrative record filings[.]"  *Id*.

### D.      Plaintiffs' Claims Against Dr. McDonald Fail as a Matter of Law

### 1.      PHL § 2164 is Subject to Rational Basis Review

Plaintiffs' claim in this action is that PHL § 2164, as applied to them, violates their First Amendment rights.  (*See* Dkt. 1 at 37 (asking the Court to "[d]eclare that N.Y. Public Health Law § 2164 is unconstitutional as applied to Plaintiffs and their schools, including against any principal, teacher or person in charge, for the students they enroll whose parents have a sincerely held religious belief against administering one or more vaccines required by N.Y. Public Health Law § 2164" and to enjoin enforcement of the law against Plaintiffs); Dkt. 28 at 34 ("[T]he complaint in this action *only* sought relief against [PHL § 2164] specifically 'as applied' to Plaintiffs and hence relief is limited thereby." (emphasis in original))).

- 16 -

The primary constitutional right that Plaintiffs claim has been violated by PHL § 2164 is the right to freely exercise one's religion.  "A law that incidentally burdens religious exercise is constitutional when it (1) is neutral and generally applicable and (2) satisfies rational basis review."  *We the Patriots*, 76 F.4th at 144 (citing *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990)).  If the law at issue "is not neutral or not generally applicable, it is subject to strict scrutiny, and the burden shifts to the government to establish that the law is narrowly tailored to advance a compelling government interest."  *Id*.

Initially, the Court notes that the Second Circuit held in *Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015), that "mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause" and that New York had—at that point in time—"go[ne] beyond what the Constitution requires by allowing an exemption for parents with genuine and sincere religious beliefs."  *Id*. at 543; *see also We the Patriots,* 76 F.4th at 150 ("[T]he government may constitutionally elect to accommodate religious believers but is not constitutionally *required* to do so." (emphasis in original)).  *Phillips*, like all Second Circuit precedent, is binding on this Court.  Accordingly, the crux of the matter before the Court is whether the *repeal* of the religious exemption, while leaving in place the medical exemption, violated the Free Exercise Clause.  The Court's analysis of that question is dictated by the decision in *We the Patriots*, wherein the Second Circuit was called upon to determine whether Connecticut's mandatory vaccination statute—which, like PHL § 2164, had been recently amended to repeal an exemption based on religious

objections, but continued to allow for medical exemptions—violated the First Amendment's Free Exercise Clause. *See* 76 F.4th at 144-57.[3]

### a.  Neutrality

In *We the Patriots*, the Second Circuit first considered whether the Connecticut statute was neutral. *Id.* at 148. The *We the Patriots* court explained that a law is not neutral if the enacting authority "proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.* at 145 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). In order to be found non-neutral, "it is not enough for a law to simply *affect* religious practice; the law or the process of its enactment must demonstrate 'hostility' to religion." *Id.* The Connecticut statute was determined to be neutral because its legislative history was devoid of any "evidence of hostility to religious believers, even when read with an eye toward 'subtle departures from neutrality' or 'slight suspicion of religion or distrust of its practices.'" *Id.* at 148 (quoting *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018)). The Second Circuit

---

[3]    Plaintiffs suggest that the as-applied nature of their claim "materially distinguishes this case from *We the Patriots*." (Dkt. 28 at 34). However, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (emphasis added). Accordingly, and contrary to Plaintiffs' argument, *We the Patriots* provides the appropriate framework for the Court's analysis.

Plaintiffs also contended at oral argument that *We the Patriots* is inconsistent with the Supreme Court's decision in *Fulton*. However, this Court is not free to disregard binding Second Circuit precedent based on a competing interpretation of the relevant legal standard.

affirmatively rejected the argument that "repealing any existing religious exemption is hostile to religion per se." *Id*. at 149.

In the complaint, Plaintiffs allege that PHL § 2164 is not neutral because "the State targeted religious adherents by eliminating [the] long-standing religious exemption while leaving the medical exemption process in place." (Dkt. 1 at ¶ 70). This allegation fails to establish non-neutrality. Nothing in the text of PHL § 2164 as amended demonstrates any hostility to religion. To the contrary, PHL § 2164 is neutral on its face, neither targeting religious belief nor singling it out for particularly harsh treatment. And, as previously noted, *We the Patriots* affirmatively held that the repeal of a previously existing religious exemption is not, of itself, hostile to religion. *See* 76 F.4th at 149; *cf. Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th Cir. 2014) ("Surely the granting of a religious accommodation to some in the past doesn't bind the government to provide that accommodation to all in the future, especially if experience teaches the accommodation brings with it genuine safety problems that can't be addressed at a reasonable price. If the rule were otherwise, it would only invite the unwelcome side effect of discouraging . . . officials from granting the accommodation in the first place[.]").

Moreover, the legislative history related to the repeal of the non-medical exemption contains no evidence of hostility towards religious belief. Those sponsoring the relevant legislation in both the New York State Senate and the New York State Assembly made clear that their concern was public health. *See, e.g.,* Sponsor Memo, 2019 N.Y. Senate Bill S2994A; Memorandum in Support of Legislation, 2019 N.Y. Assembly Bill A2371. In addition, rather than evidencing hostility to religious belief, the state legislature was

concerned about individuals who were claiming a nonmedical exemption despite not having a religious belief regarding vaccination.  N.Y. Senate, Tr. of Floor Proceedings, 242d Sess., at 5400-01 (June 13, 2019).

The state legislature considered the available scientific data, which showed that in the areas of the state most impacted by the measles outbreak, infections were primarily in unvaccinated children.  *See* N.Y. Assembly, Tr. of Floor Proceedings, 242d Sess., at 58-59 (June 13, 2019).  It noted that the New York City Department of Health had reported a case in which one infected child with a religious exemption resulted in 44 additional cases of measles, 26 of which were also in fellow students with religious exemptions.  *See* N.Y. Senate, Tr. of Floor Proceedings, 242d Sess., at 5385 (June 13, 2019).  The state legislature also  considered data showing the number and percentage of religious exemptions in nonpublic schools had tripled or quadrupled in certain geographic areas in recent years, potentially causing the loss of herd immunity in those communities.  *Id*. at 5388-89.

The state legislature considered alternatives, such as eliminating the religious exemption only with respect to the measles vaccine or otherwise narrowing the religious exemption, but ultimately determined such alternatives would not be effective in protecting New York's schoolchildren from all vaccine-preventable illnesses.  *Id*. at 5402, 5408.  The state legislature also "acknowledged the impact [repealing the nonmedical exemption] would have on children and families who hold religious objections to vaccination but balanced that impact against the risks to public health."  *We the Patriots*, 76 F.4th at 148; *see also F.F. v. State*, 194 A.D.3d 80, 85-87 (3d Dep't 2021) (discussing the legislative history of the repeal of the religious exemption and concluding that it was neutral).

Plaintiffs further allege that the enforcement of PHL § 2164 is not neutral, because of statements made and actions taken by NYSDOH during the administrative proceedings against the plaintiff schools. (Dkt. 1 at ¶ 71). In particular, Plaintiffs take issue with NYSDOH's characterization of their actions as "willful non-compliance" with PHL § 2164. (Dkt. 10 at 21 ("The DOH was clear about its animus towards Plaintiffs and their religious beliefs, characterizing such beliefs as willful non-compliance. It also pushed for a significant penalty because, 'Respondents' admission that they violated the statute and their promise to continue violating the law of "man" is in essence a recommendation for administrative nullification of a duly enacted law.' And DOH's final order reflected this animus in assessing ruinous fines[.]" (internal citations omitted)).

The statements pointed to by Plaintiffs are not indicative of religious animus by NYSDOH. Indeed, Plaintiffs have failed to explain precisely what it is they object to in the identified statements, which are fully consistent with the positions they took before the ALJ and the positions they have taken in this Court. The statement that Wengerd read at the hearing stated: "It is our utmost desire to live a quiet peaceful undesturbed [sic] life and obey those in authority over us. But once those laws are in conflict with what the bible teaches then we are commanded to obey God rather than man." (Dkt. 1 at ¶ 39). The statement also asked the ALJ to grant the plaintiff schools "an exemption of immunization for our children on religious and ethical grounds," (*id.*), despite the fact the PHL § 2164 does not allow for any such exemption. In the instant action, Plaintiffs have asserted that they will "choose prison time or a martyr's death before going against their convictions." (Dkt. 1 at ¶ 41). They have alleged: "For the avoidance of all doubt, Plaintiffs do not, will

not, and cannot comply with" PHL § 2164.  (*Id.* at ¶ 58).  In other words, Plaintiffs' own complaint confirms that their noncompliance with PHL § 2164 is willful, and not the result of inadvertence or misunderstanding of what the law requires.  *See Merriam-Webster Dictionary*,  Willful,  https://www.merriam-webster.com/dictionary/willful  ("done deliberately **:** intentional | *willful* disobedience") (last accessed Mar. 10, 2024).  This distinction was plainly relevant in the context in which it was raised, which was whether NYSDOH should adopt the ALJ's recommendation that no penalty be assessed due to a lack of notice.  NYSDOH's characterization of Plaintiff's position towards PHL § 2164, which is grounded in fact, cannot plausibly be interpreted as demonstrating animus.

Nor does the imposition of substantial penalties reflect hostility to religion.  "Apart from the text, the effect of a law in its real operation is strong evidence of its object." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993).  However, "adverse impact will not always lead to a finding of impermissible targeting."  *Id*. NYSDOH explained in its order that imposition of no penalty despite plaintiff schools' undenied violation of PHL § 2164 "would be contrary to public policy, [NYSDOH's] mission, and the clear intent of the state legislature[.]"  (Dkt. 1-6 at 5).  Further, NYSDOH concluded that allowing the plaintiff schools to deliberately violate PHL § 2164 without consequence would "encourage other schools to ignore the law's requirements and assert a religious exemption," thereby putting NYSDOH "in the position of nullifying a duly enacted statute, . . . and failing to carry out its vital purpose of protecting the health of all New Yorkers."  (*Id.* at 5-6).  NYSDOH's refusal to functionally recognize a religious exemption that is statutorily unavailable does not constitute hostility to religion.

Moreover, while Plaintiffs allege before this Court that "[b]ecause the schools are not publicly funded and have no reserve cash, they are unable to pay the penalties" (Dkt. 1 at ¶ 58), they do not allege that they ever made this argument to NYSDOH. To the contrary, NYSDOH's order states that "Respondents have not argued that they cannot afford" the penalties sought. (Dkt. 1-6 at 6).[4] The allegedly financial ruinous nature of the imposed penalties cannot plausibly demonstrate religious animus where NYSDOH was not on notice thereof.

Plaintiffs' complaint further alleges that "there are comparable secular activities (from a risk perspective) that are permitted, while religious exemptions are forbidden, which also undermines neutrality." (Dkt. 1 at ¶ 71; *see also* Dkt. 10 at 23 ("New York's purported concern for public safety is only urgent when it seeks to eradicate religious observance related to mandatory vaccination for school. In contrast, in all other contexts, the State is disinterested in the purported threats posed by those unvaccinated in virtually every other area of life, including the over 66,000 children enrolled in school without required vaccination and without a medical exemption.")). The alleged underinclusivity of PHL § 2164 is properly assessed under the general applicability analysis. *See Fulton*, 593 U.S. at 534 ("A law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."). The Court performs that analysis below and concludes that PHL § 2164

---

[4]     To be clear, the Court is making no determination about the financial impact of the penalties imposed on the plaintiff schools. Instead, the Court has cited NYSDOH's order "to explain the decision-making of state authorities." *Goe*, 43 F.4th at 29.

does not permit comparable secular activities.  Accordingly, this argument also necessarily fails with respect to neutrality.

For these reasons, the Court finds as a matter of law that PHL § 2164, as amended in 2019, is neutral.  Strict scrutiny does not apply on this basis.

### b.   **General Applicability**

The Court also finds that PHL is generally applicable.  A law is not generally applicable if it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (alteration and quotations omitted).  "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*. at 534.  Plaintiffs allege that both of these conditions are satisfied here.[5]

With respect to the matter of individualized exemptions, Plaintiffs allege that PHL § 2164 "fails the general applicability test because it allows discretionary medical exemptions, but prohibits a similar exemption process for those who, like Plaintiffs, possess sincerely held religious reasons for declining compulsory vaccination." (Dkt. 1 at ¶ 62).  The Court disagrees.  The Connecticut statute at issue in *We the Patriots*, like

---

[5]     Plaintiffs also argue that "[i]n repealing its religious exemption but leaving the medical exemption intact, the state made a conscious choice that non-vaccination for secular reasons was 'worthy of solicitude,' but that non-vaccination for religious reasons must be eliminated.  Thus, the statute fails the general applicability test from the outset." (Dkt. 28 at 26 (citations omitted)). This argument must fail in light of *We the Patriots*, where Connecticut had also repealed its religious exemption but left a medical exemption in place.

PHL § 2164, contains a medical exemption.  Specifically, it provides that a student  "shall be exempt" from the mandatory vaccination requirement "if, for instance, the student 'presents a certificate . . . from a physician, physician assistant or advanced practice registered nurse stating that in the opinion of such physician, physician assistant or advanced practice registered nurse such immunization is medically contraindicated because of the physical condition of such child.'"  76 F.4th at 150 (quoting Conn. Public Act 21-6 § 1(a)(2)).  The *We the Patriots* court explained that "where a law provides for an objectively defined category of people to whom the vaccination requirement does not apply, including a category defined by medical providers' use of their professional judgment, such an exemption affords no meaningful discretion to the State" and thus does not render the law not generally applicable.  *Id*. at 151 (quotation omitted).

PHL § 2164(8) provides: "If any physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health, the requirements of this section <u>shall be</u> inapplicable until such immunization is found no longer to be detrimental to the child's health."  (emphasis added).  This exemption, like the exemption at issue in *We the Patriots*, is phrased in mandatory terms and applies to an objectively defined group of people.[6]  Accordingly, it is not—under binding Second Circuit case law— an individualized exemption triggering strict scrutiny.

---

[6]      As previously explained, New York regulations define "may be detrimental to the child's health" in objective terms as meaning that "a physician has determined that a child has a medically contraindication or precaution to a specific immunization consistent with ACIP guidance or other nationally recognized evidence-based standard of care."  10 NYCRR § 66-1.1(m).

Plaintiffs attempt to distinguish PHL § 2164 from the Connecticut statute at issue in *We the Patriots* by pointing to the last sentence of 10 NYCRR § 66-1.3, which allows the principal or person in charge of a school to "require additional information supporting the exemption." (*See* Dkt. 28 at 28-29). According to Plaintiffs, under this regulation, "school officials are delegated enormous independent and personalized discretion to override a physician's medical recommendation, including the ability to require additional information and ultimately make the final discretionary decision to grant or deny a medical exemption." (*Id*. at 28). This argument lacks merit. Nothing in the language of 10 NYCRR § 66-1.3 suggests that school officials may request information other than that necessary to confirm that the requirements of PHL § 2164(8) have been satisfied, or that a school official has any discretion to deny an exemption that complies with the statutory requirements. And, even were there some ambiguity in 10 NYCRRR § 66-1.3, under New York law, "in the event of a conflict between a statute and a regulation, the statute controls." *Sciara v. Surgical Assocs. of W. New York, P.C.*, 104 A.D.3d 1256, 1257 (4th Dep't 2013). Here, the statute is clear and mandatory.

Plaintiffs make much of the Second Circuit's statement in *Goe* that "New York State law . . . delegates to school officials the authority to grant a medical exemption from the State's school immunization requirements." 43 F.4th 19. But non-discretionary duties and discretionary duties are both capable of delegation. That school officials are the state employees ultimately charged with determining whether PHL § 2164(8) has been satisfied does not mean that they are free to "decide which reasons for not complying with the policy are worthy of solicitude." *We the Patriots*, 76 F.4th at 151 (quotation omitted and

concluding that the Connecticut statute's "requirement that specified documents supporting requests for medical exemptions be acknowledged by, *inter alia*, state and local officials" did not "afford[] such officials the discretion to approve or deny exemptions on a case-by-case basis.").[7]

Plaintiffs argue that "New York has administratively granted over 97,900 non-medical exceptions by not enforcing [PHL § 2164] for students not vaccinated for secular reasons." (Dkt. 28 at 29). This argument lacks merit for multiple reasons. Plaintiffs base this claim on a statement by Dr. Debra Blog, the medical director of NYSDOH's Bureau of Immunization, that "[a]fter the religious exemption was repealed in New York, the average percentage of school-aged children completely immunized in the State steadily grew, from 93% of children in the 2017-2018 school year (pre-repeal) to 96% in the 2021-2022 school year." (Dkt. 25-3 at ¶ 19; *see* Dkt. 28 at 14)[8]. Plaintiffs have taken the 96% number provided by Dr. Blog and extrapolated therefrom that "[t]he [remaining] 4%

---

[7]    Plaintiffs have also argued that variances in medical exemption rates between schools are evidence of discretionary action by school officials. (*See* Dkt. 1 at ¶ 65). This is pure speculation. There are any number of reasons why one school would have more requests for medical exemptions than another. Moreover, even if some school officials in New York are not complying with their duties under PHL § 2164(8), that does not mean the statute is not mandatory—it means those school officials are not performing their statutory duties. New York law provides mechanisms to address any such issues.

[8]    The Court notes that this increase brought the number above the 95% recognized as necessary for herd immunity, as was the state legislature's stated goal.

amounts to over 97,900 students who are permitted to attend school in New York without mandated school vaccines." (Dkt. 28 at 14).[9]

The flaws in Plaintiffs' logic are apparent. First, there is nothing in Dr. Blog's statement to suggest that the 4% of school-aged children who are not completely immunized are attending schools, as opposed to being homeschooled. Second, there is nothing in Dr. Blog's statement to support Plaintiffs' conclusion that these students are unvaccinated for secular as opposed to religious reasons. Third, 10 NYCRR §§ 66-1.1(j) and 66-1.3(b) permit schools to admit children who are in the process of receiving the immunizations required by PHL § 2164. In other words, a child could be in the process of obtaining his or her immunizations, and thus lawfully permitted to attend school in New York, but not yet completely immunized.

Fourth, and perhaps most importantly, the fact that NYSDOH has not achieved perfect compliance with PHL § 2164 does not mean that it is not generally applicable. That is a standard that virtually no law could meet. Plaintiffs have not alleged that NYSDOH has declined to take steps to enforce PHL in any similarly situated secular school, and the Court finds their assertion that New York has granted "functional exemptions" to 97,000 school-age children unsupported by factual allegations. *See First Nationwide Bank v. Gelt*

---

[9]     In their complaint, Plaintiffs estimated the number of "unvaccinated children that attend schools in New York without a medical exemption" as "approximately 66,000." (Dkt. 1 at ¶ 67). They revised this number upward in their subsequent briefing based on Dr. Blog's statement. (*See* Dkt. 28 at 14 (concluding based on Dr. Blog's statement that "the 66,000-student estimate was well *below* the actual number" (emphasis in original))). The 66,000 estimate was also based on guesswork. (*See* Dkt. 1 at ¶ 67 n.4).

*Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) ("Under Rule 12(b)(6), the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted." (quotation omitted)).

For the reasons set forth above, the Court rejects Plaintiffs' contention that PHL § 2164 allows for individualized exemptions and is therefore subject to strict scrutiny.   The Court accordingly turns to Plaintiffs' argument that PHL § 2164 treats comparable secular activity more favorably than religious exercise.  As an initial matter, the Court notes that Plaintiffs rely heavily on the fact that they are making an as-applied challenge, contending that the general applicability inquiry should thus focus on the extent to which granting "an Amish-specific religious exemption" would undermine New York's interests.  (Dkt. 28 at 34).  Plaintiffs are incorrect.  They cite *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), but *Gonzales* involved application of the "strict scrutiny test" required by the Religious Freedom Restoration Act.  *Id.* at 430-31.  It says nothing about determining whether a law is generally applicable under the governing legal framework.

Similarly, the portion of *Fulton* cited by Plaintiffs involved the application of strict scrutiny *after* the Court had already determined that the ordinance at issue was not generally applicable.  *See* 593 U.S. at 541.  At that stage of the inquiry, the focus is indeed on whether the state has "an interest in denying an exception to" the particular claimant. *Id*.  However, in determining in the first instance whether a statute is generally applicable, the focus is not so narrow.  The general applicability standard looks, as the Supreme Court has stated, at whether the government has "in a selective manner impose[d] burdens only

on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543.  Accordingly, the general applicability analysis does not turn on whether the secular activity identified by Plaintiffs is comparable in terms of risk to allowing only them to be exempt from PHL § 2164 for religious reasons.  It turns on whether it is comparable in terms of risk to allowing a religious exemption for all who would potentially claim it.[10]

"[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).  "Therefore, [the Court] must first determine what interest [New York] has asserted justifies [PHL § 2164], then decide whether permitting medical exemptions and repealing religious exemptions promote the State's interest." *We the Patriots*, 76 F.4th at 151.

New York's asserted interest in PHL § 2164 is twofold.  "First, it aims to protect the health of children while they are physically present in the school environment.  Second, it aims to protect the health of the public in general against disease outbreaks both in and outside of school; it does this by serving as the apparatus that ensures that, the vast majority of children—who will quickly grow into the vast majority of adults—are vaccinated."

---

[10]    Plaintiffs also cite *Central Rabbinical Cong. of the U.S. v. N.Y.C. Dep't of Hlth. & Mental Hygiene*, 763 F.3d 183 (2d Cir. 2014) and assert that it held that a "law intended to counteract infectious disease failed general applicability test on under-inclusivity grounds as it pertained to the Orthodox Jewish community."  (Dkt. 33 at 42-43).  This is an inaccurate statement of the holding in *Central Rabbinical*.  The Second Circuit in that case was "unable to conclude" that the law at issue was generally applicable because it "applie[d] exclusively to religious conduct implicating fewer than 10% of the cases of neonatal HSV infection," while failing to regulate at all the non-religious conduct "accounting for all other cases."  *Id.* at 196-97.

(Dkt. 25-1 at 40-41).  Plaintiffs contend that these interests are "*post-hoc* asserted interests" that are "at war with each other."  (Dkt. 28 at 32-33).  The Court disagrees.  The interests asserted by Defendants in this litigation are the same as those asserted by the state legislature at the time the religious exemption was repealed.  In the record before it, the Court does not "find any sign that the State has offered for litigation purposes a *post hoc* rationalization of a decision originally made for different reasons."  *We the Patriots*, 76 F.4th at 152.

As to whether these interests are served by repealing the religious exemption while keeping the medical exemption in place, *We the Patriots* is on point.  There, Connecticut asserted that its interest was to protect the health and safety of its schoolchildren.  *Id*.  The Second Circuit determined that maintaining the medical exemption served this interest, while "maintaining the repealed religious exemption would not."  *Id*.  The Second Circuit rejected the plaintiffs' argument that it "should cabin [its] analysis to the risk an individual child who is unvaccinated—whether for medical or religious reasons—might pose to the health and safety of Connecticut students."  *Id*. at 153.  The Second Circuit explained that "exempting a student from the vaccination requirement because of a medical condition and exempting a student who declines to be vaccinated for religious reasons are not comparable in relation to the State's interest," because the Connecticut statute seeks to "promote[] the health and safety of *vaccinated* students by decreasing, to the greatest extent medically possible, the number of unvaccinated students (and, thus, the risk of acquiring vaccine-preventable diseases) in school."  *Id*. (emphasis in original).  The Connecticut statute "also promotes the health and safety of *unvaccinated* students.  Not only does the absence of a

religious exemption decrease the risk that unvaccinated students will acquire a vaccine-preventable disease by lowering the number of unvaccinated peers they will encounter at school, but the medical exemption also allows the small proportion of students who cannot be vaccinated for medical reasons to avoid the harms that taking a particular vaccine would inflict on them." *Id*. (emphasis in original).  This analysis applies with full force to PHL § 2164, and forecloses the argument that the medical exemption and the repealed religious exemption are comparable for free exercise purposes.

Plaintiffs have identified additional alleged "comparable secular activities" allowed by New York: " 1) granting functional exemptions, due to lax enforcement, to an estimated 97,900 [PHL § 2164] non-compliant schoolchildren who have not claimed any exemption; (2) allowing unvaccinated adults to work in the school system; (3) permitting homeschooled children to congregate in unlimited numbers in educational settings without vaccination requirements; (4) permitting children who have not been vaccinated against Covid, flu, and numerous other diseases for which vaccines exist, or the around 1,400 pathogens for which no vaccine exists, to attend school; [and] (5) allowing citizens to congregate *en masse* for every activity imaginable without any vaccine mandate[.]"  (Dkt. 28 at 35-36).  The Court has already discussed at length why Plaintiffs' argument regarding so called "functional exemptions" lacks merit.  The remaining alleged "comparable secular activities" were equally present in *We the Patriots*,[11] yet did not cause the Second Circuit

---

[11]    Connecticut, like New York, requires vaccinations for measles, rubella, poliomyelitis, mumps, diphtheria, tetanus, pertussis, hepatitis B, Hib, varicella, pneumococcal disease, and meningococcal disease, and additionally requires vaccination for hepatitis A and influenza.  *Compare* PHL § 2164(a)(2) *with* CT ADC § 10-204a-2a.

to conclude that the Connecticut statute was not generally applicable.  The Court finds no basis in the record before it to reach a different conclusion here.

PHL § 2164, like the Connecticut statute at issue in *We the Patriots*, is generally applicable for free exercise purposes.  Strict scrutiny does not apply on this basis.

### c.    <u>Implication of Other Constitutional Rights</u>

Finally, Plaintiffs argue that strict scrutiny applies because this case involves "hybrid rights"—that is, in addition to their free exercise rights, they allege that PHL § 2164 impacts their rights to freedom of speech, to freedom of association, and to regulate the upbringing and education of their children.  (Dkt. 28 at 43-44; *see* Dkt. 1 at ¶ 74). However, courts in the Second Circuit "do not apply heightened scrutiny to 'hybrid rights' claims." *We the Patriots*, 76 F.4th at 159.  In particular, the fact that Plaintiff's free exercise claim is "connected with a communicative activity or parental right" does not trigger heightened scrutiny under Second Circuit precedent.  *Id*. (quotation omitted and finding that the district court "correctly held that plaintiffs' claim that the Act violates their liberty interest in childrearing was coextensive with their Free Exercise Clause claim").  While the Court understands that Plaintiffs disagree with that holding (*see* Dkt. 28 at 44 ("Plaintiffs maintain *Smith*'s hybrid rights analysis stands as settled law, and that the hybrid rights presented here are subject to strict scrutiny.")), this Court is not free to disregard Second Circuit precedent.  The Court will not apply strict scrutiny on this basis.

---

The Connecticut statute at issue in *We the Patriots* also does not regulate unvaccinated adults working in schools, unvaccinated homeschooled children, or unvaccinated children and adults in non-school settings.

The Court also does not view the complaint as asserting freestanding claims for violation of the rights to freedom of speech, assembly, or to regulate the upbringing of one's children, distinct from the free exercise claim.  The complaint contains a single count, which is denominated "VIOLATION OF PLAINTIFFS' FIRST AMENDMENT FREE EXERCISE RIGHTS."  (Dkt. 1 at 20).  The Court concludes that Plaintiffs' claims for infringement of their other constitutional rights are coextensive with their free exercise claim and rise or fall therewith.

### 2.    PHL § 2164 Satisfies Rational Basis Review

For all the reasons set forth above, the Court concludes that PHL § 2164 is subject to rational basis review.  To survive such review, it is necessary only that the challenged law be "reasonably related to a legitimate state objective."  *Goe*, 43 F.4th at 32.

Plaintiffs have not argued that PHL § 2164 cannot satisfy rational basis review—to the contrary, Plaintiffs' counsel conceded at oral argument that it could.  This is plainly correct.  As the Second Circuit held in *We the Patriots*, "protecting public health is a compelling government interest."  76 F.4th at 156.  Further, repealing the religious exemption was "rationally related to that interest because it seeks to maximize the number of students . . . who are vaccinated against vaccine-preventable diseases." *Id*.  Further, the requirement that children be vaccinated to attend school, as opposed to participate in other types of social gatherings, "is rational because only at school is attendance mandated by law[.]"  *Id*.  Accordingly, Plaintiffs have not plausibly alleged that PHL § 2164 violates the Free Exercise Clause, and their claims against Dr. McDonald must be dismissed.

## II.      **Plaintiffs' Motion for a Preliminary Injunction**

Plaintiffs have asked the Court for a preliminary injunction.  (Dkt. 9).  The Court's determination that Plaintiffs' claims must be dismissed eliminates any possibility that the Court could grant their request for preliminary injunctive relief.  Accordingly, Plaintiffs' motion for a preliminary injunction is denied as moot.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss (Dkt. 25) and denies Plaintiff's motion for a preliminary injunction (Dkt. 9) as moot.  More particularly, Plaintiffs' claims against Dr. Rosa are dismissed without prejudice for lack of subject matter jurisdiction, while Plaintiffs' claims against Dr. McDonald are dismissed with prejudice for failure to state a claim.  The Clerk of Court is instructed to enter judgment in favor of Defendants and close the case.

SO ORDERED.



ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:  March 11, 2024
         Rochester, New York